**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

---

JUAN CARLOS OCASIO

Plaintiff

against-

Civil Action 15-1019 (TSC)

Merit System Protection Board

Defendants

______________________________/

## REQUEST FOR JUDICIAL NOTICE

PLEASE TAKE NOTICE that pursuant to Federal Rules of Evidence 201 Juan Carlos Ocasio, hereby request that the court take judicial notice of the November 2, 3 2000 MSPB HEARING TRANSCRIPT in the matter of EVANGELISTA LUGO V DEPARTMENT OF NAVY Merit Systems Protection Board Case No SF-0750-00-0499I-1

Juan Carlos Ocasio
2245 Barker Ave Apt 5D
Bronx New York 10467
646t-322-4144

John C Troung
Asst United States Attorney
555 4th Street N.W.
Washington D.C; 20530

## INDEX OF TESTIMONY EXHIBITS

All exhibit references correspond to exhibits attached hereto.


| | |
|---|---|
| Exhibit 1 | HEARING TRANSCRIPT LUGO V DEPT OF THE NAVY |
| Exhibit 2 | TESTIMONY LINDA CARRANZA |
| Exhibit 3 | TESTIMONY OF KAEWE CHARLES SHAM |
| Exhibit 4 | TESTIMONY OF GREGORY FARLEY |
| Exhibit 5 | EVAN PARASKEVOPOULOS |
| Exhibit 6 | TESTIMONY OF CHARLES SMITH |
| Exhibit 7 | TESTIMONY MARIA ELENA GRIJALVA |
| Exhibit 8 | HEARING TRANSCRIPT NOVEMBER 3, 2000 |
| Exhibit 9 | TESTIMONY RAYMOND M. LEWIS |
| Exhibit 10 | TESTIMONY EVANGELISTA LUGO |
| Exhibit 11 | EXAMINATION BY JUDGE |

# EVANGELISTA LUGO

V

# DEPARTMENT OF THE NAVY

MERIT SYSTEMS PROTECTION BOARD
SAN FRANCISCO REGIONAL OFFICE
CASE SF-0752-00-0499-I-1

# EXHIBIT

# 1

# COVER PAGE WITH INDEX

SUPERIOR REPORTING SERVICES
AND TRANSCRIPTIONS
P.O. BOX 751438
PETALUMA, CA 94975-1438

**Invoice**

| Number | IND00-020 |
|---|---|
| Date | 11/21/00 |

Bill To
EVANGELISTA LUGO
3039 35TH AVE.
OAKLAND, CA 94619

Ship To

| P.O.Number | Terms | VENDOR | Sales Territory | Code |
|---|---|---|---|---|
| | CC | | | |

| Description | Unit Price | Amount |
|---|---|---|
| CASE NAME: EVANGELISTA LUGO v. DON | | |
| CASE NO. SF-0752-00-0499-I-1 | | |
| DATE OF HEARING: 11/2/00 AND 11/3/00 | | |
| VOLUME 1 = 105 PAGES | | |
| VOLUME 2 = 271 PAGES | | |
| 376 @ $2.40 = $902.40 | 902.40 | 902.40 |
| DEPOSIT PAID [AUTH CODE 006422] | -825.00 | -825.00 |
| SHIPPING/HANDLING | 38.60 | 38.60 |
| CREDIT OF $45.00 FOR LATE DELIVERY | -45.00 | -45.00 |
| BALANCE DUE = $71.00 [AUTH CODE 006487] | | |

902.40
825
77.40

825.00
38.60
863.60
45
18

Amount Paid 71.00 **Amount Due -0.00**

**TOTAL** **$71.00**

COPY

**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**
**SAN FRANCISCO REGIONAL OFFICE**

In Matter of:

| | |
|---|---|
| EVANGELISTA LUGO,<br>Appellant,<br>v.<br>DEPARTMENT OF THE NAVY,<br>Agency. | Case No. SF-0752-00-0499-I-1 |

**VOLUME I**

ANTHONY L. ELLISON
Administrative Judge

THURSDAY, NOVEMBER 2, 2000
9:00 A.M.

Reported By: Mary Sproul
gh

Superior Reporting Services and Transcriptions
P.O. Box 751438
Petaluma, California 94975-1438
(707) 763-2456 Fax 763-2669

**APPEARANCES:**

For the Appellant:
Juan Carlos Ocasio
466 West 27th Street, Apt. 8C
New York, NY 10001

For the Agency:
Darcy Baird Brown
Department of the Navy
Human Resources Central Office
Labor & Employee Relations
Code NOOCP32
937 North Harbor Drive
Building 1, 6th Floor
San Diego, CA 92132-0058

Also Present:
John Di Filippo

Roger A. Carnagey, Esq.
Attorney at Law
One Kaiser Plaza, Suite 601
Oakland, CA 94612

# I N D E X


| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Agency: | | | | |
| Linda Carranza | 6 | 13 | 45 | |
| Keawe Charles Sham | 47 | 60 | | |
| Gregory Farley | 80 | 96 | 123<br>140 | 125 |
| Evan Paraskevopoulos | 141 | 147 | 172 | |
| Charles S. Smith | 182 | 193 | 244 | 245 |
| For the Appellant: | | | | |
| Maria Elena Grijalva | 248 | 266 | | |

| EXHIBITS | IDENTIFIED | RECEIVED |
|---|---|---|
| Appellant's Hearing Exhibits: | | |
| No. 1 Attorney General Opinion | 171 | 171 |

# EVANGELISTA LUGO

V

# DEPARTMENT OF THE NAVY

MERIT SYSTEMS PROTECTION BOARD
SAN FRANCISCO REGIONAL OFFICE
CASE SF-0752-00-0499-I-1

# EXHIBIT

# 2

TESTIMONY LINDA CARRANZA
PAGES 6 THROUGH 46

THURSDAY, NOVEMBER 2, 2000 9:00 O'CLOCK A.M.

P R O C E E D I N G S

ADMINISTRATIVE JUDGE ELLISON: Okay. We're on the record approximately 9:00 a.m., November 2nd, 2000, in San Francisco. The Western Regional Office of the MSPB has before it the appeal of Mr. Evangelista Lugo. Mr. Lugo is represented by Juan Carlos Ocasio and the Agency is represented by Ms. Darcy Brown and Mr. John DiFilippo is here as well.

My name is Anthony Ellison and I've been designated as the Administrative Judge in this case. A tape recording is being made of this hearing. This will be the only official record of what transpires here today. We don't follow the rules of evidence or procedure strictly in Board proceedings, so we'll just try to maintain reasonable bounds of materiality and relevance as we go along. I personally tend to discourage objections, unless it's -- you feel it's extremely necessary and unusually important, because it largely tends to slow down the proceedings. That doesn't mean you can't do it in an appropriate instance, but don't try to make a habit of it, especially in light of the fact that we do not apply the rules of procedure and evidence strictly.

Of course, it's the Agency's burden of proof to sustain its charge in this case. And which Agency witness do we have available first?

MS. BROWN: Linda Carranza, I believe.

ADMINISTRATIVE JUDGE ELLISON: Okay. All right.

(Off the record.)

ADMINISTRATIVE JUDGE ELLISON: All right. Could we close the door, please.

MS. BROWN: He's getting his briefcase.

ADMINISTRATIVE JUDGE ELLISON: Oh, I'm sorry. Good morning, Ms. Carranza.

THE WITNESS: Good morning.

ADMINISTRATIVE JUDGE ELLISON: Do you have any objection to taking an oath regarding your testimony?

THE WITNESS: No, I don't.

ADMINISTRATIVE JUDGE ELLISON: Could you raise your right hand, please.

Whereupon,

LINDA CARRANZA,

having been first duly sworn, was examined and testified as follows:

ADMINISTRATIVE JUDGE ELLISON: Thank you. Could you state and spell your full name for the record, please.

THE WITNESS: Linda Carranza, L-I-N-D-A, C as in Charlie, A, double R, A-N-Z-A.

ADMINISTRATIVE JUDGE ELLISON: Okay. Thank you very much. Ms. Brown?

MS. BROWN: Hi, Ms. Carranza. I'm Darcy Brown, Department of the Navy. I understand you've been ill so I want

to thank you for coming today. We appreciate it. We're here, I'm sure as you know, about Mr. Lugo's removal from the Department of the Navy as a police officer, and that removal is based on events that occurred on the 14th and 15th of March, so that's pretty much what I want to talk to you about. The first thing I want to do is see if you recognize this document. It's in Exhibit 4-E, Agency Exhibit 4-E as in echo. I'll just hand it over to you.

THE WITNESS: Yes, I do.

MS. BROWN: It'll be a typed statement toward the end, Judge.

ADMINISTRATIVE JUDGE ELLISON: Okay.

DIRECT EXAMINATION

BY MS. BROWN:

Q. And did you write that? I'm going to give you a chance to read it. Go ahead and review it.

A. Yes, I did.

Q. Great. Is that your signature at the bottom on the second page?

A. Yes, it is.

Q. Okay. Were you at the club on the 14th and 15th of March?

A. Yes, I was.

Q. And by 14th and 15th I kind of mean the late night of the 14th and the early morning on the 15th.

A. Yes.
Q. Okay. First I wanted to ask you what is your title? What is your position at the club?
A. I'm the manager.
Q. Okay. And if I wanted to go to the club tonight, how would I get in? What is the procedure?
A. Excuse me, I'm a little bit nervous.
Q. Me too. It's okay.
A. You just go into the door, you would pay your ticket, you would show proper ID, you would be either or not -- 'cause you're a girl you wouldn't be patted down, but you would be either with the metal detector or, you know, your purse would be checked.
Q. Okay. And if I were --
A. And then you would go in.
Q. If I happened to be a man, what would happen to me then?
A. You would be patted down or frisked. And, you know, pay your ticket, you follow that same procedure except with a woman, you know, you don't -- it's not as detailed or intense as a man.
Q. Okay. Do you recognize the gentleman sitting across from you?
A. Yeah, Mr. Lugo.
Q. Yeah.

A. I do.
Q. Did Mr. Lugo ever come into your club?
A. Yes, several times.
Q. Okay. Did he ever -- the procedure that you talked about just now, coming into the club, did he ever avoid that procedure?
A. Yes, he did.
Q. And what did he do?
A. He usually didn't want Security to frisk him. He showed his badge and it depended on the Security that was there at the time. That's how they, you know, treated him. But usually he always didn't want nobody to touch him. He had -- he was usually armed and showed his -- like I said, he showed his badge. And one time I tried to look at it and he got real upset.
Q. Okay. I want to talk specifically about the 14th and 15th 'cause that's pretty much what we have to focus on. So, on -- I guess he would have come in the 14th.
A. Um-hmn.
Q. It would have been late that night. That night did he show his badge --
A. Yes, he did.
Q. -- at the front door? And that night did he avoid being searched?
A. Yes, he avoid -- he avoid paying and being searched.

Q. How does he do that, I mean?
A. He showed the badge to -- there was a girl at the door. That's when she called me 'cause I'm the manager.
Q. Okay.
A. And she asked me --
Q. Who's the girl at the door?
A. Excuse me?
Q. The girl at the door, could you give me her name?
A. Yeah, Marybelle (phonetic).
Q. Marybelle?
A. Marybelle Sandoval.
Q. Marybelle and then Sandoval, is that what you said?
A. Yeah, she called me because she's -- she's responsible for writing -- no, for all the tickets.
Q. Okay.
A. And she has to tell me who paid and who didn't. So, she called me and told me, well, this person doesn't want to pay and she says he's a police officer, he doesn't want to get searched, and so on.
Q. Okay.
A. And --
Q. So, what did you do?
A. I got kind of upset and I told my husband and my husband was very busy. He said to, you know, as a courtesy of the badge to let him slide.

Q. What does your husband do there?
A. He's the head of Security.
Q. Oh, okay. So, that's why you would have talked to him.
A. Yes.
Q. Okay. So, he -- you just said that Mr. Lugo showed his badge, and then Marybelle called you, and then you let him --
A. Because she -- yeah, she was responsible for the tickets.
Q. Okay. Now, if he hadn't said he was a police officer or showed his badge, would he have had to pay the cover charge?
A. Of course.
Q. And if he hadn't said he was a police officer and showed his badge, would he have had to been searched?
A. He -- yes, everybody gets searched even. And usually the police officers that go there have the courtesy of leaving their gun with the security officer or letting them know, at least letting them know that they are armed, and you know.
Q. Okay. Now, it says in that statement, I believe, that not only did Mr. Lugo get in free, but also his guests as well. Is that correct?
A. Yes.
Q. So, basically he went in and so did several of his friends free because of his showing his badge?

A. To tell you the truth, I don't recall the rest of the friends.

Q. That's okay. That's fine.

A. Like for sure I know --

Q. I'd rather you tell me if you don't know.

A. Yeah, but like I said I was upset because he -- this was not the first time he did it.

Q. At that -- that night, the 14th, did you see his identification card? Did you look at it?

A. No, he wouldn't let me.

Q. Okay.

A. I mean every time that I asked him he would just -- he goes, "Do I have to show it to you?" You know.

Q. So, did you ever see it, like hold it in your hand see it?

A. No.

Q. Okay.

A. I saw it, but not hold it in my hand. I've not held it. He would not give it to me physically.

Q. Okay.

A. He would just show it.

Q. All right. Could you actually read it?

A. No.

Q. Okay.

A. I mean like I said it was -- every time he showed it

it was just flashed.

Q. Okay.

A. And then he would want to talk to my husband.

Q. Did you believe that Mr. Lugo was entitled legally to carry a weapon?

A. At the time, yes, I did.

Q. And why was that?

A. Because -- it was because of the badge and I assumed it was, you know. Like I said he never really let me examine it, and you know.

Q. I want to ask you something about California. Are you allowed to smoke in bars and restaurants in California?

A. No, you're not.

Q. And are patrons of the Flamingos allowed to smoke inside it?

A. No.

Q. And why is that?

A. Because there's -- first there was a nonsmoking policy that we have. We have a patio in the back for smokers. The second is that I am allergic to smoke and I, you know, I enforce -- myself I enforce that rule. There is no smoking at all, not by employees, not by anybody.

Q. What could happen if the owners or operators had someone smoking inside the bar?

A. They would be taken out by Security.

Q. Okay.

A. Asked, you know, to go outside and smoke. And if they didn't comply, they would be taken out of the club.

Q. Now, what would happen if -- legally what would happen if the club is found to admit smoking?

A. We would be fined and so would the person I think. I'm not sure about that, but I know that we would be fined. We had several random inspections and, you know, always been clear. There's no smoking at all.

MS. BROWN: Okay. I pass the witness.

ADMINISTRATIVE JUDGE ELLISON: Okay. Mr. Ocasio?

MR. OCASIO: Thank you.

CROSS-EXAMINATION

BY MR. OCASIO:

Q. Exactly what is your -- your position at the Flamingos, ma'am?

A. I'm the manager.

Q. Not owner?

A. No, I'm not the owner, I'm the manager.

Q. Okay. Your husband, is he also a manager or an owner?

A. Do I have to answer that?

Q. Yes, you do.

A. I think my husband should answer that for himself.

Q. Well --

ADMINISTRATIVE JUDGE ELLISON: Do you know what his

position is there?

BY MR. OCASIO:

Q. Do you know what his position is?

A. He's the head -- head of Security.

Q. Head of Security. Would that be Carranza and Associates Security Company?

A. No, that would be the Security for the nightclub.

Q. Okay. Well, let me ask you this. Does the nightclub maintain any license that allows any individual to carry an exposed firearm as part of their security functions, ma'am?

A. Yes.

Q. And who --

A. The club has all the licenses that it requires to operate.

Q. And what license does the club have that authorizes armed guards at the club, ma'am?

A. You would have to look at the policy yourself, if you need it.

Q. I've -- I've looked at --

A. And I'm sure you have a copy of it.

Q. My question, ma'am, is very simple. What license does the Flamingos Nightclub have or own that allows any individual in that club to carry a firearm as part of their security functions, ma'am?

MS. BROWN: Objection. Relevance, and he's certainly

asked the question already.

MR. OCASIO: The relevance to the question, you know, it's -- the relevance to the question is quite simple. If the position that the Agency witness is going to have is that Mr. Carranza is the head of Security, it's no secret working into the Pleadings that it is legally impossible for a three-time convicted felon to carry a firearm.

ADMINISTRATIVE JUDGE ELLISON: Okay.

MR. OCASIO: Your husband maintains --

THE WITNESS: My husband is not a convicted felon at all.

MR. OCASIO: Yes.

THE WITNESS: No, he is not.

MS. BROWN: Ma'am, just --

ADMINISTRATIVE JUDGE ELLISON: Okay. Hold on, hold on, hold on, hold on.

MR. OCASIO: Excuse me, it's --

ADMINISTRATIVE JUDGE ELLISON: Hold on, Mr. Ocasio.

MR. OCASIO: Okay.

ADMINISTRATIVE JUDGE ELLISON: First of all it hasn't been established that Mr. Carranza is -- is somebody who's authorized to carry a firearm. You asked the question about whether to have a license --

MR. OCASIO: I asked the question and the very first stumbling block I'm getting is that we are now running into a

stall on what the relevancy is. The relevance is very simply your testimony is that you --

ADMINISTRATIVE JUDGE ELLISON: Well, no, you tell me.

MR. OCASIO: He came to the front with --

ADMINISTRATIVE JUDGE ELLISON: You tell me what the relevance is and then we'll decide how to proceed.

MR. OCASIO: Okay. Well, the relevancy to this matter, Your Honor, is one of capacity and status. They're saying or she's testifying that her position in the club is this. Part of her ministerial function is to review credentials, how people come in. She is the one who makes sure that everybody coming through the place pays the gate. She testifies her husband is the head of Security, that if the policies of the club are not enforced that you're going to be removed by armed Security personnel, so on and so forth.

THE WITNESS: I didn't say armed.

ADMINISTRATIVE JUDGE ELLISON: Well, that's true, she didn't.

MR. OCASIO: I know, I said -- that's why I asked for the -- for the relevancy of what the Security function is there and whether or not they carry firearms or not is secondary. I want to make sure that if she's saying Rudy Carranza is the head of Security for the club, I want to establish what legal capacity Mr. Carranza has as the head of Security for the establishment.

ADMINISTRATIVE JUDGE ELLISON: Well, that's where you get into a relevancy problem because how does it relate to the charge?

MR. OCASIO: The relevancy problem is that -- is the Agency's -- it is the witness's position that the club enforces all of its policies and procedures. They enforce state law. You can't smoke in there, and so on and so forth. I want to get to just be able to frame what everybody's legal position is, because in the communication from Captain Gaston to the Agency he identifies Mr. Carranza as the owner of the club. Doesn't say manager, administrator, he said owner. It was the framing of Mr. Carranza's positions as the club owner that lent some type of weight of credibility to the Agency for them to move ahead with the investigation. Might have been different perhaps if Captain Gaston said the manager of the club called me, or so on and so forth. He specifically identifies Mr. Carranza as the owner of the club. The relevancy of the question is what exact position does Mr. Carranza have in the club.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, you've asked that and she's told you. And if there is a discrepancy with what's in the report, then --

MR. OCASIO: That's fine then.

ADMINISTRATIVE JUDGE ELLISON: -- so be it.

MR. OCASIO: Then I'll be able to proceed with my

cross-examination and just drop the issue of Mr. Carranza and we'll concentrate specifically on her statements.

ADMINISTRATIVE JUDGE ELLISON: Okay.

BY MR. OCASIO:

Q. Your testimony, ma'am, is that Mr. Lugo had entered into the club previous times, avoided the gate by showing you his identification; is that correct?

A. Showing whoever was at the door the identification. Then I was called and either let him in or not.

Q. Okay. So, it's your testimony that Mr. Lugo had been to the club more than one time.

A. Yes.

Q. Would you consider him to be more a frequent patron of the club sort of? He's been there a couple, three times.

A. Yes.

Q. Okay. In all of the instances that Mr. Lugo entered into the Flamingos, ma'am, did he always enter in through the front of the club?

A. I'm not aware of that. I don't recall.

Q. You don't recall if he would always come through the front, ma'am?

A. No, I don't recall because sometimes he would come to the back and I would not know about. If he did come to the back, I wouldn't -- I wouldn't know about it.

Q. Okay.

A. That's what I'm saying, I cannot say.
Q. That's not a problem. My question is how would Mr. Lugo be able to enter in through the club through the back room?
A. Maybe you should ask him.
Q. No, I'm asking you.
A. He should not go into the club through the back.
Q. Oh, no.
A. And if he did he probably showed his badge.
Q. Okay. So, if he's coming in through the back and he shows his badge, they're going to let him in because he has a badge?
A. They usually -- the officers or whoever's in the back usually let the police or any officer into the club through the back if -- if, you know, if they say there's a reason for it.
Q. Okay. Your testimony kind of caught my eye one moment when you said that other police officers who enter into the club, they let themselves be searched. Is --
A. Yes, they do.
Q. Is that your testimony?
A. They -- they open their -- show their badge and let them. They're very cooperative.
Q. Okay. Have you ever been at the front of the club when a police officer wanted to come in, ma'am?
A. Have I ever been there?

Q. Yeah.

A. Yes.

Q. Okay. So, when a police officer shows you his ID card can you tell where on the ID card it has any inclination in there in there whether or not a police officer can carry a firearm?

A. Yes, because I worked for the Mayor and I usually know the differences between badges, but in the case of Mr. Lugo he never let me examine his badge.

Q. I -- I would like to focus on that statement that you just made right now. Mr. Reed and I, John Russo --

ADMINISTRATIVE JUDGE ELLISON: Okay. Now, you know we did --

MR. OCASIO: No, it's --

ADMINISTRATIVE JUDGE ELLISON: I don't know if we --

MR. OCASIO: If her testimony, Your Honor, is that because she makes the statement that part of a prior job function was that she was able to examine credentials and for some reason or another would be able to discern a police officer's ability to carry a firearm, and that's what her testimony is, then the question winds up being if I show her a police credential would she be able to discern from that if I can carry a firearm?

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, she wasn't allowed to see it. According to her testimony, she wasn't --

MR. OCASIO: I understand that, Your Honor.

ADMINISTRATIVE JUDGE ELLISON: -- allowed to see Mr. Lugo's credential --

MR. OCASIO: I am --

ADMINISTRATIVE JUDGE ELLISON: -- that night.

MR. OCASIO: I am merely trying to make sure I pinpoint what her testimony is because the Agency's sole contention for the remove was the misuse of a government credential. It's Ms. Carranza's testimony --

MS. BROWN: That's actually not correct.

ADMINISTRATIVE JUDGE ELLISON: Well, it's --

MS. BROWN: You might want to check --

MR. OCASIO: Well, that's --

MS. BROWN: -- the proposed removal.

MR. OCASIO: That's -- that's fine. I mean it's --

ADMINISTRATIVE JUDGE ELLISON: I mean that's in part.

MR. OCASIO: That's part of it.

ADMINISTRATIVE JUDGE ELLISON: That's got partly to do with --

MR. OCASIO: Her testimony is that he wouldn't show her the credential, he attained his way into the club, and so on and so forth. And it's her testimony that it's because he was able to use his badge that he couldn't be searched, and so on and so forth. I want to make sure I'm not misstating you. That's your testimony.

THE WITNESS: You --

MR. OCASIO: So, my question to you --

ADMINISTRATIVE JUDGE ELLISON: Well, she said he wasn't searched because she called back to Mr. Carranza and he said to let him come in.

MR. OCASIO: I -- I understand that. And since that's what her testimony is, my only question to you then is if -- if testimony comes before the Board that says that not only did he not enter in through the club that night through the front, but entered in through the back --

ADMINISTRATIVE JUDGE ELLISON: We haven't heard that yet.

MR. OCASIO: Well, we're going to, but it's what the issue here --

ADMINISTRATIVE JUDGE ELLISON: Well, we haven't heard it from this witness.

MR. OCASIO: No, we can't get past the first question, has he ever come in through the back? You're saying you don't know.

BY MR. OCASIO:

Q. So, is it your testimony that every time Mr. Lugo comes through the club or comes to your club specifically, he comes through the front door, attains his way in, and doesn't have to pay the gate?

A. When he comes through the front door, when he came

through the front door he did not pay his way in.

Q. I understand that.

A. When he came through the back door, if he did come through the back door without me knowing, I have no idea whether he paid or not. I did not know of him coming in through the back. And that night, you know, you could base yourself on my testimony. I don't know what your question is.

Q. My question is how -- if your statement is that Lugo has used his badge to enter into your club and not pay the door before, my question to you is then how many times to your knowledge has Mr. Lugo come to your establishment and not paid his way into the club?

A. At least three -- three times that I know, at least.

Q. Okay. Three times that you're aware of.

A. Yes, that I recall.

Q. Okay. How many times in the previous year has Mr. Lugo been to your establishment that you're aware of?

A. I don't recall.

Q. Don't recall two or three? Don't recall more than three?

A. Don't recall.

Q. Well, if you can't recall how many times when Mr. Lugo has been to your club, then how can you recollect if he's ever attained his way in and you wouldn't know about it?

MS. BROWN: Argumentative.

MR. OCASIO: Now it's argumentative. If we're going to be --

ADMINISTRATIVE JUDGE ELLISON: Well, I mean she's --

THE WITNESS: I don't recall the specific times. You're asking how many times. I don't recall specific times.

BY MR. OCASIO:

Q. Well, then so let's get back to the evening in -- in question here. She calls you, you show up, he's into the club. Okay. He came in with three guests; is that correct? Or he came in with two guests?

MS. BROWN: Which question do you want to ask her?

Q. Answer whichever one you please. How many guests did Mr. Lugo bring into the club that night?

A. I think the names are right here in the statement.

Q. That's not my statement.

ADMINISTRATIVE JUDGE ELLISON: Do you recall now, currently, how many he came in with?

THE WITNESS: Not exact -- not of the exact amount of people, but I recall for a fact two persons came in with him when I was with Maria Elena Grijalva.

ADMINISTRATIVE JUDGE ELLISON: Okay.

BY MR. OCASIO:

Q. Okay. After they came into the club do you remember more or less what time they came into the club, ma'am?

A. No, I don't recall at this time. I know it was late

Tuesday night. You know, late Tuesday night.
Q. Closer to closing? Maybe a little bit --
A. Oh, no, no. I don't want to give a false time.
Q. No, I mean just an approximation.
A. It wasn't closing time.
Q. Hmn?
A. It was not closing time.
Q. Oh, okay.
A. They came in, you know, during the event.
Q. Okay. How long were they in the club, ma'am?
A. How long were they in the club?
Q. At the club, yes.
A. I don't recall. Like I said, if I don't know exactly what time they came in. I know they didn't want to leave when it ended. That I recall.
Q. We'll get right there. Okay. So, when they came into the club were they seated at their own table, were they seated with other people? To your knowledge were they sitting alone?
A. I stayed at the front trying to figure out the payment and the, you know, so I don't know where they sat.
Q. So, you're not sure.
A. I'm not sure.
Q. Would you have an idea more or less of how many drinks were purchased by Mr. Lugo and his guests?
A. No, I don't have an idea how many drinks were

purchased, but I do -- he was already drinking, I mean he was already under the influence when he came in.

Q. He was under the influence?

A. Not drunk, but he was --

Q. How do you know he might have been under the influence?

A. In my opinion, seeing the people that come into the club, I could tell when somebody has been drinking.

Q. Did he smell of alcohol?

A. I didn't get close enough to smell him and I don't recall, but I know he was.

Q. Okay.

A. The way he was acting.

Q. How was he acting?

A. He said, "Nobody touches me," (witness making sounds).

Q. I'm -- I'm sorry, I didn't understand.

A. He said, "Nobody touches me, I don't want to be searched."

Q. That's when he's coming in.

A. That's when he's coming in.

Q. Okay. So, now he's in the club.

A. So, he seemed like either he was either intoxicated or he just was very rude. It's up to your opinion. Is your opinion.

Q. Could be both. I understand. So, now he's in the

club.

A. In my opinion he was intoxicated. Well, not intoxicated, I'm sorry.

Q. Under the influence.

A. He was under the influence --

Q. Okay. So, now he's in the club.

A. -- of his drinks.

Q. Was he smoking in the club?

A. There's no smoking in the club.

Q. My question is was he smoking in the club?

A. Not to my knowledge.

Q. To your knowledge did he exit the club to smoke a cigarette and then come back in?

A. No, I was not taking care of him. I was not babysitting. I was not --

Q. No, no, I --

A. -- aware of what he was doing all the time that he was in the club. I usually at the front, in the office, at the bar, I don't watch the clients. That's what they do, those waitress -- waitresses and other employees.

Q. Okay. You have conversations with waitresses, guards, other employees at the club regarding this incident?

A. At what time?

Q. Well, I mean have you had any conversations with anybody there regarding this incident after it happened?

A. Yes.

Q. Okay. There's a question I wanted to ask you. Tuesday night when I was at your club I noticed that the security camera from the vantage point of where the DJ booth is a color surveillance camera. Is there a closed-circuit television system there?

MS. BROWN: Your Honor, I've already objected to this. Obviously that tape was not used in making the decision. The deciding official will make that decision. This has everything to do with the Navy's case and nothing to do with the District Court case.

MR. OCASIO: You cannot testify to anything or you cannot object to anything outside of your own personal knowledge. For you to say the Agency didn't use a piece of evidence that we're not even --

MS. BROWN: Your Honor, I'm willing to stipulate.

MR. OCASIO: We haven't even established --

ADMINISTRATIVE JUDGE ELLISON: Yeah, well, we know -- we know they didn't consider --

MR. OCASIO: I understand that.

ADMINISTRATIVE JUDGE ELLISON: -- the videotape because apparently --

MR. OCASIO: Your Honor --

ADMINISTRATIVE JUDGE ELLISON: -- they did not receive one. You can ask the question. Go ahead.

MR. OCASIO: If what the bottom line here is --

ADMINISTRATIVE JUDGE ELLISON: You can ask the question. Go ahead.

BY MR. OCASIO:

Q. You know, it's -- is there a closed-circuit television system there at the club?

A. You mean a security camera?

Q. Yeah.

A. Yes, there are security cameras.

Q. Are those security cameras attached to any recording device?

A. Yes, they are.

Q. Would -- those recording devices, they stay on when the -- when the club is open?

A. Yes.

Q. Was there a recording device on at the time of this incident, ma'am?

A. It's -- there's recording devices there during the club hours, I guess. I don't know how it works. It's a security system. I think it stays there for 24 hours and then starts all over. I don't really know how it works. And when you were at the club last Tuesday and I asked you not to come in and you grabbed me, I mean you were -- were --

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, we don't need to know about this Tuesday.

THE WITNESS: Okay.

MR. OCASIO: I -- I --

ADMINISTRATIVE JUDGE ELLISON: Go ahead.

BY MR. OCASIO:

Q. My question, ma'am, is the night of the incident there's a videotape in the machine that recorded the event, ma'am?

A. There is a videotape in the machine every night.

Q. The question, ma'am, is was there a tape in the camera at the moment of this incident, ma'am?

A. I don't recall.

Q. I'm sorry, what?

A. I don't recall.

Q. You just said --

A. There should be a video --

Q. -- a moment ago that --

A. I just answered your question. You keep asking the same thing, so what do you want me to say?

Q. I would like you to go back to the statement you just made a few moments ago that there is a videotape in this recording device during the time that the club is open.

A. Yes, there is.

Q. Okay. Let me ask you a question. After the incident occurred was that videotape reviewed?

A. What incident?

Q. When the arrest or the assault or the altercation that happened at the club.
A. Was the tape reviewed?
Q. Yeah.
A. If it was requested by the police, the tape was given to the police, but --
Q. No, no, no. I asked --
A. -- I do not know any matter.
Q. Well, I want to --
A. You're asking if it was reviewed.
Q. -- make sure I'm very -- yes.
A. If it was reviewed, it would have been reviewed by the police or the Security personnel.
Q. The question.
A. Not myself.
Q. Was the tape reviewed by the Security personnel, ma'am.
MS. BROWN: Objection. Personal knowledge. I don't think she's the Security personnel. Perhaps you ought to ask them.
ADMINISTRATIVE JUDGE ELLISON: Well, she either knows or she doesn't.
MR. OCASIO: She either knows or she doesn't know, so she could say yes or no. Very simple.
MS. BROWN: Thank you, Judge.

BY MR. OCASIO:

Q. To your knowledge, ma'am, was the tape reviewed by Security personnel?

A. I don't know. Not to my knowledge.

Q. Simple. That takes care of that. Okay. So, you know, I'm at a loss to understand how some things you remember clearly, some things you don't, but I'll just stick with the incident. Okay. So, he's now at the club, he attained his way in, you believe he's under the influence.

A. When I'm -- when I'm insulted I remember those things clearly.

Q. I see.

A. When I'm attacked I remember those things clearly. When somebody gets drunk in my club I do not remember or recall.

Q. No, no. Just I wanted to make sure that I framed this correctly. Okay. So, now he's at your club, he's drinking, he has guests that have made their way in. They're consuming alcohol, yes? They're drinking. I mean they're up to nothing. They're having a nice time.

A. If you say so.

Q. Okay. Well, so now we get to the -- to the time that the club is about to close. People are getting escorted out of the table and now we have this incident that occurred at the club. To your own personal recollection would you tell us what

you remember happening that evening, ma'am?
A. Do you want me to read the statement?
Q. I would like you to tell us from your own recollection, ma'am, what you remembered happened.
A. I asked Mr. Lugo to please let Security do their job and if he --
Q. No, no.
A. -- was armed to please leave his weapon.
ADMINISTRATIVE JUDGE ELLISON: Okay. Ms. Carranza, he's asking what your current recollection is about anything else. We've talked at some detail about --
MR. OCASIO: Yeah.
ADMINISTRATIVE JUDGE ELLISON: -- how he got in and now Mr. Ocasio is asking about what may have happened at the end of the evening when people were --
THE WITNESS: Please excuse me, I'm very upset.
ADMINISTRATIVE JUDGE ELLISON: That's okay. Just relax and listen to the question and try to answer to the best of your knowledge.
THE WITNESS: Mr. Lugo came in with friends. He proceeded to go in without paying. He had a weapon. He had been drinking. I was very concerned. I asked my husband to -- I asked my husband to, you know, ask him to leave his weapon. And at the time my husband was very busy and he said, you know, as a courtesy to the badge, you know. So, he went in and at

the end of the evening he refused to -- he wanted to smoke. First of all he didn't want to leave. Then he wanted to smoke inside the club. He was approached by one of the security officers and asked to leave if he didn't put out his cigarette and apparently he didn't. I was not present, you know, right in front of them when it was happening, but I trust the security officer that was working at that time. He was a very -- he is a very good officer. We have never had any problems with him and most of the Security personnel that we do have are very well trained people.

ADMINISTRATIVE JUDGE ELLISON: Okay. But you didn't see this occur, all this about smoking and not wanting to leave, et cetera.

THE WITNESS: No, I was not -- I was not in front of the table. The --

ADMINISTRATIVE JUDGE ELLISON: You just heard about this later; is that correct?

THE WITNESS: Yeah.

ADMINISTRATIVE JUDGE ELLISON: Okay.

BY MR. OCASIO:

Q. So, now we have this -- this thing that's going on in the back of the club.

A. The officer proceeded to do his job.

Q. No, I --

A. He -- he called the police and the Redwood City Police

took over.

Q. I understand. My -- my question is, knowing the layout of your club, ma'am, where were you positioned when this thing happened? Were you in the front, were you by the bar?

A. I don't recall because I was -- usually at that time I'm running around. I go to the front and close the, you know, get the till from the front. I go to the bar, I go to the office, I go to pay the bands.

Q. You're running around.

A. I'm running around.

Q. Okay.

A. So, I don't recall at that time the exact place where I was at.

Q. Okay. Can you remember more or less how many people were left in the club about the time this incident happened?

A. Oh, what do you mean?

Q. Well, I mean --

A. If it was closing time --

Q. Yeah.

A. -- there was no people. People usually go out by, you know, 1:30 everybody leaves. And at the time when they were -- it was closing time so I'm pretty sure, like I said I wasn't right in front, but I'm pretty sure there was no people. Maybe one or two tables left and they were all, you know, in the process of leaving.

Q. So, then the only people who would have remained in this place would have been employees of the club.

A. No, like I said there was a couple of tables, persons, clients, when this --

Q. So, I mean a guess more or less. Were there more like 10 or 15 people there? Was it a couple, three? I mean what's a couple --

A. I don't recall. I can't -- I can't tell you. I wasn't there. I wasn't in the back of the club looking at how many people were there at that minute that it was happening. I just know that everybody was exiting.

Q. Okay. So, now the incident happens. You get a radio broadcast of --

A. I don't have a radio, Security radio.

Q. Okay. So --

A. This is being taken care of by Security. Like I said, I have many things to do. In Security, you know, everybody does their job. The waitresses clean up, the people that clean up start sweeping, and so on.

Q. My question, ma'am, is did anyone come to you personally and tell you that you had this -- something was going on in the back that might have --

A. They didn't have to.

Q. No one --

A. Like I said, everybody takes -- everybody does their

job. Security did their job and so on.

Q. So --

ADMINISTRATIVE JUDGE ELLISON: So, the answer's no?

THE WITNESS: No.

ADMINISTRATIVE JUDGE ELLISON: Nobody came to you.

THE WITNESS: The answer's no.

BY MR. OCASIO:

Q. Okay. So, when Maria Elena Grijalva testified that she came to get --

A. Oh, you mean when she was screaming?

Q. When she --

A. She came by screaming.

Q. I'm sorry, I thought you just said --

A. She went by screaming to everybody who was there.

Q. What was she screaming?

A. She was screaming that something was going on, but she just passed by. She was also under the influence. Like I say, it's when matters like that happen Security takes care of it.

Q. So, she didn't ask you specifically to go back there and stop what -- what was going on with Lugo?

A. She was -- she went by, like I said before she was screaming. She was --

Q. The question, ma'am, was did she ask you specifically to go over there and do something about it or to get your husband?

A. Did Maria Elena ask me to get my husband?
Q. Yes, ma'am.
A. She was -- not specifically. She was screaming. She was screaming from far and she was screaming that -- a lot of things. I don't recall her exact words. Excuse me.
Q. I see. So, let me see if I can frame this within --
A. She was insulting. Let me tell you that.
Q. She was insulting.
A. Yes.
Q. Okay.
ADMINISTRATIVE JUDGE ELLISON: She was insulting you?
THE WITNESS: Yes, insulting everybody, not just me.
BY MR. OCASIO:
Q. What was she doing and what was she saying?
A. She was saying, "Well, you got to stop this," and blah blah, you know, very belligerent. I can't repeat the words.
Q. Yes, you can. What did she say that was offensive? Or what was she saying period?
A. (Indiscernible, speaking in Spanish). It isn't set on the schedule. (Indiscernible, speaking in Spanish.) That's what she was saying.
ADMINISTRATIVE JUDGE ELLISON: Okay. Could you translate that for us, please?
MR. OCASIO: Okay. The translation, sir, would be that --

MS. BROWN: Wait.

ADMINISTRATIVE JUDGE ELLISON: Could you -- could you --

MR. OCASIO: -- Ms. Grijalva -- and so on.

ADMINISTRATIVE JUDGE ELLISON: I'm sorry.

THE WITNESS: Okay. I could translate it. She was saying, "Who's the boss around here? Can't anybody . . ." You know -- how could I say this? She wanted, she was saying -- like I said she was belligerent. She was saying, "Who's the boss around here? Nobody's worth a shit." She did this shithole and everybody's going to be -- I mean how could I -- I can't translate belligerence.

ADMINISTRATIVE JUDGE ELLISON: Well, I mean don't worry about if the language is crude. That's not a problem. I just would like to know what you said in Spanish there just a minute ago.

THE WITNESS: You know, that people they were worthless. (Indiscernible) means worthless. And she was like being, you know. My brother-in-law was there and myself and the bartender and the cleaning people, and she was saying that everybody was worthless.

BY MR. OCASIO:

Q. Okay. A question on that point, ma'am. Exactly who was in the club when this incident happened?

A. The employees for sure.

Q. Which employees, ma'am?
A. Excuse me? The people that clean up.
Q. Which employees were present at the club? Who was cleaning?
A. The people that clean up, the bartender, a waitress. At that time there was a waitress left, people that clean up, and I think they all gave the statements.
Q. Which? Well, I don't know what statements they've given. I'm asking you from your recollection who exactly was in the club at this time?
A. The employees.
Q. Who?
A. Who? Myself.
Q. Okay.
A. And Rosie Julio (phonetic), Jose, my brother-in-law. That's the peoples at present time.
Q. And which Security personnel were there, ma'am?
A. The -- oh, the Securities that were there? I don't recall how many were there at that time, but I know for a fact there was Sham and, let's see, Hustle. Hustle (phonetic), Luis, I think. I'm not sure. I'm sorry, I don't want to give you the wrong information. I don't recall.
Q. Was Officer -- was Officer Abaum (phonetic) there?
A. I don't recall.
Q. Okay.

A. Oh, mean Abbey -- Abbey (phonetic).
Q. Yeah.
A. Yes, he was.
Q. Okay. What the bottom line here is after Lugo attains his way into the club you really didn't see anything that happened, you don't remember anything that happened, because you were taking care of other things when the incident happens and you don't remember Maria Elena coming to you specifically and asking you to stop the assault.
A. There was no assault.
ADMINISTRATIVE JUDGE ELLISON: Okay. Well, she didn't come to ask you specifically to do anything?
THE WITNESS: She went by -- specifically, no. She went by and said to --
MR. OCASIO: She was insulting.
THE WITNESS: She's insulted. She was very -- yeah.
BY MR. OCASIO:
Q. Okay. To your knowledge, ma'am, did Maria Elena go and seek your husband?
A. To my knowledge she was -- yeah. She -- like I said, she was screaming. She was -- yeah.
Q. Did she get your husband?
A. She didn't want to leave. I don't know.
Q. You don't know if she went to get your husband.
A. I don't know if she got him after all or not. I don't

know. To this point I don't really know.

Q. Okay.

A. Because like I said, everything was done properly. The officer, the security officer called the Redwood City Police and the police took over.

Q. Let me ask you this. So, Lugo gets detained, right? He --

A. Like I said, that was a matter for the police. Once they exit the club --

Q. My question, ma'am, is --

A. -- and the police takes over --

Q. -- was Lugo --

A. -- it's a matter for the police, and I have no knowledge of what the police do.

Q. Simple question, ma'am. Was Lugo arrested in your nightclub, ma'am?

A. I will tell you same answer. The security officer did what he was supposed to do and the police, Redwood City, took over. Whether he was arrested or not, that's a matter for the police.

Q. No, because the police didn't arrest him. Well, let's talk about --

A. Then why are you asking?

Q. -- him doing what he had to do. Exactly why was Mr. Lugo -- what -- what exactly did Mr. Lugo do that prompted your

security officer to --

A. He lighted up a cigarette. He didn't want to leave.

MS. BROWN: Objection. My understanding was that she doesn't have --

MR. OCASIO: Excuse me, let her --

MS. BROWN: She wasn't there when all this happened.

ADMINISTRATIVE JUDGE ELLISON: Yeah, well, that's a good point. I mean I thought we tried to --

MR. OCASIO: Your Honor, it --

ADMINISTRATIVE JUDGE ELLISON: We tried to establish this earlier that --

THE WITNESS: Why -- why am I here for?

MR. OCASIO: Yeah.

ADMINISTRATIVE JUDGE ELLISON: Hold on, hold on, hold on.

MR. OCASIO: If we're going to --

ADMINISTRATIVE JUDGE ELLISON: Tried to establish earlier whether or not she had any percipient knowledge of anything that happened after the -- the entry incident, for lack of a better word.

MR. OCASIO: If her testimony is going to remain vague and amorphous, that she's reading her statement 'cause she's obviously been coached by counsel so as now she's going to be vague, amorphous, and the security officer --

THE WITNESS: I didn't even see counsel --

ADMINISTRATIVE JUDGE ELLISON: Hold on, hold on.

THE WITNESS: -- till this minute.

MR. OCASIO: Excuse me, I'm speaking.

ADMINISTRATIVE JUDGE ELLISON: Hold on.

MR. OCASIO: Okay. If we're going to have a relevancy objection, the security officer did whatever he had to do, he was doing his job. My function or my question winds up being: What exact job was he doing? What exactly did Lugo do that prompted this altercation?

ADMINISTRATIVE JUDGE ELLISON: Okay. And she answered that and she also said that she, in answer to your question, you were --

MR. OCASIO: That she didn't know. That's right.

ADMINISTRATIVE JUDGE ELLISON: -- that you were trying to establish apparently that she didn't have any first-hand percipient knowledge of what happened around the --

MR. OCASIO: Around the offense.

ADMINISTRATIVE JUDGE ELLISON: -- closing exit time, which I accept, so I'm not sure why we're not finished with this witness.

MR. OCASIO: Well, I mean it's -- it's -- that's all I was trying to establish. I basically have no -- no questions for you other than what you've already answered. You can't testify to anything.

ADMINISTRATIVE JUDGE ELLISON: Well, that's fine. We

have no other questions then.

MR. OCASIO: Fine, then we can --

ADMINISTRATIVE JUDGE ELLISON: That could have ended it five minutes ago.

MR. OCASIO: -- we can -- we can dismiss the witness.

ADMINISTRATIVE JUDGE ELLISON: Okay.

MR. OCASIO: I don't need you.

ADMINISTRATIVE JUDGE ELLISON: Anything else from the Agency?

MS. BROWN: Just one silly question.

REDIRECT EXAMINATION

BY MS. BROWN:

Q. Have you and I seen each other before today?

A. No.

Q. When was the first time you saw me?

A. Right now.

MS. BROWN: Okay.

ADMINISTRATIVE JUDGE ELLISON: Okay. Thank you very much. I appreciate it.

THE WITNESS: Can I leave?

ADMINISTRATIVE JUDGE ELLISON: Yes.

MS. BROWN: Are we releasing the witness?

MR. OCASIO: Yeah.

ADMINISTRATIVE JUDGE ELLISON: I don't believe we have any reason to call her back, no. Thank you very much.

# EVANGELISTA LUGO

V

# DEPARTMENT OF THE NAVY

## MERIT SYSTEMS PROTECTION BOARD
## SAN FRANCISCO REGIONAL OFFICE
## CASE SF-0752-00-0499-I-1

# EXHIBIT

# 3

## TESTIMONY OF KAEWE CHARLES SHAM
## PAGES 47 THROUGH 79

MS. BROWN: Thanks.
THE WITNESS: Appreciate it.
ADMINISTRATIVE JUDGE ELLISON: Can we pause the record.
(Witness excused.)
(Off the record.)
ADMINISTRATIVE JUDGE ELLISON: All right. Good morning.
THE WITNESS: Good morning, sir.
ADMINISTRATIVE JUDGE ELLISON: Do you have any objection to taking an oath regarding your testimony?
THE WITNESS: No objection, sir.
ADMINISTRATIVE JUDGE ELLISON: Could you raise your right hand, please.
Whereupon,

KEAWE CHARLES SHAM,

having been first duly sworn, was examined and testified as follows:
ADMINISTRATIVE JUDGE ELLISON: Thank you. Could you state and spell your full name for the record, please.
THE WITNESS: My full name is Keawe Charles Sham. First name Keawe, K-E-A-W-E, middle name Charles, C-H-A-R-L-E-S, last name Sham, S-H-A-M.
ADMINISTRATIVE JUDGE ELLISON: Okay. Thank you. Ms. Brown?

MS. BROWN: Hi, Mr. Sham. How you doing?

THE WITNESS: Fine, thank you.

DIRECT EXAMINATION

BY MS. BROWN:

Q. Could you -- you already said your name. Could you tell me what your title is? What do you do for a living?

A. Currently or at the --

Q. Currently, right now.

A. Currently I am a police recruit for the City of South San Francisco.

Q. Okay. And I believe you know that we're here about the removal of Mr. Lugo from the federal service, from the Department of the Navy. And the basis for that is events that happened on March the 14th late at night and March the 15th. So, basically I'm going to be asking you questions about that night. So, throwing yourself back in time, on March the 14th and March the 15th of this year where did you work?

A. On March the 14th I was an employee for the City of -- let's see, I'm sorry -- for Flamingos Nightclub in Redwood City.

Q. And what did you do there?

A. I worked as a contract security officer.

Q. Okay. How long did you work there?

A. I worked -- I'd been working there for approximately two years.

Q. I'm going to give you what is Agency Exhibit 5. Going to throw it at you, Ken. Let you look at that real quick. Go ahead and review it if you'd like. That's fine.

ADMINISTRATIVE JUDGE ELLISON: Is this part of your prehearing submissions or the original package or --

MS. BROWN: Part of the prehearing submissions. It should be Agency Exhibit 5.

ADMINISTRATIVE JUDGE ELLISON: But in which? In case the --

MR. OCASIO: 4-E.

ADMINISTRATIVE JUDGE ELLISON: -- the numbers are --

MS. BROWN: That's not correct. It's actually a Declaration, Agency Exhibit 5.

ADMINISTRATIVE JUDGE ELLISON: Do you know when it was sent in? With the original case file or subsequently with the prehearing submission?

MS. BROWN: It would have been subsequently with the prehearing submissions.

ADMINISTRATIVE JUDGE ELLISON: Okay.

MR. OCASIO: And this is Exhibit 4-E, Your Honor, she submitted. I'm sorry, the --

MS. BROWN: And it's Agency Exhibit 5.

ADMINISTRATIVE JUDGE ELLISON: Okay. With the prehearing submissions. Okay.

MS. BROWN: That's correct.

ADMINISTRATIVE JUDGE ELLISON: All right.
MS. BROWN: It should be a Declaration.
ADMINISTRATIVE JUDGE ELLISON: Yes, okay. Thank you very much.
BY MS. BROWN:
Q. You recognize this document?
A. Yes, I do.
Q. The last page of it is that your signature?
A. Yes, it is.
Q. Anything in there incorrect that you can tell right now?
A. No, nothing.
Q. Okay. You worked at Flamingos. We just actually had testimony from Linda Carranza, who was just here, talking about the procedure to get into Flamingos. She talked about people getting searched and paying as they went in. Did Mr. Lugo -- did you recognize Mr. Lugo across the table here?
A. I do recognize the gentleman.
Q. Did he come into the club more than once that you know of?
A. He had been in there before.
Q. Okay. Did he ever avoid the procedure to come into the club?
A. Once that I can remember, yes.
Q. Okay. What did he do?

A. He displayed -- he had a badge hanging around his neck and it didn't -- I didn't see any ID, but I remember that night he had a badge around his neck. I asked him to submit to the search. He said he was a police officer and that he was not required to go by the search.

Q. Okay. What did you do at that point?

A. I stepped back. I had another officer handle it, handle the -- handle that search. I switched off.

Q. Oh, okay.

A. I didn't -- I didn't want to let him into the club.

Q. Okay. Did the other officer let him into the club anyway?

A. I believe he did. I saw him later that night inside the nightclub.

Q. Why would they have let him in the club anyway?

A. I don't know.

Q. Okay. On March the 14th and 15th was Mr. Lugo in Flamingos?

A. Yes, he was.

Q. Basically I want to go through what happened that night. It would have been that night, early morning around 1:30 or so.

A. Yes.

Q. So, could you tell me what was happening? What time does the club close?

A. The club closes approximately at 1:40. We close between 1:40 and 2:00 o'clock depending on the size of the crowd. We need to have the club clear by 2:00 according to ABC rules.

Q. ABC is the --

A. Alcohol Beverage Control.

Q. Oh, okay.

A. Drinking establishments need to be closed by 2:00.

Q. I see. So, that night around closing time what was your interaction with Mr. Lugo?

A. I -- that night I saw him drinking with three other individuals that I'm not able to identify. They were still seated at the table. We had already gave the announcement to close.

Q. Okay.

A. And they were still seated and appeared to be drinking.

Q. What was he doing that made you remember that night?

A. He placed an unlit cigarette between his lips and appeared to be searching his pockets. I assumed it was a lighter he was looking for, match.

Q. So, what did you do?

A. I approached the table, asked him not to light the cigarette.

Q. And what happened then?

A. He told me, as I in my statement, to fuck off, go get your boss, Rudy.

Q. Okay. What was his manner whenever he said that to you?

A. He was -- he appeared intoxicated to me. He appeared --

Q. What was he doing that would have given you that impression?

A. He -- he slurred his words.

Q. Okay.

A. Slurred words. I could see numerous open bottles of liquor and glasses on the table.

Q. Okay. So, did you go get Rudy at that point?

A. No, I didn't. We had radio. We have radios in that nightclub. I tried to contact over the radio, but I couldn't get any response.

Q. Okay. So, at that point did Mr. Lugo stop, put the cigarette down, or what happened?

A. No, the cigarette was still in his mouth.

Q. Okay. So, what'd you do then?

A. I asked the table to leave.

Q. Okay.

A. I made a request to leave. The nightclub is now closed, it's time for you to leave.

Q. And at this point can you tell me where everybody was

positioned? I mean who was standing, who was sitting?

A. All four were seated at that time.

Q. And you were?

A. I was approximately four feet, three to four feet away from the table standing.

Q. Okay.

A. I -- I just walked towards the table and -- and my arms in an open motion. I was attempting to give the impression that it's time to go home.

Q. Okay. Then what happened?

A. Mr. Lugo lurched out. Well, he -- I continued to ask them to leave. I continued to ask them to leave. Mr. Lugo continued to cuss and swear at me. We continued our interaction. He lurched out of his chair, grabbed my left arm, and attempted to drag me to the floor. At that time everybody at that table stood up. Another gentleman that was -- that was with Mr. Lugo stood up also and pushed my right arm. So, I drug myself and Mr. Lugo back the opposing wall on the nightclub trying to call for help, backup from the other security guards there at the nightclub.

Q. Did you do that on the radio or did you --

A. No.

Q. -- just yell out?

A. I yelled out. My radio, I was not getting any response from my radio.

Q. Okay.
A. So, I yelled out and eventually somebody responded. I dislodged Mr. Lugo from my arm, placed him -- I advised him that I was placing him under citizen's arrest.
Q. Okay.
A. And for Rudy, the nightclub owner, to call the Redwood City Police Department.
Q. When you were, I guess attached is a decent word, to Mr. Lugo it says in your Declaration, I believe, that you felt what you suspected to be a gun on --
A. Yes.
Q. What did you do at that point?
A. I -- well, when I felt the gun I had my -- well, he had -- he had my left arm. I held his firearm with my hand in his holster. I didn't want him either drawing the weapon or it falling out. At this nightclub I am an armed security officer so I carry a firearm also, but it wasn't a lethal force situation. I used my hasp baton to pry off Mr. Lugo from my arm and ward off the other gentleman to keep him from attacking me.
Q. Okay. And at that point is that whenever you -- what did you do at that point?
A. I was calling for help --
Q. Okay.
A. -- from the other security officers.

Q. So, now you use your hasp baton and you get him off you. Then what happens?
A. That's when we gained control of Mr. Lugo, placed him in handcuffs.
Q. Did he continue to -- to struggle with you at that point or did he at some point just give up?
A. He -- he was -- he did not -- he wasn't -- he wasn't actively fighting us, no, so we --
Q. At that point.
A. At that point, no, he was not actively fighting. He was -- he was not cooperating, but he was not actively fighting us at that point.
Q. Okay. To take you back just a little bit before that when he lurched out of his chair and came toward your arm, would you consider that actively fighting you?
A. Yes.
Q. Okay.
A. I'd consider that --
Q. Okay.
A. -- an aggressive action.
Q. Is he saying anything at the time you're having this struggle?
A. Yes, at the time he's -- at the time we're having that struggle he was asking me what I was -- what I was doing. Let's see. Yeah, of -- Court, do you want me to --

Q. I'm going to show you -- I mean --
ADMINISTRATIVE JUDGE ELLISON: Okay. Mr. Sham, if you could just try to --
MS. BROWN: -- just try to remember what you --
ADMINISTRATIVE JUDGE ELLISON: -- testify from your present recollection --
THE WITNESS: I'm sorry. He --
ADMINISTRATIVE JUDGE ELLISON: -- to the best of your ability.
THE WITNESS: What -- what I was doing? What am I arresting him for? Do I know who I --
MS. BROWN: Did he --
THE WITNESS: Don't I know who I -- who he is? And I --
BY MS. BROWN:
Q. What did you think he meant by that, don't you know who he is?
A. Well, I thought he was trying to imply that, because he's -- he had shown the badge before to me at the nightclub, that he's a police officer and he has every right to be armed and intoxicated.
Q. Okay. Now, what did you do with the gun after Mr. Lugo --
A. I removed --
Q. -- quit struggling?

A. When I placed him in handcuffs I removed the firearm from his person. I attempted to unload it. I moved the -- well, I opened up the chamber, I pulled back the slide, I noticed that there was no -- there were no rounds in the chamber of the firearm, itself.

Q. Okay.

A. The slide fell forward loading the fire -- loading a round in. I released the magazine and pulled the slide back again to get the -- the round that was chambered by me, attempting to unload -- unload the weapon.

Q. Okay.

A. And I kept possession of the firearm until Redwood City Police Department could arrive.

Q. Okay. Did -- did Mr. Lugo say anything as you're messing with his firearm?

A. Yeah, he said I didn't know what I was doing. He saw me, he saw me chamber the round.

Q. Okay.

A. Told me I didn't know what I was doing and that's his gun, I had no right to --

Q. Did he indicate to you that he was authorized to carry that weapon?

A. He never said anything specifically.

Q. Okay. I think in your Declaration -- I'm kind of confused because I think in your Declaration it says something

like he repeatedly told me he was allowed to carry the weapon because he was a police officer and was authorized to carry a weapon. Do you remember that?

A. I believe he told that to Officer Farley when we were outside. During that, at that moment when we were -- when I removed the gun from him he didn't say it yet.

Q. But you heard it later?

A. I heard it later.

Q. So, did you telephone the police?

A. No.

COURT REPORTER: One moment.

(Tape changed at this time.)

MS. BROWN: All right.

THE WITNESS: I didn't -- I did not call --

BY MS. BROWN:

Q. Wait, hold on. Did you telephone the police?

A. I did not call the police, no. When I had finally gotten Mr. Lugo outside and we were waiting for the police we continually -- we were arguing about what had happened and he -- he used -- he was very belligerent with me, but he at that time he started talking about him working for Hunters Point Naval Shipyard.

Q. Okay.

A. That -- that's when the Redwood City pulled up.

Q. Okay. Whenever the police arrived did you speak with

them?

A. Yes, I did.

Q. Okay. And at that point did they ask you if you wanted to file a complaint?

A. Yes, they did.

Q. And what did you decide on that?

A. I told them I wanted to file a complaint and they separated the two of us. I guess Mr. Lugo presented identification identifying himself as a Department of Defense police officer. When they returned to me and told me that he was a Department of Defense police officer and allowed to carry the weapon, I decided that I did not want to file a complaint. They said that he was going to file a complaint against me and that we would both taken into custody.

Q. Okay. Did you think that Department of Defense police officers could carry firearms off duty?

A. I don't know. I did not know.

Q. Okay. If Mr. Lugo hadn't indicated that he was a police officer to those officers, would you have gone ahead and filed a complaint?

A. Yes, I would have.

MS. BROWN: Okay. I pass the witness.

ADMINISTRATIVE JUDGE ELLISON: Okay. I'm sorry, could we take a five-minute break?

MS. BROWN: All right.

MR. OCASIO: Yes, sir.

(Off the record.)

ADMINISTRATIVE JUDGE ELLISON: All right, Mr. Ocasio?

CROSS-EXAMINATION

BY MR. OCASIO:

Q. Okay. Your exact position at the Flamingos, sir, what was it?

A. It was a contract security officer. Was our security officer.

Q. Contract security officer. You were contracting your own services --

A. No.

Q. -- to the company you're working --

A. I misspoke. That I was a security officer for Flamingos.

Q. For Flamingos.

A. Yes, I worked directly for Rudy Carranza.

Q. You worked directly. You worked directly for the Flamingos or Mr. Carranza, himself?

A. As far as I'm concerned they're one and the same.

Q. Okay. So, the uniform shirts that you people wear it says Flamingos or Carranza and Associates, sir?

A. Yes.

Q. Which? I'm sorry, I haven't seen the shirts.

A. Carranza and Associates.

Q. Okay. We go to your testimony the point it -- a real straight question from your statement, page 3. Is it our understanding that you arrested Mr. Lugo?

MS. BROWN: I'm sorry. Are you Exhibit 4-E, are you Exhibit 5?

MR. OCASIO: This is your exhibit, Mr. Sham's statement.

MS. BROWN: Right, and what Mr. Sham has in front of him is Agency Exhibit 5.

MR. OCASIO: Okay. Well, Agency Exhibit 5. I don't care.

MS. BROWN: That's not what you have there.

MR. OCASIO: Agency Exhibit 5 is --

MS. BROWN: No.

MR. OCASIO: Okay. It's -- what is this thing?

ADMINISTRATIVE JUDGE ELLISON: It's part of the prehearing submission, Statement of Facts and Issues.

MR. OCASIO: Yes, sir.

ADMINISTRATIVE JUDGE ELLISON: August 25th.

MR. OCASIO: Yeah.

BY MR. OCASIO:

Q. Did you arrest Mr. Lugo?

A. I'm sorry, sir?

Q. Did you arrest Mr. Lugo?

A. That night?

Q. Yes, sir.

A. According to that statement that you have there in front of you?

Q. Yes, sir.

A. I don't have the statement, sir. I did place Mr. Lugo under citizen's arrest that night, but --

Q. Okay. No problem. Exactly what did you arrest him for, sir?

A. I placed Mr. Lugo under citizen's arrest --

Q. Yes.

A. -- for carrying a concealed firearm.

Q. You placed Mr. Lugo --

A. And battery on my person.

Q. So, you arrested him.

A. Yes.

MR. OCASIO: Okay. I would like, with the Board's indulgence, this exhibit marked for the Judge, Agency, and for the Court Reporter. It's the Attorney General Opinion, 9801, October 2, 1990, from the Ventura County District Attorney's Office to the Attorney General, Your Honor.

ADMINISTRATIVE JUDGE ELLISON: Okay. The Reporter doesn't need a copy unless she wants to read.

MR. OCASIO: My apology. Okay. We'll get back to the Attorney General Opinion in a moment. I want to get back to the arrest though. Okay. I drew up on the board there my very

poor representation of what I believe the nightclub dance floor looked like on the evening in question where you have the DJ booth on the corner, the rear door to the club, the stage, the bathrooms in that circle in the lower right-hand corner of -- of the wall. Is it your knowledge that that little --

MS. BROWN: You know, objection.

MR. OCASIO: -- your device that's circled there --

MS. BROWN: Judge, I'm not really sure this is an accurate representation speaking when none of us have been in the club. And secondly, if indeed it is perhaps we should write it on a piece of paper and maybe put it in an exhibit. 'Cause then you'd --

ADMINISTRATIVE JUDGE ELLISON: Well --

MS. BROWN: -- at least have the viable option --

MR. OCASIO: Well, I -- I --

MS. BROWN: And --

ADMINISTRATIVE JUDGE ELLISON: I mean that's certainly true if you want to have it as part of the record, 'cause clearly this --

MS. BROWN: And then we'll have to --

MR. OCASIO: Well, I mean it's --

ADMINISTRATIVE JUDGE ELLISON: -- can't be part of the record but --

MR. OCASIO: -- for the purposes of framing Mr. Sham's position when the arrest happened of where Mr. Lugo was

situated, was merely a representation so that when I direct my questions to Mr. Sham we can get an idea more or less of where in the club these people were located. If the Agency wants me to reduce that to an exhibit, I'm more than happy. And as a matter of fact I can draft one out, have some copies made.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, we could. I mean if it becomes something that should be in the record, then I would --

MR. OCASIO: No problem.

ADMINISTRATIVE JUDGE ELLISON: -- ask you to do that --

MR. OCASIO: I just want to get an idea because --

ADMINISTRATIVE JUDGE ELLISON: -- later.

MR. OCASIO: -- she hasn't been to -- to the nightclub.

BY MR. OCASIO:

Q. How long have you worked for Mr. Carranza?

A. I worked for him for approximately one to two years.

Q. Okay. So, would it be fair to say then that you are fairly knowledgeable of the layout of the club?

A. Yes, it would be.

Q. Would it be fair to say that you would also have a fair knowledge of the layout of any video or surveillance cameras in the club?

A. Yes, I would be.

Q. Okay. Would it be a fair representation to make that that marking right close to the bathroom doors would be possibly a video camera peeking into the dance floor and the DJ booth, sir?
A. It used to be a video camera. It was --
Q. I'm asking.
A. Yes.
Q. All right. Is it a fair representation to make that at the night in question there were video cameras operating at the club or they don't work any more?
A. Possibly. I don't know.
Q. Okay. Exactly what happened when you approached the table where Mr. Lugo was sitting with his guests?
MS. BROWN: Objection. Asked and answered.
MR. OCASIO: To your knowledge.
ADMINISTRATIVE JUDGE ELLISON: Well, I mean he gave that narrative in some detail.
MR. OCASIO: Yeah.
ADMINISTRATIVE JUDGE ELLISON: So, if you want to ask specific questions about --
MR. OCASIO: All right. Well --
ADMINISTRATIVE JUDGE ELLISON: -- part of it, that's fine.
MR. OCASIO: Okay.
ADMINISTRATIVE JUDGE ELLISON: But I don't want him to

just reiterate everything he said.

MR. OCASIO: Well, I don't want him to reiterate it either. There are representations made in his statement that he believed Lugo might have been intoxicated. His statement says that were various open bottles of cognac, so on and so forth, with the inference being that the Appellant was drunk or intoxicated or under the influence of someone.

BY MR. OCASIO:

Q. So, my first question to you is do you remember or did you witness exactly how many alcoholic beverages Mr. Lugo had?

A. No, I did not.

Q. Did Mr. Lugo smell of alcohol?

A. Yes, he did.

Q. Smell strong, light? I mean can you remember?

A. Not strong, light.

Q. Okay. Do you remember how long Mr. Lugo was at the club?

A. No, I do not.

Q. Don't remember what time he might have come in?

A. No, I do not.

Q. Okay. Your point of vantage in this little diagram there of the dance floor, observing the table where Mr. Lugo was, how long were you observing that table?

A. Approximately I had observed his table five to 10 minutes.

Q. Five to 10 minutes. In the five to 10 minutes you were observing that table did you see Mr. Lugo drinking alcohol?
A. No, I did not.
Q. I see. So, how he puts a cigarette in his mouth and what happens from there?
A. I approached his table.
Q. Okay. So, when you approached the table what's going on there that you remember?
A. What I remember was he had the cigarette in his mouth and I asked him to please not smoke in the nightclub.
Q. Was anybody else drinking at the table?
A. I do not remember.
Q. Your statement says you noticed the open bottles, glasses, you know, unfinished drinks numerous.
A. That's exactly what it says.
Q. Numerous unfinished drinks being two or three, one or two? Do you remember?
A. Four or five.
Q. Four or five unfinished drinks?
A. I believe so.
Q. How many people were at the table?
A. I can remember right now four.
Q. Two men, two women? Two women, I mean --
A. Two men, two women.

Q. And Mr. Lugo.
A. No, Mr. Lugo was one of those men.
Q. So, Jesus Contreras (phonetic) was sitting at the table with Lugo, yet we have another lady to --
A. I do not --
Q. -- your recollection?
A. I do not remember.
Q. Okay. No problem. Your testimony is that after you speak to Mr. Lugo he -- he lurched out of the chair?
A. Yes.
Q. Do I understand that? How did he lurch out of the chair? Did he move and jump? Did he pull and grab? Did he --
A. I'm sorry, I don't understand the question.
Q. How did he lurch out of the chair?
A. How did he lurch out of the chair?
Q. Yeah.
A. He fell forward out of the chair and grabbed my arm.
Q. And he grabbed your arm. Okay. Now you're subduing Mr. Lugo. I want to make sure I understand this correctly. You -- did you handcuff him while you were struggling or did you subdue him and then handcuff him?
A. I had to subdue him then handcuff him.
Q. Okay. So, after you handcuffed him what's the very first thing that you informed Mr. Lugo of after you put the handcuffs on him?

A. The very first thing that I -- the first thing I remember saying to Mr. Lugo was that I'm placing him under citizen's arrest.
Q. Okay. Exactly what did you arrest him for? So I make sure I understand it.
A. Battery on my person and carrying a concealed firearm.
Q. To your knowledge what exactly was the radio call that was made to the Redwood City Police Department?
A. I don't know, sir. I did not make the call to the Redwood City Police Department.
Q. Okay. Now, the -- you -- he's handcuffed, he's placed under citizen's arrest.
A. Yes.
Q. Okay. Mr. Lugo had on his possession a valid federal carry permit.
A. I would not know that.
Q. It was contained in his identification --
MS. BROWN: Objection.
Q. The question --
MS. BROWN: This is assuming facts not in evidence.
MR. OCASIO: Okay. Well --
ADMINISTRATIVE JUDGE ELLISON: Says he doesn't know.
MR. OCASIO: All right. I'll strike the question.
BY MR. OCASIO:
Q. How did you know at the time of the arrest Lugo could

not carry a firearm concealed?
A. I did not. He was -- I did not know he was a police officer at that time.
Q. So, while you're subduing him did he have his shield around his neck, was it clipped to his belt, was it in his pocket, you didn't see it?
A. I did not see it.
Q. So, it's not your testimony that he had the badge clipped to his belt close to his gun.
A. At that moment in time, no.
Q. Okay.
A. I don't remember.
Q. So, now you have handcuffs on him, he's your -- you've arrested him, and you mentioned that you arrested him for carrying a concealed weapon.
A. Yes.
Q. Do you understand that arrest to be a felony or misdemeanor?
A. I do not know.
Q. So, how would you know that you could arrest him for carrying a concealed weapon?
A. Because if he's not a police officer, and that moment in time I did not know he was a police officer, it's illegal for citizens to carry firearms, unless they're working as a contract security officer in our -- in our establishment.

Q. That a fact? Okay. So, now the Redwood City Police show up. Lugo is in handcuffs?
A. Yes.
Q. Was Lugo able to move of his own free will?
A. Yes.
Q. Lugo was able to move of his own free will. Well, but --
A. I'm sorry?
Q. Okay. Let me --
A. Move of his own free will?
Q. Let me rephrase the questions. Excuse me. Your recollection was that Lugo was handcuffed?
A. Lugo was handcuffed, yes.
Q. Is it a fair representation to make that Mr. Lugo was not free to leave of his own accord?
A. I believe so, yes.
Q. Is it a fair representation to make then if you are unable to leave of your own accord or/and the consentual contact that you are, in fact, under arrest?
A. I believe so.
Q. Did you advise Mr. Lugo by what authority you had arrested him, sir?
MS. BROWN: Objection. It seems that we're going right down the District Court road here and this is --
MR. OCASIO: Excuse me. You cannot separate -- you

cannot separate the line of questioning from what he thought at the time he writes this statement. If he's placing him under citizen's arrest, what he thought at the time of the arrest is relevant to the statement. If he didn't know that he could do it, that's relevant also. Unfortunately, the case is inextricably intertwined and you do not have the right to separate out what stuff you deem relevant for this appeal. The line of questioning has not gone --

ADMINISTRATIVE JUDGE ELLISON: She certainly has the right to --

MR. OCASIO: -- askew.

ADMINISTRATIVE JUDGE ELLISON: Certainly has the right to express her opinion on that.

MR. OCASIO: I understand and I wanted to make sure that I go back to the Judge's admonishment at the beginning of this, that if you're going to start a standing objection that's going to be fine. However, if we can cut to the chase and just take the statement off the table and have him tell us what he thought was going at the time, we can expedite this witness and move on with everybody else who's going to testify.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, now ultimately whether or not it was a proper citizen's arrest under whatever --

MR. OCASIO: I just --

ADMINISTRATIVE JUDGE ELLISON: -- case law applies, is

irrelevant to this proceeding.

MR. OCASIO: I understand. I am just wishing to establish the record and make sure that the line of questioning basically stays consistent.

BY MR. OCASIO:

Q. All I want to know is at the time you arrested him, you handcuff him, did you -- what did you tell him you arrested him for?

MS. BROWN: And we've asked and answered that question --

ADMINISTRATIVE JUDGE ELLISON: Well, you asked --

MS. BROWN: -- at least three times now.

ADMINISTRATIVE JUDGE ELLISON: You asked him what he thought he was arresting him for.

MR. OCASIO: Arresting him for, yeah.

ADMINISTRATIVE JUDGE ELLISON: Are you asking him now if he advised --

MR. OCASIO: Specific, yeah.

ADMINISTRATIVE JUDGE ELLISON: -- Mr. Lugo what he was arresting him for?

BY MR. OCASIO:

Q. Did you tell him why you arrested him?

A. I do not remember.

Q. Okay. So, now he's arrested. You searched him?

A. Yes, I did.

Q. Okay.
A. I did a brief cursory search strictly for the firearm.
Q. Okay. And after you find the firearm what else did you do? Did you remove his credential?
A. No, I did not.
Q. Okay. You bring him outside the club, now the Redwood City Police show up.
A. Yes.
Q. Okay. Did you turn custody of Mr. Lugo over to the Redwood City Police Department?
A. Yes, I did.
Q. Did -- did the officer take custody of Mr. Lugo to your knowledge?
A. To my knowledge, I believe he did.
Q. You believe he did?
A. He -- I talked, I spoke with the Redwood City police officer, stated what had happened, who Mr. Lugo -- who I believed Mr. Lugo was, and the Redwood City police officer advised that he would figure out the situation and --
Q. No -- no problem. My question to you is: Prior to this incident you've seen Mr. Lugo in the club before?
A. I had seen him once, once that I can remember.
Q. Once that you can remember. Had you seen Mr. Lugo anywhere prior to the club that you recollect?
A. No, I do not.

Q. So, you don't recall ever seeing him outside of the Flamingos?
A. No, I do not.
Q. You never saw him at 1301 Clay Street?
A. I do not remember seeing him at 1301 Clay Street.
Q. Okay. Well, then the only thing that winds up going down to this particular point is you said that after the officer -- I mean it's -- if he had assaulted you and you had arrested him -- well, let's get there just one second. The officer shows up and what happened?
A. The officer showed up.
Q. Yeah.
A. Asked me what happened.
Q. Now, at the time you're detaining Mr. Lugo did you detain him by yourself or the other -- the people who helped you subdue him?
A. There were other Security present.
Q. Okay. To your knowledge did the officer also speak to the other officers?
A. No, I do not -- I don't remember.
Q. Okay. So, he tells you this guy's a cop and do you want to not press your charges?
A. Yes, it -- yes.
MR. OCASIO: Okay. Well, I'm done with this witness.
ADMINISTRATIVE JUDGE ELLISON: Okay. Anything else?

MS. BROWN: Agency has no redirect.

ADMINISTRATIVE JUDGE ELLISON: Okay. Thank you very much.

MR. OCASIO: Thank you.

ADMINISTRATIVE JUDGE ELLISON: I appreciate it. Can we pause the record, please.

MS. BROWN: If you were --

(Witness excused.)

(Off the record.)

COURT REPORTER: On the record.

ADMINISTRATIVE JUDGE ELLISON: Okay. We have had a indication from the representative for Mr. Rudy Carranza, who is an approved witness in this case, and on whom -- now I don't know exactly on whom the subpoena was delivered. Was it delivered to Mr. Carranza directly or to you?

MR. CARNAGEY: It was, Your Honor, copies dropped off at my office when I was not present about a week ago.

COURT REPORTER: Excuse me. You need to move up closer.

ADMINISTRATIVE JUDGE ELLISON: Yeah, okay. I'm sorry.

MR. CARNAGEY: I'm not going to speak.

COURT REPORTER: Give your name, please.

MR. CARNAGEY: My name's Roger A. Carnagey. I represent Rudy, Rudolfo Carranza. He is an employee of Flamingos Nightclub. I -- Your Honor, I was -- some copies of

subpoenas were dropped in my office about a week ago when I was not present. Mr. Ocasio had previously sought authorization for me to accept service on behalf of my clients. My clients did not authorize such service. And Mr. Carranza, there was an attempted serve at Flamingos on Friday or Tuesday night about 11:30 p.m. The subpoena was dropped in front of Mr. Carranza, as I understand it. It was delivered to the premises, he was aware of it, but there were no witness fees tendered with that subpoena, and that's a requirement, as I understand it, of the rules that govern these proceedings.

ADMINISTRATIVE JUDGE ELLISON: Okay. So, intention is to file a motion to quash on that basis?

MR. CARNAGEY: Yes.

ADMINISTRATIVE JUDGE ELLISON: Okay. So, what we determined and talked about off the record is that you would do that in the very near future in writing obviously, a copy to the Agency representative and Mr. Ocasio, and whatever input is appropriate from both sides we'll take, and then I'll exercise whatever discretion authority I have over that to -- to rule on it. And then if that, for whatever reason, the motion to quash is not successful, I advised Mr. Ocasio that he then, of course, has the right to attempt to obtain enforcement of the subpoena through the District Court and we will have to, if that becomes necessary, talk about the proper way to go about doing it. Mr. Ocasio indicated that he was not at this time

willing to withdraw Mr. Carranza as a witness, so -- which obviously is right, so that's fine and we'll just proceed with the motion to quash and then, if necessary, petition for enforcement of the subpoena.

MR. CARNAGEY: Also, Your Honor, in order to hopefully avoid further problems, assuming that you are provided with -- a motion to quash is filed timely today, I would represent to the Court that, depending on the outcome of the motion, that Mr. Carranza would be available tomorrow assuming that the subpoena is not quashed, so that we might avoid further proceedings.

ADMINISTRATIVE JUDGE ELLISON: Well, okay. In that case I take back what I said and if you could -- well, I don't -- I don't believe I'll be in my office today, since I intend to be here, so faxing it to me there won't do any good now. So, if you want to get it to me before I leave today, before we leave, I assume we're going to be here till about 5:00 o'clock, I'm assuming, that's fine, but those are the parameters. I don't -- I can't guarantee certainly what the outcome would be. I can't even guarantee that I would necessarily have the opportunity to -- to rule on the motion to quash in that short of time. So --

MR. CARNAGEY: I understand that, Your Honor.

ADMINISTRATIVE JUDGE ELLISON: Okay. Thanks.

MR. OCASIO: Then notwithstanding, Your Honor, I would

respectfully request that if we are to proceed to the second day of the administrative hearing, that Mr. Carranza be available. If the Judge issues a standing order that the subpoena is quashed, then Mr. Carranza can go home. If the Court finds counsel's argument unavailing, then it would be nice to have Mr. Carranza appear and give testimony.

ADMINISTRATIVE JUDGE ELLISON: Obviously. Okay. All right. And then also, just to put on the record, the counsel for the two police officers who are going to testify here requested that I limit their testimony to the facts that are relevant to the charges in this case and not have their testimony be expanded to anything that might have an impact on a subsequent, I believe it's District Court case between the Appellant and the two officers, and I informed him that, of course, it is my job to limit the testimony to issues that are relevant to this Board appeal, but that we don't strictly apply rules of federal evidence or procedure, and that I cannot guarantee that any ruling I make on materiality or relevance will be strictly in accord with those rules, but I certainly intend to keep their testimony and everyone else's to the relevant issues in this case.

MR. CARNAGEY: Judge Harrington [sic], thank you.

ADMINISTRATIVE JUDGE ELLISON: Okay.

MR. OCASIO: Thank you, Your Honor.

ADMINISTRATIVE JUDGE ELLISON: All right. And so now

# EVANGELISTA LUGO

V

# DEPARTMENT OF THE NAVY

MERIT SYSTEMS PROTECTION BOARD
SAN FRANCISCO REGIONAL OFFICE
CASE SF-0752-00-0499-I-1

# EXHIBIT

# 4

TESTIMONY OF OFFICER GREGORY FARLEY
PAGES 80 THROUGH 140

we have Officer Farley?

MS. BROWN: Officer Farley.

ADMINISTRATIVE JUDGE ELLISON: Okay. Have a seat, please. Okay. Do you have any objection to taking an oath regarding your testimony?

THE WITNESS: I do not.

ADMINISTRATIVE JUDGE ELLISON: Could you raise your right hand, please.

Whereupon,

GREGORY FARLEY,

having been first duly sworn, was examined and testified as follows:

ADMINISTRATIVE JUDGE ELLISON: Thank you. Could you state and spell your full name for the record, please.

THE WITNESS: Gregory, G-R-E-G-O-R-Y, Farley, F-A-R-L-E-Y.

ADMINISTRATIVE JUDGE ELLISON: Okay. Thank you. Ms. Brown?

MS. BROWN: Hi.

DIRECT EXAMINATION

BY MS. BROWN:

Q. You've already stated your name. Could you tell me what your title is?

A. I'm a police officer with the City of Redwood City.

Q. Okay. How long have you worked for the City of

Redwood City as a police officer?
A. Just six years now.
Q. Okay. And how long have you been a police officer in total?
A. Six years.
Q. Okay. So, your whole time spent there.
A. Yes.
Q. Okay. As I'm sure you know, we're here to talk about the removal by the Department of the Navy of Mr. Lugo, who is sitting across from you over there, and that removal is based on events that occurred on March the 14th and the 15th, so that's what we'll be talking about.
A. All right.
Q. Okay. I want to take you back to March the 14 -- actually to the 15th, early early in the morning, of this year. And -- and ask you were you dispatched that night to Flamingos?
A. Yes, I was.
Q. And what information did the dispatcher give you whenever you got that call?
A. The information was there was a disturbance at Flamingos and that Security had one detained out front.
Q. Okay. Do you remember approximately what time that was?
A. It was approximately 1:30, 1:40, in the morning.
Q. Okay. Pretty early. So, did you go immediately to

Flamingos?

A. Yes, I did.

Q. And what did you see when you got there?

A. When I arrived I saw Mr. Lugo out front with Security Officer Sham and several other people, and I think two other security officers whose names I don't know.

Q. Okay. What did you do at that point?

A. At that point I had Mr. Lugo stand with Officer Paraskevopoulos approximately 10 feet away from me and Officer Sham -- or Security Officer Sham, and I obtained a brief synopsis of what happened from Security Officer Sham.

Q. And what did he tell you?

A. Security Officer Sham told me that he was working that night as Security in the club. He observed Mr. Lugo put a cigarette in his mouth and when he --

ADMINISTRATIVE JUDGE ELLISON: I'm sorry. I'm sorry. Is there a problem?

MS. BROWN: I was just confused. Did Mr. Ocasio --

MR. OCASIO: No, I'm --

MS. BROWN: Is there something wrong or --

MR. OCASIO: No, I've been sitting so long I'm starting to feel like a chair. I'm stretching my back muscles. I wanted to make sure I wasn't disturbing the Agency representative.

ADMINISTRATIVE JUDGE ELLISON: Okay.

MS. BROWN: I just didn't want to distract the witness from the questions.

MR. OCASIO: Oh, no, I'm sorry. That's why I stepped out of the way.

MS. BROWN: I apologize.

MR. OCASIO: My back was bothering me. I'm sorry.

THE WITNESS: It's okay.

ADMINISTRATIVE JUDGE ELLISON: Okay. Go ahead.

MS. BROWN: That's -- perhaps it was distracting me more than you.

THE WITNESS: That's fine.

MS. BROWN: But that's probably the case. So, we'll go back.

BY MS. BROWN:

Q. You said that you were speaking with Officer Sham about what happened. Can you tell me what he told you again?

A. He told me that he saw Mr. Sham in the club.

Q. No, wait.

A. I'm sorry. Mr. Lugo in the club and he saw him put his cigarette in his mouth. Security Officer Sham approached Mr. Lugo and asked him or told him of the California law stating that you cannot smoke in an establishment. And Sham told me that Mr. Lugo told him that, you know, he can smoke in the club, it was okay, that Rudy Carranza said it was okay for him to smoke in there. And Sham then told me that he informed

Mr. Lugo that, no, it was California law you cannot smoke in his establishment. Sham said that Lugo said, well, quote, "Fuck off, go get Rudy, go get your boss." And Sham says, "Well, no, he's busy and you still can't smoke in this club." Sham told me that at that point Mr. Lugo lunged at him from his seat and grabbed onto his arm. Mr. Sham said that Lugo pushed up against him and they started to fall backwards, and as they were falling backwards Sham said that he could -- he felt a what he felt to be a firearm or a weapon of some sort attached to the side of Mr. Lugo. Sham said at this point he became very scared for his safety, removed his hasp baton and pried, in the closed mode of the hasp baton, pried Mr. Lugo's hand from his arm, took him to the ground, and handcuffed him. At that point he brought him -- he took his firearm off of him, took the magazine out, slide the rack of the firearm back and locked it open and found there was no round in the chamber, transported Mr. Sham -- or Mr. Lugo outside and had someone call the police and waited for our arrival.

Q. Okay. I have a question that's maybe just me that has this question, but everybody keeps referring to an hasp.

A. Yes.

Q. What's an hasp?

A. I can demonstrate that for you.

Q. Well, if you could just tell me, 'cause it's not going to be easily explained on the transcript. But can you tell me

what --

A. Okay.

Q. -- an hasp is? I mean you can demonstrate at the same time.

A. An hasp is this, is a long metal baton that's expandable. It has two modes. In the closed mode it's approximately 12 inches, 10 inches long. In the open mode, depending on what model you have actually, is -- excuse me -- it extends out to something like 21 inches.

Q. Okay.

A. It depends on what type of hasp you have, there's different sizes.

Q. So, he kept it in a closed mode is what you were talking about.

A. That's -- this is how he explained it to me, yes.

Q. That was more for my benefit I think.

A. Okay.

Q. Now, at this point when Mr. Sham was talking to you what was he doing with his handgun that he had taken off Mr. Lugo?

A. When -- when Sham -- when I first approached Sham he gave me the opened gun.

Q. Okay.

A. And the magazine, which I handed to Officer Paraskevopoulos to secure --

Q. Okay.
A. -- while I spoke to the parties.
Q. Whenever Mr. Sham was talking to you about the incident at the table in the -- in the club did he tell you what kind of language, other than, you know, "fuck you, get Rudy," did he tell you that was the typical language or did he explain any further about the language that was used?
A. He described his behavior and his language toward him as abusive.
Q. Okay. During this you said you were about 10 feet away from Officer Paraskevopoulos who was over with Mr. Lugo, right?
A. Right.
Q. During you talking to Mr. Sham was Mr. Lugo silent at this point?
A. No, he interrupted several times and --
Q. What's he saying?
A. He's saying several -- he interrupted several times. On some of the occasions said, "Hey, you know, I'm a cop, come on over, let's talk." And I would tell him, no, just stay where you're at. And then he would say, "Hey, I got to listen to what he's saying, too." And I said, "That's it, no, you don't have to listen to what he's saying, stay where you're at." So, the interruptions were frequent and they had either to do with either one of those subjects that I just explained.

Q. So, the subjects would be again what?
A. Would be, "Hey, I'm a cop, you know, come over and talk to me." He wanted a private conversation with me was what he was indicating.
Q. Okay. And the second one?
A. And the second thing was that he wanted to hear what I was talking to Sham about.
Q. Okay. Did you -- you said that you had the gun and everything. Did you pat down Mr. Lugo?
A. Yes, I did pat him down.
Q. When did you do that?
A. That would be right when I arrived actually.
Q. Okay. What did you find doing that?
A. I found a holster on his belt and I also found a knife clipped to his boot.
Q. Okay. During the pat down did Mr. Lugo try to talk to you?
A. Yes, he was telling me that he was a cop, he was a cop. He showed me a badge that he had on his belt and told me that I could remove his ID from his wallet.
Q. Did you do that?
A. Yes, I did.
Q. And what did you do with that identification?
A. At that point I just -- at that very instant I just briefly inspected it, it said Federal Police -- or said police

officer on it, and I handed it to Officer Paraskevopoulos to have him run through CLETS.

Q. What is CLETS?

A. I don't know what the acronym stands for. I'm sorry. But it's basically the --

Q. I don't either.

A. It's a wants and warrants system. It runs their driver's license, it -- it, you know, just lets you know if they're wanted or have any probation hits, parole, everything.

Q. Okay.

A. It's just the whole gamut of everything.

Q. Okay.

COURT REPORTER: One moment, please.

(Tape changed at this time.)

COURT REPORTER: Go ahead, please.

BY MS. BROWN:

Q. Okay. So, did Officer Paraskevopoulos tell you what happened when he ran the ID through CLETS?

A. Actually I could hear it on my own radio, and he came back with a --

Q. Oh, it comes over the radio?

A. What, the return? The information comes back over the radio.

Q. Oh, okay.

A. And the return said that he was -- he had confidential

information on his driver's license.

Q. What does that mean? I mean am I confidential 'cause my number isn't listed? Or --

A. Well, what it means is that you have filled out a DMV form, and passed it through supervisor, and asking for confidentiality on your driver's license. It's usually restricted to law enforcement, district attorneys, people that would have necessarily need their address to be confidential from outside sources.

Q. Okay. So, what did him coming up confidential then mean to you?

A. Well, in combination with him having a badge and having a ID card that said federal -- that said police officer, and him telling me that he was a police officer, it made me further believe that he was telling me the truth that he was a police officer.

Q. Okay. At this point did he still have the handcuffs on or when did you take those off?

A. I took those off. After I'd finished interviewing Sham, I asked Sham, you know, "Is this something you're going to want to press charges on? Do you want to make a citizen's arrest?" And he said, you know, "If he's willing to go on his way, no, I don't want to make a citizen's arrest." At that point I returned to Mr. Lugo and took the handcuffs off immediately at that point.

Q. Okay. Is it legal to carry a concealed weapon in California?
A. It is not legal, no.
Q. But yet Mr. Lugo had a weapon on him. I'm confused about that.
A. Right, you have an exemption if you are a police officer and --
Q. So, like you could do that.
A. Right, I can carry a concealed weapon.
Q. Okay.
A. Or if you have concealed weapons permit, you can carry concealed weapon.
Q. Okay. So, did you ask Mr. Lugo if he was permitted to carry a concealed weapon?
A. I had the conversation with him, yes. I asked him, you know, does this ID that you're showing me, which didn't say anything about carrying a concealed weapon or not carrying a concealed weapon, asked him if he was allowed to carry a concealed weapon and he told me, yes, that he was a police officer and that he can.
Q. Okay. So, at that point whenever he told you that did you make any further checks or did you just assume that he was telling you the truth?
A. At that point we -- I asked if he had any phone numbers we could call at that time of night to confirm his

employment. He said there were not. We had Dispatch check for any phone numbers they could find that would connect us to federal police agencies or Department of Defense agencies, and they could not find any phone numbers. After I had interviewed Mr. Lugo and he said he didn't want to press any charges against Sham, at that point I didn't feel it necessary to investigate it any further and waste any more of anybody's time on it and just released him.

Q. Okay. Whenever -- you said that you spoke with Sham first and then you went and spoke with Mr. Lugo, what was his version of why the police were called to Flamingos that night?

A. His version was -- was similar. He told me that he was in the club and that he was trying to smoke and that Sham approached him and told him that he couldn't smoke. Lugo told me that everyone in the club knows that he's a police officer and that he can smoke in the place if he wants to. And secondly he also told me that Rudy Carranza is a friend of his and that Rudy lets him smoke when he wants to inside the club. Mr. Lugo told me that he told Sham to go get Rudy and that Sham refused and --

Q. Did he deny there was a scuffle between the two men?

A. No, he said that Sham had grabbed him and threw him to the ground and handcuffed him.

Q. Did he appear to be injured or hurt to you?

A. No, he did not.

Q. Did he ask you for medical attention?
A. No, he did not.
Q. When you spoke with him what was his demeanor? What was Mr. Lugo's demeanor?
A. He was -- he was -- he was on two levels. I'm trying -- I'm going to explain that.
Q. Okay.
A. One is that he would be very interruptive and very confrontational and the next minute he was very cooperative and almost like he wanted to be -- he wanted some kind of -- this is my impression now, that he wanted some kind of favor like, hey, come here, you know, we're cops, let's go. You know, we're buddies, come on over here and talk to me privately. We can figure this out. And I told him no, that that wasn't going to happen, and which is why I didn't have a private conversation with him. I didn't want the appearance of any special favors between what appeared to be two police officers --
Q. Okay.
A. -- me and him.
Q. When you spoke with him did he appear to be intoxicated to you?
A. Yes, I could smell a strong odor of an alcoholic beverage on his breath and person. He had red watery eyes. He slurred when he spoke. And when walking he had a staggered

gait.

Q. Okay. So, at this point you have spoken now with Sham, you've spoken with Mr. Lugo. Did both men -- what is it, both men said they didn't want to --

A. Right.

Q. -- file charges?

A. Neither party wished to sign a citizen's arrest against the other. Mr. Lugo never told me that he wanted Sham arrested.

Q. Okay. So, here's my question. This is just as a person that doesn't know the answer. Why wouldn't there be an arrest without either one of them wanting to file a complaint against each other?

A. Well, in California a police officer can only make a misdemeanor arrest, which this would be, if it is committed in his presence or if there's a citizen's arrest involved, then he would accept the arrest.

Q. Oh, okay. So, that's why you couldn't do it on your --

A. There's only -- there's certain circumstances where you can make misdemeanor arrests not committed in your presence and they have mostly to do with DUI and domestic violence.

Q. Okay. What eventually happened with the gun?

A. The gun was returned to Mr. Lugo and the loaded magazine was returned to his female companion that was there

with him.

Q. And why was that?

A. He was -- Mr. Lugo was intoxicated and I didn't feel it was really safe at this point, seeing what he had just been through, for him to have a gun and bullets, and but I wasn't going to deprive him of his weapon at that point thinking that he was a police officer.

Q. Okay. Do you know whether Department of Defense police officers -- actually let me rephrase that. At the time at March 15th did you know whether DOD police officers were allowed to carry firearms off duty?

A. I did not know.

Q. Okay. What would -- well, actually, you know what? Did you see his ID?

A. Yes, I did.

Q. Okay. I'm going to show you Agency Exhibit 13, which again was in the prehearing submissions. It's not a very beautiful picture, apparently we can't afford a color copier, but it's something. Can you tell me what that was?

A. That appear -- that appears to be the U.S. Department of Defense police ID card.

Q. Is that what you saw that night?

A. It was something very similar to this, yes.

Q. Okay. Now, the one that you saw did it say the bottom part which says "Off-Duty Weapons Not Authorized?"

A. No, it did not.

MR. OCASIO: Now I have an objection, Your Honor. The Agency has worked very diligently at being able to ensure we don't have crossovers into the District Court Complaint and now she's slipping this one in under the guise of her questioning. I have no objection if she's going to be allowed to do that as long as I'm able to explore that very same issue before the Board.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, since there's no charge here about carrying a weapon or anything --

MR. OCASIO: Well, the --

ADMINISTRATIVE JUDGE ELLISON: -- related to that, as I've said earlier, I don't think it's going to make a difference. So, I mean if you -- unfortunately or not we can't --

MR. OCASIO: No, I just want to be able to have a shot at being able to --

ADMINISTRATIVE JUDGE ELLISON: Well, my point is --

MR. OCASIO: -- go over some of the questions.

ADMINISTRATIVE JUDGE ELLISON: -- I'm not going to give you that shot. I'm -- you can strike. We don't have the capacity to actually strike a question and answer. He's already answered the question. It's going to have no impact on the outcome of this Board case one way or the other. So, I mean perhaps if you had made the objection before he answered,

I would have sustained it. So, let's go on.

MR. OCASIO: Okay.

BY MS. BROWN:

Q. If Mr. Lugo hadn't told you that he was a police officer and showed you his identification and his identification hadn't come up confidential, what would have happened in this particular case?

A. Exactly the same thing. He would have been allowed to go as long as they both did not want to press charges against each other.

Q. Okay. Now, if in terms of the weapon, if he hadn't indicated to you that he was a police officer and permitted to carry that weapon, would you have still let him go that evening?

A. In terms of the weapon I would have asked for a permit, concealed weapons permit. And had he produced something like that, yes, same thing would have happened. If not, then he would have been charged with carry a concealed weapon.

MS. BROWN: Okay. I'll pass the witness.

ADMINISTRATIVE JUDGE ELLISON: Okay. Mr. Ocasio?

MR. OCASIO: Where do I start? Okay.

CROSS-EXAMINATION

BY MR. OCASIO:

Q. When you arrived Mr. Lugo was in handcuff, yes?

A. Yes.
Q. Is it your understanding that Mr. Lugo was not free to leave of his own free accord? He couldn't move, he's handcuffed, right?
A. Right.
Q. Would that be a fair representation, your understanding he was under arrest?
A. Can you ask the question again, please?
Q. Would your arrival to the club, observing Mr. Lugo handcuffed, surrounded by security guards, be a fair representation of your understanding he was under arrest?
A. I'm not exactly sure what you're asking me.
Q. I'll repeat it one more time.
A. Thank you.
Q. When you arrived at the club Mr. Lugo is in handcuffs. In your experience as a police officer would that be a fair representation the Appellant was under arrest?
MS. BROWN: Your Honor, I thought -- my understanding was that this is a misquote 'cause I thought he said he was detained.
ADMINISTRATIVE JUDGE ELLISON: Well, I mean there may be that distinction. I don't know, I'm missing.
MR. OCASIO: Well --
ADMINISTRATIVE JUDGE ELLISON: If there is such a distinction, fine.

MR. OCASIO: There is a very -- there is a very very large legal distinction.

MS. BROWN: But I think that legal distinction is something that we're focusing on in the District Court case, not in this particular case.

MR. OCASIO: Oh, so now we're going to be switching it. Okay.

ADMINISTRATIVE JUDGE ELLISON: Well, I mean ultimately. You know, I allowed the question and it's fine. I think there might be a distinction. I'm not sure how it has an impact on this Board appeal --

MR. OCASIO: Well, it -- it has all the --

ADMINISTRATIVE JUDGE ELLISON: -- because whether or not --

MR. OCASIO: It has --

ADMINISTRATIVE JUDGE ELLISON: As I said earlier, whether or not this citizen's arrest was fully effected, and if it was effected if it was ultimately legal or proper or whatever, is ultimately, and in fact initially, irrelevant to this proceeding, this Board proceeding.

BY MR. OCASIO:

Q. Was he under arrest? Yes or no.

ADMINISTRATIVE JUDGE ELLISON: Well, because of that it's irrelevant to the proceeding. I mean if there's going to be an objection, which there has been, then I'm going to have

to rule on it. Then that's it. It's -- it's not going to have, you know, it's not going to have any impact on the outcome of this case.

MR. OCASIO: Unfortunately, I believe it will.

ADMINISTRATIVE JUDGE ELLISON: In this case, the Board case.

MR. OCASIO: One of the reason I am vigorously preserving this record is I know this baby is going up on appeal.

ADMINISTRATIVE JUDGE ELLISON: Well, that's fine.

MR. OCASIO: And these objections are going to get --

ADMINISTRATIVE JUDGE ELLISON: We have a tape recording. You can --

MR. OCASIO: That's fine. I mean I --

ADMINISTRATIVE JUDGE ELLISON: I mean we're on the record here.

MR. OCASIO: -- don't have a problem with that if -- well, fine. Let's move from there. May I approach the witness, please?

ADMINISTRATIVE JUDGE ELLISON: Sure.

MR. OCASIO: This is contained in the Agency file.

MS. BROWN: You want to give me an exhibit number?

MR. OCASIO: I have not a clue where I put it. I'll make a copy and then I'll give it to her.

ADMINISTRATIVE JUDGE ELLISON: Well, let's identify it

so we can find it and all look at it.

MR. OCASIO: Okay. Oh, gosh.

ADMINISTRATIVE JUDGE ELLISON: Okay. Officer Farley, if you can hand it to Ms. Brown, she might be able --

MR. OCASIO: Yeah, would you?

ADMINISTRATIVE JUDGE ELLISON: -- to identify where it is in the record --

MR. OCASIO: Yeah, hand her that.

ADMINISTRATIVE JUDGE ELLISON: -- of this appeal.

MR. OCASIO: Well, let's forget the weapon license one second. Let me ask you a real basic question.

BY MR. OCASIO:

Q. If Mr. Lugo had no identification on his person, okay, didn't have a driver's license, no ID, no nothing, you ran him through CLETS, exactly what would you get back, sir?

A. Okay. If a ran a person through CLETS what would I get?

Q. Yes, sir.

A. I would get back driver's license information, a Sheriff's record if they had one. I would get whether or not they're on parole, probation. I would get any kind of confidentiality on their -- their license, any kind of restrictions on their license, if they had any restraining orders. And off the top of my head that's all I can recall right now that I would get back.

Q. Okay. So, let me ask you this. Let's go on a foregone conclusion for a moment. He had no identification on his person whatsoever, you run his name through CLETS on a alpha search. Would his DOD police status come up on his CLETS, sir?

A. I don't know what an alpha search is.

Q. You're running him by his surname only. No date of birth, you have nothing else except Lugo, E. If you question him further, he's in handcuffs, he says my date of birth is, my driver's license number, and you key it in on your mic and you call CLETS, Lugo, Evangelista, date of birth, driver's license number, what would come back over the radio, sir?

A. His driver's license would come back confidential.

Q. Okay. Would the notation in the CLETS come back also indicating he is a federal police officer, sir?

A. No, it would say what agency granted the confidentiality.

Q. So, if we ran his CLETS and we produced one that said that the City of Redwood City ran a CLETS and knew at the time of the incident that he was a federal police officer, would that be something that would not have only been keyed over the mic, but you would have seen it also on the display screen of the computer terminal?

A. What computer terminal? I'm not --

Q. If Officer Paraskevopoulos --

A. I don't understand what you're talking about.

Q. -- is sitting in his squad car and he types in Lugo, Evangelista --

A. We don't have that capability, sir.

Q. -- it's sent.

A. I just don't want to -- I don't want to interrupt you. We don't have that capability.

Q. So, the Redwood City police cars do not have mobile terminals inside the vehicles.

A. They do now, but they don't work and they haven't worked yet.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, I mean for purposes of this case Mr. Lugo made a sufficient representation to the -- be careful there -- sufficient for the purposes of that evening to establish that he was a DOD police officer and so, therefore, everybody went their separate ways. So, that's -- that's kind of where the facts of this case end.

MR. OCASIO: Well --

ADMINISTRATIVE JUDGE ELLISON: Or the incident anyway.

MR. OCASIO: Here's what my problem is at this particular juncture in this Board appeal. I'm working off of the handicap that the Agency is being able to advance certain contentions, limiting the character, nature, and scope of the questioning which has been basically sustained by the Board. You have not only limited my ability to produce all the

exhibits for trial by denying me discovery, denying me requests, denying me documents, denying everything that was properly requested. The request to depose a nonfederal agency witness was properly filed and served, no objection came through, they denied me all of these documents, all of these -- everything out the door. I'm now being forced to appear at trial do a ironman request here, with the Agency throwing all these sidebars in, referencing the District Court case that they don't want to include it, and exploring the issue of did the officer know the Appellant could not carry a concealed firearm, being that the inference is he's not only misusing the credential, but he's also carry a weapon illegally.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, as I said that's not part of the charge. So, that's --

MR. OCASIO: Yeah, but they're still working it in anyway and I'm, you know, tied where I now have to voice my objection. We're done from there. Let me go back to the -- to the questioning and we'll just keep it simple.

BY MR. OCASIO:

Q. You arrive at the club, who was present surrounding Mr. Lugo when you got there?

A. Security Officer Sham.

Q. Who else was standing next to Sham?

A. There was another security officer.

Q. And that officer was?

A. I don't recall his name.

Q. Okay. Exactly why did Sham tell you he arrested him?

A. I'm sorry, we're talking about an arrest. Never said that.

Q. Exactly why did Sham tell you Lugo was in handcuffs?

A. Okay. He told me Lugo was in handcuffs because they had a physical altercation in the club where he had to restrain him with handcuffs.

Q. So, he arrested him.

A. I did not say that.

Q. I'm asking. If he detains him and he handcuffs him, what does that represent to you as a police officer?

A. A detention. If he detains him and handcuffs him it's a detention. Thank you.

ADMINISTRATIVE JUDGE ELLISON: And Mr. Sham didn't tell him apparently that he attempted to do a citizen's arrest. If that what I'm understanding?

THE WITNESS: That's correct.

ADMINISTRATIVE JUDGE ELLISON: Okay.

BY MR. OCASIO:

Q. Did he tell you he attempted a citizen's arrest or did he tell you he made a citizen's arrest?

A. He told me the -- what I told you before.

Q. No, I'm asking you now exactly what do you remember he told you?

A. I don't remember saying this subject is under citizen's arrest. I do not remember him saying that. I remember him saying -- telling me what happened inside the club.

Q. So, now you get there, Sham's the only guy you speak to, you don't remember anybody else there; is that correct?

A. No.

Q. Okay. Lugo was intoxicated your testimony is?

A. Yes.

Q. What field sobriety test did you perform that would lead you to believe he was unable to care for himself, sir?

A. I didn't make a statement that I felt that he was unable to care for himself.

Q. Excuse me. If you said he was intoxicated, then what premise of California law allows you to release a drunk on the street, sir?

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, why don't you ask the question that you started with and then --

MR. OCASIO: Okay. Well --

ADMINISTRATIVE JUDGE ELLISON: -- kind of expand it therefrom --

MR. OCASIO: We'll start with -- fine.

ADMINISTRATIVE JUDGE ELLISON: -- if you want.

BY MR. OCASIO:

Q. It was your opinion Mr. Lugo was drunk?

A. Yes.

Q. And your opinion was based on what criteria, sir?

ADMINISTRATIVE JUDGE ELLISON: The observations that he stated previously.

BY MR. OCASIO:

Q. Okay. So, your observation is that he's drunk. Was there anything in addition to your observation that might have confirmed your opinion that he might have been intoxicated, sir?

A. Yes.

Q. And what might that have been?

A. His statement that he was drunk and that he wanted to go to Denny's to sober up.

Q. He told you he was drunk?

A. Yes.

Q. Anybody else tell you he was drunk?

A. No.

Q. Although we'll ask Officer Paraskevopoulos directly, was it his opinion he was drunk also?

ADMINISTRATIVE JUDGE ELLISON: Well, you got to ask him that.

MR. OCASIO: I am, but I'm asking --

ADMINISTRATIVE JUDGE ELLISON: So, ask questions --

MR. OCASIO: -- the Agency's witness of his opinion because it's now being subjective. It's his opinion Lugo was

drunk. There's no --

ADMINISTRATIVE JUDGE ELLISON: That's what it always was, his opinion.

MR. OCASIO: I understand. So, there's no field sobriety test or anything else other than your subjective opinion. Let me ask you this.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, just to be absolutely clear here. I know you've implied, you've asked it once, then you kind of went off on a tangent, and then you kind of now have reached a conclusion, and you're probably right. But was there any field sobriety test done on Mr. Lugo at that time?

THE WITNESS: No.

ADMINISTRATIVE JUDGE ELLISON: Okay. Go ahead.

BY MR. OCASIO:

Q. Okay. How many units responded with you, sir, to the disturbance at the Flamingos?

A. Three.

Q. Who were the three units, sir?

A. There would be me, Officer Paraskevopoulos, and I believe Officer Serena (phonetic) had drove by and stopped for a few minutes.

Q. Officer --

A. Serena.

Q. Serena. Now, was Sham the only security officer you

spoke to, sir?
A. Yes.
Q. You didn't get a statement from Rudy or anybody else, just Mr. Sham?
A. Rudy wasn't present.
Q. My question, sir, was did you speak to him?
A. He wasn't present.
Q. Okay. Let me redirect my question one more time. After Mr. Lugo is released did you speak to Mr. Carranza?
A. No, I did not. Not that night.
Q. You spoke to him another night?
A. I've spoken to Mr. Carranza several nights.
Q. Regarding this incident?
A. A couple of times we've talked about this, yes.
Q. Okay. Your best representation of that conversation with Mr. Carranza, sir, was what?
A. I'm sorry, could you ask that question again?
Q. What was your representation of your conversations with Mr. Carranza regarding this incident?
A. What was my representation? I'm not exactly sure what you're getting at.
Q. What did you and Mr. Carranza speak about concerning this incident that you can remember, sir?
A. I'm sorry. Can you ask me something more direct? I mean we had a conversation.

Q. How many conversations did you have with Rudy about this incident, sir?
A. To the best of my recollection I would say maybe two.
Q. Okay. And in both of those conversations -- the first conversation you had with Mr. Carranza, sir, what was your recollection of that conversation?
ADMINISTRATIVE JUDGE ELLISON: You mean what did they talk about?
MR. OCASIO: Um-hmn.
ADMINISTRATIVE JUDGE ELLISON: Okay.
THE WITNESS: We talked about the incidence that happened on the night of -- or the morning of March 15th.
BY MR. OCASIO:
Q. As I do not understand your vague and amorphous answer, sir, your conversation with Mr. Carranza was exactly what did you guys talk about, if Rudy was not a witness, as you've just testified?
A. I have not testified to that.
Q. Oh, okay. So, was Mr. Carranza a witness to the incident to your knowledge?
A. I don't know.
Q. Okay. So, on the two times that you have a conversation mentioning this thing with Mr. Lugo, what exactly was your conversation, sir?
A. I'm sorry. Can you ask me specifically, specific

questions? I can't recall the entire conversation.

Q. How about just one word from the conversation? What did you and Rudy talk about this specific incident?

A. In one word I think he probably said hello.

Q. And after he said hello and how's it going, you entered into a conversation about this incident, sir. What was it?

A. I don't know what you're asking me.

ADMINISTRATIVE JUDGE ELLISON: Can you recall the conversations you had with Mr. Carranza about this incident?

THE WITNESS: I can recall talking to him, yes.

ADMINISTRATIVE JUDGE ELLISON: Do you remember any specifics of the conversation? Who said what to whom about this incident?

THE WITNESS: I can't really recall what exactly we said. I know that we talked about the incident that night, which is really what I'm trying to tell him.

ADMINISTRATIVE JUDGE ELLISON: You talked about the incident that night, the 15th?

THE WITNESS: The night of what we're talking about, the morning, the 15th.

ADMINISTRATIVE JUDGE ELLISON: And when was that, after everybody had been released?

THE WITNESS: This was, I believe, the next week the first time I had talked to him about it.

ADMINISTRATIVE JUDGE ELLISON: Okay. So, it was not that same morning that you spoke to Mr. Carranza.

THE WITNESS: No.

ADMINISTRATIVE JUDGE ELLISON: Okay. 'Cause you just said that it was, so that's why I'm confused. So, you spoke a week later to Mr. Carranza about this incident?

THE WITNESS: Yes.

ADMINISTRATIVE JUDGE ELLISON: Okay. Do you -- did he ask you about it? Did you talk to him about it? Do you remember what you discussed about it?

THE WITNESS: All I remember is being in the back parking lot saying -- and he was telling me that he knew Lugo from way back and that I can't believe this happened, things of that nature. He didn't relay to me that he saw anything or that he was even present for it.

ADMINISTRATIVE JUDGE ELLISON: Okay.

BY MR. OCASIO:

Q. Have you ever responded to the Flamingos Nightclub before, sir?

A. Yes, I have.

Q. A guess more or less. Over your six years with the Department you have an idea more or less, or just a guess, how many times you've responded there?

A. At least a hundred.

Q. Okay. Over the year and a half that you -- rather

over the year and a half that Officer Sham testified he worked at the Flamingos Nightclub did you have occasion to respond in other situations Sham was involved?

A. Yes.

Q. Guess more or less. You recall offhand how many such incidents?

A. That Officer Sham was involved?

Q. Yeah.

A. Well, I need a definition of involved. I mean --

Q. You get a call.

A. -- he was there.

Q. Problem, Flamingos, help, help, send somebody, and you happen to be one of the people to show up.

A. Right.

Q. Can you guess more or less how many times that might have happened?

ADMINISTRATIVE JUDGE ELLISON: At least a hundred.

THE WITNESS: At least a hundred.

MR. OCASIO: At least a hundred.

BY MR. OCASIO:

Q. Of the year and a half that Sham is working at the club can you remember how many times you've responded to a matter Sham personally was involved in?

A. Well, that's really hard to say. Maybe four or five, six maybe.

Q. Four or five. Can you recall any of the details of any of those things?

A. No, I cannot.

Q. So, your recollection would be kind of fuzzy.

A. Yes.

Q. But about this specific incidence you're crystal clear of everything you remember.

A. Yes.

Q. Okay. So, you testified that nobody at Dispatch was able to find a number for DOD police to verify his status. Is that what you said?

A. That's right.

Q. Even though the Hunters Point Substation is a 24-hour station, as well as San Bruno, Redwood City could not find anyone to verify his status with.

A. Redwood City dispatchers at that time.

MS. BROWN: Objection.

ADMINISTRATIVE JUDGE ELLISON: I'm sorry, I thought --

MS. BROWN: That was so compound I can't even --

MR. OCASIO: Okay.

ADMINISTRATIVE JUDGE ELLISON: I thought that -- I thought, and I may be wrong, that Officer Farley -- that you asked or that he asked Mr. Lugo if there was a number that could be called to verify --

MR. OCASIO: Then he also mentioned --

ADMINISTRATIVE JUDGE ELLISON: -- his status.

MR. OCASIO: And I want to make sure I frame it correctly 'cause I don't want to misspeak. But I thought I remembered you saying that Redwood City Dispatch also could not find any way to verify his status.

BY MR. OCASIO:

Q. So, with the -- with the badge and the class and the other stuff you decided to kind of let him go. I mean I want to -- is that paraphrasing it more or less what happened or am I missing something?

A. Okay. Can you ask me specifically what you want to know? 'Cause I'm not sure what you just asked me.

ADMINISTRATIVE JUDGE ELLISON: Do you know whether the Redwood police attempted to find out any way of verifying Mr. Lugo's status as a DOD police officer that night?

THE WITNESS: They -- they drug -- all I know is they told me that they couldn't find any phone numbers to verify it.

ADMINISTRATIVE JUDGE ELLISON: That's what --

THE WITNESS: That's what my dispatcher told me over the radio.

ADMINISTRATIVE JUDGE ELLISON: Okay.

MR. OCASIO: That's -- that's what I was -- fine, and that takes of that one, so okay.

BY MR. OCASIO:

Q. So, it's your testimony now we have this situation,

Sham doesn't want to press charges and Lugo doesn't want to press charges; is that correct?

A. That's right.

Q. Okay. So, who took the handcuffs off of Officer Lugo?

A. I did.

Q. Okay. Have you ever handcuffed anyone before in your six years as a police officer?

A. Yes.

Q. So, in your understanding handcuffing somebody are they detained for -- or are they arrested?

MS. BROWN: Asked and answered.

ADMINISTRATIVE JUDGE ELLISON: Yeah, that's what he said. I mean he said it was a detention, if you saw somebody --

MR. OCASIO: Okay. Well, I -- I mean it's --

ADMINISTRATIVE JUDGE ELLISON: -- standing there handcuffed.

MR. OCASIO: I don't understand a vague and amorphous description of detention, so I'm trying to clarify.

ADMINISTRATIVE JUDGE ELLISON: Okay. But, you know, ultimately, as I said previously, it's not relevant to this appeal.

MR. OCASIO: I understand. He's unlocking the cuff and off we go. Okay.

/////

BY MR. OCASIO:

Q. So, now did you write a report of this incident after it happened, sir?

A. Yes.

Q. And do you recall when abouts you might have written the report, sir?

MS. BROWN: Objection. You know what? The report wasn't among the materials that the deciding official reviewed, so I'm not terribly certain why it would be appropriate to find out when it was written.

ADMINISTRATIVE JUDGE ELLISON: No, it's not in the record?

MR. OCASIO: No.

MS. BROWN: It is in the record, but it is not something the deciding official had before him. It actually postdates the proposed removal, I believe.

MR. OCASIO: Well, sir, the relevancy of the date --

ADMINISTRATIVE JUDGE ELLISON: Well, I mean --

MR. OCASIO: -- the report was written --

ADMINISTRATIVE JUDGE ELLISON: So, if it's in -- if it's in the record, we can look at it and see when it was written.

MR. OCASIO: Well, the relevancy of the report, sir, falls into the Gaston investigation of the matter. Because as soon as Gaston comes to the club to do his interview and take

all these statements we now have crossovers between the attorneys for the City of Redwood City, EFA, Base General Counsel, and the proposing official.

ADMINISTRATIVE JUDGE ELLISON: Okay. So we -- but we can determine the date on which this report was prepared.

MR. OCASIO: Yes, so I'm --

ADMINISTRATIVE JUDGE ELLISON: Right.

MR. OCASIO: I'm trying to time qualify when this report was written, sir.

ADMINISTRATIVE JUDGE ELLISON: Well, we can look at it and see.

MS. BROWN: Seems to me that the document would speak for itself, wouldn't it?

MR. OCASIO: I -- I didn't ask you. I asked the witness. If you have an objection, make it.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, I'm telling you we could look at it. Obviously, that's going to be the best reference point for when it was prepared or certainly when it was dated, and if there's any --

MR. OCASIO: Is --

ADMINISTRATIVE JUDGE ELLISON: -- dispute or need to go further we can ask Officer Farley about it.

MR. OCASIO: Is there a reason why I'm not being allowed to time date the preparation of this Police Report? Because now I'm --

ADMINISTRATIVE JUDGE ELLISON: No, you are. I'm trying to help.

MR. OCASIO: Well, I mean it's -- he can answer very simply when he prepared the report.

ADMINISTRATIVE JUDGE ELLISON: Okay. Do you remember when you prepared the report?

THE WITNESS: It was sometime in late April.

BY MR. OCASIO:

Q. Okay. So, now we push past the incident. You receive a phone call from the DOD Police Captain, sir?

A. No, I did not.

Q. You did not have a telephone interview with Captain Charles Anthony Gaston concerning this incident, sir?

A. I remember talking to someone from the Navy. Their name does not come to memory.

Q. Okay. Well, that's very nice. Can you remember what it was we were talking about with this person from the Navy whose name you can't remember?

A. I talked about the incident that happened on the morning of the 15th.

Q. And exactly what do you recall telling this person?

A. I told him that I responded to Flamingos on a dispatch, that I -- a dispatch of a disturbance where Security had one detained. I arrived at the club, I spoke with a Mr. Sham who told me that he had a physical altercation with a Mr.

Lugo inside the club. I told him that after our discussion and he told me about the altercation that he didn't want to press charges against Mr. Lugo. Told him that I then spoke to Mr. Lugo, who told me that he had a physical altercation with Mr. Sham in the club and that he didn't want to press charges against the subject. We spoke about him having a firearm on his person, that Mr. Sham had handed me, the fact that it had been loaded at some point according to Mr. Sham. We spoke to his presenting of a federal police identification card and the fact that I did not see anything that said he was allowed to carry a weapon or that he wasn't allowed to carry a weapon on that identification card. We spoke to --

Q. Could I stop you right there one second? You're looking at Officer Lugo's credential. Did you remove the ID card from the case?

A. Yes, I did.

Q. Were there any other documents contained with the ID card, sir?

A. Not that I saw.

Q. You mean to tell me you didn't see the federal carry permit that was in behind his ID card?

MS. BROWN: Objection. Assumes facts not in evidence.

MR. OCASIO: Excuse me, I'm ask -- he can testify yes or no.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, he already

testified he didn't see any other documents.

BY MR. OCASIO:

Q. So, you didn't see the concealed weapon permit.

A. No, I did not see a concealed weapons permit.

Q. Okay. You mentioned that there are several exemptions to the California law to carry a concealed weapon, sir. What exemptions are those?

MS. BROWN: Repeat.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, I'm not really sure that's relevant to this appeal.

MR. OCASIO: It's relevant to --

ADMINISTRATIVE JUDGE ELLISON: We don't have any charge --

MR. OCASIO: -- the entire matter on appeal --

ADMINISTRATIVE JUDGE ELLISON: -- once again about --

MR. OCASIO: -- because it's an alleged off-duty violation of his credential. That somehow he misused his credential by carrying the badge, using the gun, all this other nonsense.

ADMINISTRATIVE JUDGE ELLISON: No, not about using the gun.

MR. OCASIO: Well, it's -- it's worked into the inference of the Agency's actions. It's referenced in the Gaston investigation. The Agency turns around and says it's a misuse of a federal credential. So, here we go.

BY MR. OCASIO:

Q. What exemptions are there at California law for any person to carry a concealed weapon?

ADMINISTRATIVE JUDGE ELLISON: Okay. I don't see how that's relevant to this appeal.

MR. OCASIO: Now my hands are getting tied. Okay, fine. Here we'll go.

ADMINISTRATIVE JUDGE ELLISON: They are tied -- tied only by materiality and relevance. That's all.

BY MR. OCASIO:

Q. To your understanding, sir, if he is a federal police officer is he governed by state or federal law?

MS. BROWN: Objection. Relevance again.

ADMINISTRATIVE JUDGE ELLISON: Okay. You know, if he -- this is another way of getting around to the same question --

MR. OCASIO: I'm -- I'm -- I'm --

ADMINISTRATIVE JUDGE ELLISON: -- but it's going to be similarly irrelevant.

MR. OCASIO: Fine, I just --

ADMINISTRATIVE JUDGE ELLISON: But if it's something else, I don't know.

MR. OCASIO: He's testifying with vague recollections with his attorney sitting here. See, I don't care either way.

/////

BY MR. OCASIO:

Q. You can testify that you ran his CLETS. Yes, you ran his CLETS?

A. I ran his information through CLETS, yes.

Q. And his CLETS come back identifying him as a DOD police officer. Yes?

A. No.

Q. It didn't identify him as a DOD police officer?

MS. BROWN: Objection. Asked and answered and he's misquoting the testimony.

MR. OCASIO: I'm not misquoting the testimony. I'm making sure I understood his "no" very carefully.

ADMINISTRATIVE JUDGE ELLISON: Well, he said that it did not reflect the DOD police officer status.

MR. OCASIO: Okay. What I will do tomorrow is I will introduce a CLETS into evidence that -- that contradicts that direct testimony.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well --

MR. OCASIO: Okay. And I viewed the CLETS in the Superior Court indictment file with the federal subpoena that was removed from the file on order from the DA. I saw the printout, you knew he was a fed when you ran him.

ADMINISTRATIVE JUDGE ELLISON: Okay. Do you have any other questions of -- pertaining to this case?

MR. OCASIO: No, I don't have any other questions for

him. You're excused.

MS. BROWN: Wait.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, first I will ask the Agency representative if she has any other questions, then perhaps I'll excuse him at that time.

THE WITNESS: So --

ADMINISTRATIVE JUDGE ELLISON: I'm not talking to you. Okay. Ms. Brown, anything?

REDIRECT EXAMINATION

BY MS. BROWN:

Q. My question -- my first question is, we were talking about interreactions -- interactions with Officer Sham, and you said that you remember this incident, but had some fuzzy recollections of other incidents. Is there any reason why you would remember this incident in particular more clearly than the others?

A. Well, there's several reasons. One is that as soon -- I learned afterwards that a Department of Defense federal police officer doesn't necessarily -- isn't necessarily allowed to carry a firearm off duty. I also learned later that Mr. Lugo wasn't allowed to carry a firearm off duty. I also learned later that I was being sued by Mr. Lugo.

Q. So, those would be relatively the reasons that you would remember this incident a bit more clearly.

A. That's correct.

MS. BROWN: All right. Okay.

MR. OCASIO: Your Honor, I have a redirect thing since she opened up the gate. Sir, who --

ADMINISTRATIVE JUDGE ELLISON: Okay. You know, I don't believe Ms. Brown's finished yet.

MR. OCASIO: Oh, I'm sorry. Please finish.

ADMINISTRATIVE JUDGE ELLISON: Okay. Now I do have to say something. You really are not allowed to participate in this proceeding here.

MR. OCASIO: Well, he is --

ADMINISTRATIVE JUDGE ELLISON: And so I think, you know, Ms. Brown, if you have any questions that pertain to this Board appeal, that's fine, then ask, but this is not really proper.

MS. BROWN: Okay. I do have one question that's kind of just to clear up confusion in my mind.

BY MS. BROWN:

Q. You were talking about -- let me see if I can get it right in my head. You were talking about writing a report and Mr. Ocasio was asking you who called and did you talk to someone from the Navy. Did the Navy call you or did you contact the Navy about the report?

A. The first I learned about it was through my supervisors and they told me that they were contacted by the Navy, which is why I said no when he asked me if the Navy

called me --

Q. Okay.

A. -- because they didn't directly call me.

MS. BROWN: I was confused about that. I apologize. Okay.

MR. OCASIO: Your Honor, I have just a real quick question. You said you found out later that Mr. Lugo --

ADMINISTRATIVE JUDGE ELLISON: I'm sorry, wait. Were you finished?

MR. OCASIO: Are you finished?

MS. BROWN: I'll pass the witness now.

ADMINISTRATIVE JUDGE ELLISON: No. Well, no, if you're not finished, I apologize.

MS. BROWN: I am finished.

ADMINISTRATIVE JUDGE ELLISON: Okay.

MS. BROWN: I just wanted the chance to say I was.

ADMINISTRATIVE JUDGE ELLISON: All right. Okay.

RECROSS EXAMINATION

BY MR. OCASIO:

Q. You said that you found out later that Mr. Lugo could not carry a firearm, sir?

A. That's right.

Q. And who might abouts you found that out from, sir?

A. Sergeant Harper (phonetic).

Q. And to your knowledge, sir, who did Sergeant Harper

find that out from?

A. The Navy.

Q. Can we get a little more amorphous, please? Who told him Lugo could not carry a concealed firearm?

A. I don't know.

Q. You don't know --

A. Someone from the Navy.

Q. -- or you don't remember? Someone from the Navy?

A. Someone from the Navy.

MR. OCASIO: I would respectfully request at this particular point that the Board reconsider the Appellant's request for EFA West Security Director Mr. Lewis. Mr. Lewis was the one, according to the Agency's exhibits, who in their submission informed the investigating detective that Mr. Lugo -- Agency's enclosure 5. "I spoke to Mike Lugo's supervisor who told me that Lugo had been fired from the incident," da da da da da. "Lewis said that Lugo is not allowed to carry a weapon under any circumstances, that he can only carry a weapon on duty, the weapon does not leave the base," so on and so forth. And that Lewis is one of three people authorized to carry a firearm.

MS. BROWN: I think that's Agency Exhibit 9 actually.

MR. OCASIO: That's Agency's Exhibit 9, the case sign-off says, "Further investigations." Appellant contends that if it was this testimony that led to the San Mateo criminal

indictment, and that if it was given to the officer with knowledge of its falsity, that I would request that the Board take judicial recognition under <u>People v. Graffini</u> (phonetic). That the submission of a statement with the intent that it be uttered or published as true constituted the state felony under perjury. If Mr. Lewis lied to the detective, it resulted in a damage as a result from this Board action from his perjury. I would ask that the Board ask Mr. Lewis to come on down so he can remember what it was he told the Redwood City detective.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, if it becomes clearer towards, as I said earlier today, through today's --

MR. OCASIO: No problem, Your Honor. I merely want to preserve the fact that we had been requesting this and the relevancy for Mr. Lewis' testimony. So, we'll just move on from there one --

ADMINISTRATIVE JUDGE ELLISON: Okay. So, I'm finished.

MR. OCASIO: Yes, sir, I'm sorry.

ADMINISTRATIVE JUDGE ELLISON: Okay. Okay.

<u>BY MR. OCASIO</u>:

Q. At this particular stage you find out later you're being sued, right?

A. Yes.

Q. After you find out you're being sued is that when the

report gets prepared? Just so I can frame my time frame here.

A. Yes.

Q. Okay. So, the report that you wrote is prepared after service of the District Court Complaint and after the contact with the Navy investigator who interviewed you by telephone, according to the Gaston statement that he interviewed you by phone in the presence of your attorney. Do you remember that?

A. Yes.

Q. Okay.

ADMINISTRATIVE JUDGE ELLISON: Was this -- excuse me. Was this after the proposal notice as well?

MS. BROWN: I think so.

MR. OCASIO: This was before, Your Honor.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, let's find out.

MS. BROWN: It'll just be a minute, Your Honor. The proposal is April the 20th.

ADMINISTRATIVE JUDGE ELLISON: Of 2000, and the statement -- I mean the -- the Officer Farley's report was prepared -- I can't remember what he said.

MS. BROWN: Well, I'm not sure how this works. It says that the reviewing Sergeant looked at it April 26th, but that your part says 3/15, so I don't know --

ADMINISTRATIVE JUDGE ELLISON: I'm sorry, what exhibit is this?

MS. BROWN: Well, this exhibit is 9, which is the Police Report. There's a reviewing Sergeant date of 4/26, but you're not the reviewing Sergeant, right?

THE WITNESS: No, I'm not.

MS. BROWN: So that would mean that you turned yours in prior to 4/26.

THE WITNESS: That's right.

BY MR. OCASIO:

Q. That's what we're trying to find out. When exactly did you turn it in?

A. Sometime in late April.

Q. Could we quantify --

ADMINISTRATIVE JUDGE ELLISON: This is -- I'm sorry. This is Exhibit 9?

MS. BROWN: That's correct.

MR. OCASIO: Yes, sir.

ADMINISTRATIVE JUDGE ELLISON: Okay. Which is dated March 15th, unless I'm looking at the wrong thing.

MR. OCASIO: It was -- it appears to be backdated, Your Honor, to the date of the incident.

BY MR. OCASIO:

Q. What we're trying to find out here is when did you submit it.

A. Am I being asked a question now --

Q. Yeah.

A. -- to answer?

Q. Um-hmn.

A. Sometime in late April.

ADMINISTRATIVE JUDGE ELLISON: April --

Q. Late April being towards the end of the month, the beginning of the month? Do we have a --

ADMINISTRATIVE JUDGE ELLISON: Well, late would imply toward the end of the month I think.

MR. OCASIO: I understand, Your Honor, but for this --

ADMINISTRATIVE JUDGE ELLISON: Okay. April of this year, correct?

THE WITNESS: Yes.

ADMINISTRATIVE JUDGE ELLISON: Okay.

BY MR. OCASIO:

Q. Okay. I was just merely trying to time quantify that this report was prepared after consultation with everybody involved in the matter. So, it's not like you prepared it on the 15th and it was reviewed later. Is it possible, sir, the report was backdated to the April -- March 15th incident, sir?

ADMINISTRATIVE JUDGE ELLISON: Well, what do you mean backdated? I mean it's got the date of the incident on it.

MR. OCASIO: Well -- well, the Agency's exhibit gives a representation that this Police Report was prepared on the night of the incident. Yes?

ADMINISTRATIVE JUDGE ELLISON: Well, it's got the date

of the incident on it --

MR. OCASIO: I understand, so it --

ADMINISTRATIVE JUDGE ELLISON: -- and you could say that it looks as if it was -- the report was dated --

MR. OCASIO: So, it gives the appearance that it was taken --

ADMINISTRATIVE JUDGE ELLISON: If I may finish now.

MR. OCASIO: Sorry, Your Honor.

ADMINISTRATIVE JUDGE ELLISON: It was dated that day, but we have explanation from Officer Farley that it was prepared late April of 2000. So, clearly it was not prepared on March 15th.

MR. OCASIO: I understand, Your Honor. The point I'm trying to get at is that from the date of the incident and after the District Court case gets served, the Gaston investigation then gets prepared with EFA West Security Director Lewis in tow at the club. All these witnesses were interviewed in the presence of Mr. Carranza's personal attorney. As the statements were not prepared on a standard Naval voluntary statement form, this was some form created by Captain Gaston.

BY MR. OCASIO:

Q. The problem winds up being is that, although I am looking at the further investigation, sir, is there any indication, to your personal knowledge, any detective in your

department interviewed the defendant in the criminal action, sir?

ADMINISTRATIVE JUDGE ELLISON: I'm sorry, who is that?

MR. OCASIO: Him. People v. Lugo.

ADMINISTRATIVE JUDGE ELLISON: Okay.

MR. OCASIO: The San Mateo indictment case.

ADMINISTRATIVE JUDGE ELLISON: Okay. So, the question is did anybody in the -- did Officer Farley or somebody in the Police Department interview Mr. Lugo?

MR. OCASIO: Yeah, after --

ADMINISTRATIVE JUDGE ELLISON: When?

MR. OCASIO: Well, it's after this report gets prepared.

BY MR. OCASIO:

Q. Your testimony is you find out later some point that he wasn't authorized to carry a weapon. Yes?

A. Yes.

Q. Okay. So, after you guys find out he's not authorized to carry a weapon and now the detective in your department speaks to Base General Counsel, which we have requested as a witness and outlined his relevance to the instant appeal. He was denied. And he speaks to his supervisor, who's a civilian. We requested his relevance in the record. He was denied also. They're speaking to everybody but Officer Lugo.

ADMINISTRATIVE JUDGE ELLISON: Okay. This is after

the event.

MR. OCASIO: This investigation, this is after the incident, Your Honor.

ADMINISTRATIVE JUDGE ELLISON: Right, okay.

MR. OCASIO: Where now, upon further investigation --

ADMINISTRATIVE JUDGE ELLISON: Okay. You know, this is probably acceptable to stipulation. I'm not sure. I don't want to speak for the Agency, but I mean there's no statement. Is -- was there a statement from Mr. Lugo in the investigation that led to this removal action?

MS. BROWN: No, and Mr. Lugo chose not to make an oral or written reply.

ADMINISTRATIVE JUDGE ELLISON: Okay. But I mean was he contacted by the investigator as far as you know?

MS. BROWN: I don't know.

ADMINISTRATIVE JUDGE ELLISON: And that's --

MR. OCASIO: I can clarify that, Your Honor. The investigator never contacted Mr. Lugo. The investigator never contacted the percipient witness, who will testify to the fact. She knows Charley personally, as do we all. Those witnesses were specifically identified in the Gaston narrative that the Agency contends was its investigation. They specifically identified those witnesses by name, Maria Elena Grijalva, Aria (phonetic) Ledesma, the two Contreras brothers that were present at the table. Somehow Gaston never got around to them.

Gaston never interviewed the Appellant. He was --

ADMINISTRATIVE JUDGE ELLISON: All right. Well, that's not something that --

COURT REPORTER: I have to change the tape.

MR. OCASIO: Yes, ma'am.

MS. BROWN: Well, what does that have to do with Officer Farley?

COURT REPORTER: Wait a minute.

ADMINISTRATIVE JUDGE ELLISON: Okay. Hold on. Hold on. Hold on.

MR. OCASIO: Okay.

COURT REPORTER: I hate to interrupt you in the middle of your statement.

MR. OCASIO: Yes, ma'am, I understand. The relevancy --

COURT REPORTER: Wait a minute. Wait a minute.

ADMINISTRATIVE JUDGE ELLISON: Wait a minute.

MR. OCASIO: I'm sorry, ma'am. Go ahead. (Pause) You ready? The relevancy to Farley --

ADMINISTRATIVE JUDGE ELLISON: Okay. So, Mr. -- Officer Farley --

MR. OCASIO: Yes.

ADMINISTRATIVE JUDGE ELLISON: -- wouldn't know that.

MR. OCASIO: I understand that, however, since we're on the line of the further investigation, it's Farley's

testimony he discovers after the fact that a weapon was carried illegally and that then the Navy finds out and the Navy takes corrective action based on the alleged off-duty misconduct by this officer.

BY MR. OCASIO:

Q. So, my question, sir, is to your knowledge, do you know or were you informed that any detective in your department contacted Mr. Lugo regarding this concealed weapon thing?

ADMINISTRATIVE JUDGE ELLISON: Well, okay. That's irrelevant on at least two bases. One, it's got to do with, you know, this idea of a concealed weapon violation, none of which is relevant to this appeal. Two, the investigation that led up to this removal was done by an employee of the Agency, not by the Police Department.

MR. OCASIO: I understand, Your Honor, but --

ADMINISTRATIVE JUDGE ELLISON: So, Officer Farley would have no idea I mean.

MR. OCASIO: I understand, Your Honor.

ADMINISTRATIVE JUDGE ELLISON: And even if he had, I mean this is simply not relevant to this removal action.

MR. OCASIO: Well, my -- my hindrance, Your Honor, is as follows. We have not been able to discern at what point the Agency investigator is acting on the part of the Agency and at what point the Agency investigator is acting for the City of Redwood City to obstruct the District Court Complaint. I would

request that the Board take judicial notice of the fact that the first District Court Complaint preceded the removal, which means every action of the Agency from that point forward is an 18 U.S.C. 1510 and 1512 violation.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, I'm sure you have somewhere a --

MR. OCASIO: That's --

ADMINISTRATIVE JUDGE ELLISON: -- copy of the -- the District Court Complaint and we can see what the date of that is and we can compare then.

MR. OCASIO: My problem, Your Honor, is that we have been able to discern what the investigation was by the Agency that led to the removal. So, if Captain Gaston does not appear then we are left with Mr. Farley's recollection and the evidence submitted by the Agency of what he remember, what he didn't. Maybe we can jar his memory to elicit the testimony.

BY MR. OCASIO:

Q. Was your report, sir, prepared after your department consulted with Navy Counsel and everybody else, or did you write your report first and we never got a copy of it?

ADMINISTRATIVE JUDGE ELLISON: Okay. That was a long sentence that began, I think, addressed to me --

MR. OCASIO: Okay. Well, it's --

ADMINISTRATIVE JUDGE ELLISON: -- and then kind of switched over to Officer Farley. Second, Officer Farley does

not know. He said he spoke to somebody from the Agency and said he didn't remember his name, but --

MR. OCASIO: I understand, I'm just --

ADMINISTRATIVE JUDGE ELLISON: He doesn't have any knowledge of --

MR. OCASIO: Who told him.

ADMINISTRATIVE JUDGE ELLISON: -- who did the investigation, since he doesn't remember his name, for the Agency and these are questions that we would properly pose to Mr. Gaston if he shows up, but if he doesn't -- even if he doesn't, Officer Farley doesn't know. I mean that the Police Department didn't do the investigation.

MR. OCASIO: Well, it's -- what I'm trying to time qualify here, Your Honor, is what exact investigation was done when and by whom. And if we're left with the amorphous task of trying to discern what --

ADMINISTRATIVE JUDGE ELLISON: Well, ask Agency witnesses who may know.

MR. OCASIO: Well, if -- if Captain Gaston doesn't appear, then I'm left with the proposition of having to take his statement and affording it all this weight without the right to cross-examine him and I'm stuck. So, all I'm trying to get home one very simple point. If he finds out after the fact Lugo can't carry or whatever it is that Lugo can't do, all I want him to be able to clarify for us is when the report was

done, and he says late April. And my specific question to the Agency's witness is was his report prepared after he had contact with Naval officials? The relevancy to this Board appeal --

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, you can ask him was he requested to prepare a statement --

MR. OCASIO: Okay. Well --

ADMINISTRATIVE JUDGE ELLISON: -- make a report. That's fine. I haven't heard that yet.

BY MR. OCASIO:

Q. Were you requested to prepare a statement?

A. A report you mean?

Q. No, a statement or report. I mean did somebody ask you to write something?

A. Someone asked me to write a report, yes.

Q. Okay.

ADMINISTRATIVE JUDGE ELLISON: Somebody from the Agency whose name you don't recall; is that correct?

THE WITNESS: Not from the Agency, my Sergeant told me.

ADMINISTRATIVE JUDGE ELLISON: Oh, your Sergeant asked you.

THE WITNESS: A Sergeant, Sergeant Lease (phonetic) and Sergeant Harper.

MR. OCASIO: Okay.

ADMINISTRATIVE JUDGE ELLISON: Okay.

BY MR. OCASIO:

Q. And when did they ask you to write the report, sir?

A. Sometime in late April.

Q. So, you can help clarify me, I mean it's I'm -- I'm confused about one thing. You have a incident where you respond to an incident. Were you the primary responding officer, sir?

A. Yes.

Q. Are you a canine officer?

A. Yes.

Q. Okay. So, you respond to a situation at a nightclub and you prepare a report how many weeks later, sir?

A. I prepared it sometime in late April.

Q. And when did the incident occur?

A. March 15th.

Q. So, we're looking at a six or seven week gap of time.

ADMINISTRATIVE JUDGE ELLISON: Obviously. What's the question?

MR. OCASIO: No, I mean there is no question. He's preparing a report --

ADMINISTRATIVE JUDGE ELLISON: Okay.

MR. OCASIO: -- after the fact seven weeks later. I'm --

ADMINISTRATIVE JUDGE ELLISON: Okay. We've

established that.

MR. OCASIO: Yeah, so I mean it's -- at that particular point there's nothing else that you can testify to except that you spoke to Sham, gave you one story, you spoke to him, he gave you another story, you made a judgment call.

ADMINISTRATIVE JUDGE ELLISON: Okay. So, there's nothing else he can testify to?

MR. OCASIO: There's nothing else that he can testify to.

ADMINISTRATIVE JUDGE ELLISON: Great. Ms. Brown, anything else?

MS. BROWN: Brief redirect.

RE-REDIRECT EXAMINATION

BY MS. BROWN:

Q. Have there been times in the past when you've filed reports at a later date than exactly the date on which the incident occurred?

A. Yes.

Q. Is that unusual?

A. It's not unusual, no.

MS. BROWN: Thank you.

MR. OCASIO: Okay. I'm done.

ADMINISTRATIVE JUDGE ELLISON: Okay. Thank you very much. Could we pause the record, please.

(Witness excused.)

# EVANGELISTA LUGO

V

# DEPARTMENT OF THE NAVY

MERIT SYSTEMS PROTECTION BOARD
SAN FRANCISCO REGIONAL OFFICE
CASE SF-0752-00-0499-I-1

# EXHIBIT

# 5

TESTIMONY EVAN PARASKEVOPOULOS
PAGES 141 THROUGH 180

(Off the record.)

ADMINISTRATIVE JUDGE ELLISON: Good afternoon.

THE WITNESS: Good afternoon.

ADMINISTRATIVE JUDGE ELLISON: Do you have any objection to taking an oath regarding your testimony?

THE WITNESS: No.

ADMINISTRATIVE JUDGE ELLISON: Could you raise your right hand, please.

Whereupon,

EVAN PARASKEVOPOULOS,

having been first duly sworn, was examined and testified as follows:

ADMINISTRATIVE JUDGE ELLISON: Thank you. Could you state and spell your name for the record, please.

THE WITNESS: My name is Evan Paraskevopoulos. First name's spelled E-V-A-N, last name is P-A-R-A-S-K-E-V-O-P-O-U-L-O-S.

ADMINISTRATIVE JUDGE ELLISON: Okay. Thank you. Ms. Brown?

MS. BROWN: Hi, Officer, how you doing?

THE WITNESS: Hi, better.

MS. BROWN: Good.

DIRECT EXAMINATION

BY MS. BROWN:

Q. You gave us your name. Could you tell me what your

title is?

A. I'm a police officer.

Q. Okay. And where do you work?

A. City of Redwood City.

Q. How long have you worked there?

A. Approximately two and a half years.

Q. Is that how long you've been a police officer?

A. That is.

Q. Okay. Work anywhere else before then as a police officer?

A. No, I did not.

Q. Okay. I'm sure you know this already, but we're here today to discuss the events which led up to the removal of Mr. Lugo by the Department of the Navy from federal service. So, those events are encompassed in March 14th and 15th, and I believe your involvement was early in the morning on March the 15th, so that's what I'm going to be talking about today.

A. Okay.

Q. Okay. So, that would be March the 15th of this year. Were you dispatched that night to Flamingos nightclub?

A. Yes, I was.

Q. And about what time was that? Do you know?

A. I believe it was early in the morning, 1:00, 2:00 o'clock.

Q. Okay. What did you see when you got there?

A. I observed a group of people standing out front.
Q. Okay. Was the other officer already there? Was Officer Farley already there when you got there?
A. I don't recall.
Q. Okay. Was Mr. Lugo -- I'm pointing at him right now, he's across there -- was he there?
A. Yes, he was.
Q. Okay. What was he doing at that point?
A. He was standing out in front.
Q. Okay. So, could you sort of tell me what happened once you got there?
A. Once I got there I observed Mr. Lugo was in handcuffs. A security officer handed me an unloaded semiautomatic pistol and Officer Farley did an investigation.
Q. So, what did you do with that pistol?
A. I secured it in my vehicle.
Q. Okay. Now, Officer Farley testified that you took Mr. Lugo, I guess, off to the side while Officer Farley spoke with Mr. Sham; is that correct?
A. I stood by with --
Q. Okay.
A. -- Mr. Lugo.
Q. Oh, I'm sorry.
A. I didn't bring him anywhere.
Q. Okay. So, when you were standing by him did he speak

to you?

A. He -- he did speak to me.

Q. And what did he say?

A. He -- he said a couple of things. One of the first things he told me was that he was a police officer and he said he got into an argument with the security guard inside, and that was kind of the basics.

Q. So, when he told you he was a police officer, what did you say?

A. Well, he told me he was a police officer and then showed me his badge, which was on his belt, and then said that we could take a look at his ID card, which was in his wallet.

Q. Did you do that?

A. I did.

Q. What did you do with the ID card?

A. I brought the ID card over to my patrol vehicle and compared it with my own.

Q. Was the ID card at that point out of the wallet?

A. It was at that time.

Q. Okay. So -- so you took it over to your car and you had your ID versus his ID --

A. Yes, I did.

Q. -- on the vehicle. Okay. I'm going to show you Agency Exhibit 13. Again, not a very beautiful exhibit, but it'll get it done I think.

A. Yep.
Q. Does that look like the type of identification card that Mr. Lugo gave you?
A. It does look similar.
Q. Did his identification card say off-duty weapons not authorized on it?
A. Those words were not anywhere on the ID.
Q. Did you run the CLETS, CLEETS?
A. CLETS.
Q. CLETS check on Mr. Lugo?
A. I had the dispatchers run --
Q. Okay.
A. -- CLETS on a DL, driver's license.
Q. And what were the results of that?
A. They came back with confidentiality out of somewhere, I believe it was the Department of Defense.
Q. Okay. And what did that indicate to you?
A. That generally when it comes back with confidentiality it is some type of -- somebody involved in enforcement of the law or a family member.
Q. Okay. Did you speak with Mr. Lugo about the weapon that he had on him?
A. I don't believe I did. I think I -- I think I only overheard Officer Farley talking to him.
Q. I think actually your statement, I think it says, "I

asked Mr. Lugo if he was supposed to carry a concealed weapon, especially when he was drinking. He stated that he was a police officer for the Department of Defense and able to carry a concealed weapon." Is that correct?

A. That's correct.

Q. So -- so whenever he told you that he was a police officer for the DOD, at that point what did you do? I mean at that point did you just run through the CLETS system?

A. Well, I tried to confirm that he was a police officer or federal agent or whatever the people of the U.S. Department of Defense are, and tried to verify that he was able to carry a concealed weapon.

Q. And did you come up to any conclusions on that?

A. As definitive of a conclusion I could come to at that point.

Q. And what would that be?

A. It seemed more likely than not that he was allowed to carry the concealed weapon. I couldn't --

Q. And what did you base that on?

A. I based it on the fact that he said he was allowed to carry a concealed weapon. He had an ID card very similar to mine, that didn't say anything about carrying a concealed weapon or not as mine does. Mine doesn't say anything about carrying a concealed weapon or not. It's simply --

Q. Oh, yours -- your card doesn't say you can carry or

not?

A. No.

Q. Okay.

A. Because I am allowed to carry as a peace officer, so I assumed the same for him. And also that he said that he was allowed to carry a concealed weapon.

Q. Okay. So, if Mr. Lugo hadn't told you he was a DOD police officer, showed you his badge, and come up on confidential, and told you he was authorized to carry the concealed weapon, firearm, whatever it is, what would have happened?

A. If he was just simply carrying a concealed weapon without all that?

Q. Well, and you didn't have the indication as far as definitive as you could get that he was a police officer, what would have happened at that point?

A. He would have been arrested for carrying a concealed weapon.

MS. BROWN: Okay. I'll pass the witness.

ADMINISTRATIVE JUDGE ELLISON: Okay. Mr. Ocasio?

CROSS-EXAMINATION

BY MR. OCASIO:

Q. How long have you been a cop?

A. A police officer? For approximately two and a half years.

Q. Were you a reserve before you were a regular officer?
A. No, I was not.
Q. So, you're a rookie. Question --
ADMINISTRATIVE JUDGE ELLISON: So, you're a police officer.
MR. OCASIO: Seventeen years on the job is a veteran officer, Your Honor.
ADMINISTRATIVE JUDGE ELLISON: I didn't say he was a veteran officer, Mr. Ocasio.
MR. OCASIO: No, I strike my comment.
BY MR. OCASIO:
Q. I don't have any identification on my person. You have detained me. The only thing you have is my last name, my first name, and my date of birth, sir. How would you verify my identity?
A. Can you repeat the question, please?
Q. I have no identification on my person. I have been detained by members of the service of the Redwood City Police Department. All you have is my name and date of birth. How would you verify my identity, sir?
A. Question's a little vague. It would depend on what you were detained for.
Q. You have a radio. I'm in handcuffs. You know nothing about me except my name and my date of birth. If you wanted to find out what information was available on me, sir, who would

you call?

A. Depends on the information.

Q. Okay. I have handcuffs on, my name is Evangelista Lugo, I have no identification on my person. You're the member of service who arrives on scene. We have that framed correctly? Do we have that picture?

MS. BROWN: I believe you're mis --

Q. You show up, I'm in handcuffs, and you know nothing about me. Can you start at that point?

A. Are we talking about yourself or Evangelista Lugo?

Q. We're talking about me.

A. Okay.

Q. Okay. So, I'm -- you arrive on scene, I have handcuffs, have no ID on me. How would you verify who I am?

A. Can I ask you a question?

Q. Sure.

A. What are you being detained for?

Q. Doesn't make a -- I have handcuffs on. We're still trying to find out what he was detained for, and as far as we're concerned attempted felony cigarette smoking is not a California crime.

ADMINISTRATIVE JUDGE ELLISON: Okay. But this is -- but this question is not how it happened.

MR. OCASIO: No, he asked me what am I detained for.

ADMINISTRATIVE JUDGE ELLISON: I know, but I mean

you're --

MR. OCASIO: Attempted felony cigarette smoking?

ADMINISTRATIVE JUDGE ELLISON: Yeah, but your hypothetical though is not --

MR. OCASIO: Your Honor, I don't believe I'm using --

ADMINISTRATIVE JUDGE ELLISON: -- does not comport with the facts of what happened in this case.

MR. OCASIO: I don't believe I'm using a hypothetical. She has been allowed to banter all of her questions about concealed weapons, and if I didn't have the ID -- so I'm going to ask her the very same question.

BY MR. OCASIO:

Q. I have no ID on me and you're running me through CLETS. Exactly what will come back to you, sir, from the CLETS system?

ADMINISTRATIVE JUDGE ELLISON: Okay. So, assuming that he's running you through CLETS, which you didn't --

MR. OCASIO: She just asked him if he wasn't there --

ADMINISTRATIVE JUDGE ELLISON: It's your question, Mr. Ocasio.

MR. OCASIO: My question, sir, is if you --

ADMINISTRATIVE JUDGE ELLISON: Frame it the way you want, but make it clear. If you wanted to make that assumption, fine.

MR. OCASIO: I'm not making an assumption, I'm asking

a directed question.

BY MR. OCASIO:

Q. If you run my name through CLETS, sir, exactly what is going to come back to you?

A. Through CLETS I believe would come back simply and only criminal history.

Q. The driving record wouldn't come up?

A. Not through CLETS. Think that would come through the DMV.

Q. Okay. So, when you specifically ran this former officer's police credential, sir, what databases did you run him through?

A. I didn't run him through any. My dispatcher ran him through and I don't know specifically --

Q. So, to your knowledge, sir, your dispatch ran him through how many databases, sir?

A. You would have to ask them. I don't know.

Q. Oh, so now you don't know. You just testified --

MS. BROWN: If he has no personal knowledge --

MR. OCASIO: You just testified --

ADMINISTRATIVE JUDGE ELLISON: Okay. Are we --

MR. OCASIO: -- when she asked him.

ADMINISTRATIVE JUDGE ELLISON: Okay. Wait a minute. Are we getting back to the actual facts of the case or are we still on --

MR. OCASIO: We're getting back to the actual facts --

ADMINISTRATIVE JUDGE ELLISON: -- are we still on the hypothetical?

MR. OCASIO: -- of the case, sir. It's not a hypothetical question.

ADMINISTRATIVE JUDGE ELLISON: Okay. Why don't you ask him -- I mean I'm just, you know, I'm trying to help him try and discern what you're trying to say.

MR. OCASIO: Your Honor, very simple. Okay.

ADMINISTRATIVE JUDGE ELLISON: Okay. You asked him --

MR. OCASIO: Officer -- I'm sorry.

ADMINISTRATIVE JUDGE ELLISON: -- if he ran -- we're talking about this is based on his requesting a CLETS run, correct?

MR. OCASIO: Yes, sir.

ADMINISTRATIVE JUDGE ELLISON: Okay. So, the question is it's your understanding what you did was give your dispatcher sufficient information or whatever information you had to do a CLETS run on Mr. Lugo?

THE WITNESS: Correct, and also a DMV check, which is --

ADMINISTRATIVE JUDGE ELLISON: Okay.

THE WITNESS: I think it might help here. DMV is for identification purposes to help in identifying. Does not identify a person.

BY MR. OCASIO:

Q. I see. So, if I can ask another question, very same thing. Okay. Here we go back to I have no ID, you're running me through DMV. What information will come back to you, sir?

A. Your name.

Q. Okay. Got that.

A. Your address.

Q. Got that.

A. If I asked for it, I can have your DMV history including convictions, height, weight, eye color, hair color, date of birth.

Q. Specific identifiers.

A. Whether your license is suspended, revoked, restricted, withheld.

Q. Okay. So, as it directly relates to this appeal, when you have this officer's credential in your hand what exact information did you request from your dispatcher to verify, sir?

A. Specifically, I asked if his information came back with confidentiality.

Q. What else did you request, sir?

A. Specifically, if his license came back with confidentiality.

ADMINISTRATIVE JUDGE ELLISON: So, you affirmatively asked that question.

THE WITNESS: Yes, I did.
ADMINISTRATIVE JUDGE ELLISON: Okay.
MR. OCASIO: Okay.
THE WITNESS: On -- Mr. Lugo asked me to.
BY MR. OCASIO:
Q. Okay. Being that there was a police officer in custody, sir, what specific steps did you specifically take to verify his status as a police officer?
A. I asked him.
Q. And what specific information database would your dispatch have been able to access to validate his status as a federal police officer, sir?
A. They could make a phone call to his supervisors, which he did not know the phone number to, but that's what they could do.
Q. What else could they do?
A. That's it.
Q. Oh, really? So, you mean to tell me the NCIC computer would not list all known felons and police officers in the United States through the FBI computer?
MS. BROWN: Your Honor, I'm not really sure what the relevance of this or where we're going.
MR. OCASIO: Well, the relevance of this is as follows. If you have been allowed to -- to explore the issue whether or not the officer in a phone call could verify whether

a federal police officer could carry a weapon concealed, then you should be able to find out if he's a federal officer in the first place. If you're running his DMV and it comes back as DOD police, I need to know specifically what your understanding was when dispatch called you back with a confidential listing on his DMV record. When, as a former police officer, I can tell you that his police status would have come over the CLETS.

ADMINISTRATIVE JUDGE ELLISON: Okay. Now you're mixing up DMV and CLETS. You're assuming that DMV would show that he was a DOD police officer. You haven't asked that. I don't know the answer to that myself although --

MR. OCASIO: It would, Your Honor.

ADMINISTRATIVE JUDGE ELLISON: Well, you're not the witness.

MR. OCASIO: The DMV printout would come --

ADMINISTRATIVE JUDGE ELLISON: This is the witness here and you asked him what would come back from a DMV and he listed all those identifiers.

MR. OCASIO: Okay.

ADMINISTRATIVE JUDGE ELLISON: What is the problem? I mean I'm trying to help you here.

MR. OCASIO: Well, the problem --

ADMINISTRATIVE JUDGE ELLISON: You're try -- you're being unclear, going from DMV to CLETS.

MR. OCASIO: Your Honor, the problem --

ADMINISTRATIVE JUDGE ELLISON: You asked him what you got out of a DMV check. He answered that question. If you want to ask him if he would get a DOD police officer status from a DMV check, you can certainly do that.

MR. OCASIO: I've been trying to do that.

ADMINISTRATIVE JUDGE ELLISON: Well, you haven't done it yet.

BY MR. OCASIO:

Q. Would your DMV check reveal his DOD police status, sir?

A. Could you define status?

Q. Is there something about the word or my limited English vocabulary that you do not understand?

A. Apparently.

Q. Well, see, let me see if I can --

ADMINISTRATIVE JUDGE ELLISON: If, in fact, he was a DOD police officer.

THE WITNESS: It does not tell me about his status.

MR. OCASIO: Your Honor, well, let's move on from there.

BY MR. OCASIO:

Q. As best you can recollect, sir, when you arrived at the scene what was your memory of what you arrived -- first of all, what radio call did you receive?

A. I received a call for a disturbance at the Flamingos

bar in Redwood City on Broadway.

Q. What was the specific radio call? Was it 415, was it a 647F? Exactly what did you --

MS. BROWN: Objection. Relevance.

Q. -- think you were responding to?

MR. OCASIO: The relevancy goes to sum and substance. If what we have is a 647F, drunk in public, it would require a lesser response than if we have a state 415, public disturbance. If the Flamingos Nightclub disclosed --

MS. BROWN: He's already testified that he came to a disturbance.

ADMINISTRATIVE JUDGE ELLISON: Yeah, well, I mean --

MR. OCASIO: I -- I -- I --

ADMINISTRATIVE JUDGE ELLISON: So, you --

MR. OCASIO: It makes a real big difference, sir.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, I mean -- well, if you want to ask more clarifying questions, you can do that, but you're testifying. You asked him what -- what kind of a dispatch he got.

BY MR. OCASIO:

Q. What exact dispatch call did you get, sir?

A. I don't remember the specific words. The dispatch call was for a disturbance at the Flamingos bar in Redwood City on Broadway.

Q. Okay. How many units responded to the call, sir?

A. I believe two.
Q. Two additional units plus you or you and another unit?
A. Two units responded.
Q. Okay. How many witnesses were present at the time your two units arrived, sir?
A. I don't recall.
Q. Okay. Could you describe Mr. Lugo's condition upon your arrival, sir?
A. Yes.
Q. What do you recollect of Mr. Lugo when you arrived, sir?
A. In regards to he was in handcuffs, he was wearing a shirt and pants with the shirt out on the outside. Either a shirt or a jacket, I can't recall. He was intoxicated.
Q. Can we stop right there one moment, sir.
A. Yes, we can.
Q. He was intoxicated. Yes? That's what you're saying?
A. He appeared to be intoxicated, yes.
Q. I'm sorry. Appeared to be or he was?
A. To me he appeared to be. To him he said he was.
Q. Okay. Independent of your appearance, subjective opinion, whatever, what field sobriety test did you guys -- did you specifically perform on this officer?
A. My appearance is fine.
Q. No, not your --

A. That was the question.
Q. His. Okay, yeah. What field sobriety examination did you conduct, sir?
A. None.
Q. When you approached the officer here in handcuffs what did he smell like?
A. Smelled like an alcoholic beverage.
Q. Potent smell? Light, medium, heavy? I mean what did he stink like?
A. He had the strong odor of an alcoholic beverage on his breath and person.
Q. On his breath and his person. Okay. Would you be able to illuminate the Board, please, what the Redwood City policy directive is when you arrive on scene and you have a drunk in handcuffs, sir?
A. The -- talking about the MOU?
Q. Um-hmn.
A. What we're directed to do?
Q. Um-hmn.
A. There's no such thing that I'm aware of.
Q. Okay. Well, in your vast experience as a police officer, sir, what do you do --
ADMINISTRATIVE JUDGE ELLISON: Okay. Mr. Ocasio, could you --
Q. -- when you arrive on scene --

ADMINISTRATIVE JUDGE ELLISON: -- try not to be sarcastic, please.

MR. OCASIO: Your Honor, I'm not being sarcastic.

ADMINISTRATIVE JUDGE ELLISON: It's a civil, professional proceeding.

MR. OCASIO: I am --

ADMINISTRATIVE JUDGE ELLISON: Let's just ask straight questions and try to get straight answers.

MR. OCASIO: Okay. Your Honor, I will ask a straight question. My first order of business, I apologize to the officer if my question sounds in any way condescending or demeaning. I will refrain from such characterization, sir. Please forgive me.

BY MR. OCASIO:

Q. In your experience as an officer, sir, have you had occasions where you arrived on scene and you were dealing with someone who was intoxicated, sir?

A. Yes, I have.

Q. Were any of those people ever arrested, sir?

A. Yes.

Q. In this specific instance you arrived on scene, Mr. Lugo according to your testimony appears to be intoxicated.

A. Yes.

Q. Why was he not arrested, sir?

A. 'Cause he wasn't committing a crime that we could --

we determined -- Officer Farley determined that he wasn't committing a crime.

Q. Okay. When you arrived on scene, sir, was it your understanding that Mr. Lugo was under arrest?

A. Nope.

Q. What was your opinion of the situation you were responding to, sir?

A. That there was a disturbance.

Q. Okay. So, if he had his hand cuffed or he was wearing handcuffs, sir, would it be a fair representation to you to figure out that he's under arrest?

A. No.

Q. Did you have occasion to speak to Mr. Sham?

A. No.

Q. Okay. So, you have his weapon on the hood of your car?

A. No.

Q. You secured the weapon in the vehicle?

A. Yes.

Q. Did you remove the identification from the case, sir?

A. Yes.

Q. Did you also come across his federal carry weapon permit, sir?

MS. BROWN: Objection. Assumes facts not in evidence.

MR. OCASIO: It was in --

ADMINISTRATIVE JUDGE ELLISON: Okay. You can answer the question if you can, please.

THE WITNESS: Can you repeat the question?

BY MR. OCASIO:

Q. Did you see Mr. Lugo's federal carry permit, sir?

A. No.

Q. Did you remove all the contents from his police wallet, sir?

A. Yes.

Q. You didn't see this behind his ID card?

A. If there was a piece of paper that large, I'm sure I would have seen it. So, I did not.

Q. There was a smaller piece of paper, this small, tape to the inside of his police ID card, sir. Yeah, I know. It's the District Court file and we'll attend to that later. So --

A. Was that a question? I'm sorry.

Q. No, it is not.

ADMINISTRATIVE JUDGE ELLISON: No, it was a sarcastic remark.

MR. OCASIO: It's not a question.

BY MR. OCASIO:

Q. So, now at this particular stage you had a limited involvement here. You ran him through the system, you reported back to Officer Farley, right?

A. (No audible response.)

Q. Were there any other actions that you took in this incident, sir?
A. Can you clarify the question, please?
Q. Did you write a police report, sir?
A. No.
Q. Any reason in particular, sir?
A. Because I wrote a officer's supplement to a police report.
Q. And when might abouts you wrote the supplement, sir?
A. I don't recall.
Q. Could we quantify that a little more, sir? Was it shortly after the incident, after the incident, was it in April, was it in June, did it happen the night of the incident perhaps?
A. I'll try and clarify it. I really don't know.
Q. Okay. You don't know when you wrote the report.
MS. BROWN: Asked and answered.
Q. Were you interviewed by any Naval investigator, sir?
A. No, I was not.
Q. Did you by any chance interview any of the witnesses at the nightclub, sir?
A. No, I did not.
Q. Did you enter into the nightclub after Mr. Lugo went to speak to anybody or did you stay outside the club, sir?
A. I don't recall.

Q. You don't recall if you went inside the club.
A. I do not recall.
Q. Exactly what do you recall, sir?
A. Can you be a little more specific?
Q. Yeah, what do you remember of this incident?

MS. BROWN: He's already testified.

ADMINISTRATIVE JUDGE ELLISON: Well, over and above what he testified?

MR. OCASIO: Yes, I mean it's -- if we got the one minute version, "I don't remember, I don't remember, I don't remember."

ADMINISTRATIVE JUDGE ELLISON: He doesn't remember to the one question you last asked him.

MR. OCASIO: Well, you know, it's -- again we keep going back to the sandbagging of this specific appeal and the fact that the availability of evidence and testimony has been intentionally obstructed. My hands are being tied and I'm being argued with issues of relevancy with Agency here and counsel and everybody.

ADMINISTRATIVE JUDGE ELLISON: You asked one question and he said he couldn't remember.

MR. OCASIO: Well, he doesn't seem to remember anything --

ADMINISTRATIVE JUDGE ELLISON: So, I'm not sure where the hand tying comes in.

MR. OCASIO: -- other than these statements. It's very very simple.

BY MR. OCASIO:

Q. Okay. Did Mr. Lugo request either you -- well, we'll just deal with you because Officer Farley's already out of here. Did Mr. Lugo request any of the officers to make a police report?

A. No.

Q. You're sure about that.

A. Yes.

Q. Okay. So, we have a situation you show up and we have a drunk cop, so let me ask you this. Why was Mr. Lugo released, sir?

A. I don't know.

Q. I'm sorry. Could you -- could we try that one more time?

A. Sure.

Q. Why was he not arrested, sir?

A. I don't know.

Q. Well, at this particular point there is not basically much to focus in on except one basic final question, sir. Getting back to Mr. Sham. Okay. Is it your understanding, sir, that if a person has been subjected to a civilian arrest, sir, do you have the discretion to not take the person into custody, sir?

A. Under my understanding, no, you do not.

Q. You do not have the discretion to not take custody; is that correct? Or am I --

A. You do not have the discretion to not accept the arrest, if that's your definition of custody.

Q. So, it's the Appellant's contention, sir, that he was under arrest. So, let me ask you this very very simply. Was Mr. Lugo able to leave of his own accord, sir?

A. At a point he was.

Q. Well, while he still has the handcuffs could he have ended the consentual contact with your department, sir?

A. No.

Q. Okay. Would it be a fair representation then to make, sir, that he was under arrest?

A. No.

Q. It wouldn't?

A. That's correct.

MR. OCASIO: I would respectfully request again the Board take judicial recognition of Attorney General Opinion 9801. It's Appellant's contention that he was under arrest. It's Appellant's contention that the officers violated California Penal Code §142 by refusing custody of a person placed under citizen's arrest. I want the record to reflect the request for admissions into the Board's record. I'm done with him.

ADMINISTRATIVE JUDGE ELLISON: Okay. I just want to make sure I mean. Admissions into the Board's record of what exactly?

MR. OCASIO: I want -- I want the record -- again we keep going back to the issue of preserving the record up for appeal. It is my contention that again being --

ADMINISTRATIVE JUDGE ELLISON: Okay. I just want you to repeat what you last said. I just want to make sure I'm not missing anything 'cause you said --

MR. OCASIO: I want -- I want --

ADMINISTRATIVE JUDGE ELLISON: If I hear the words, "I want this to be in the Board's record,"

MR. OCASIO: Okay.

ADMINISTRATIVE JUDGE ELLISON: -- I need to know what it is somebody is saying to me so I can either say yea or nay.

MR. OCASIO: Okay. Well, I want the Board to take judicial recognition of the Attorney General Opinion from 1990, which poses the question from the Ventura County District Attorney to the Attorney General, which goes --

ADMINISTRATIVE JUDGE ELLISON: Okay. Do you have a copy of this?

MR. OCASIO: Yes, I do. It's already submitted.

ADMINISTRATIVE JUDGE ELLISON: Okay. You want to give it to us?

MR. OCASIO: It's already supplied as an Agency

exhibit, one to the Agency, one to the Judge, and one to the Court Reporter.

MS. BROWN: Oh, it's definitely not an Agency exhibit.

MR. OCASIO: Well, you have a copy of --

MS. BROWN: Right.

MR. OCASIO: -- of the Attorney General Opinion. Very simple. The question that it presents before --

ADMINISTRATIVE JUDGE ELLISON: Where is it in the record? That's what I need to know. I mean I'm not -- I don't want to discuss it now because --

MR. OCASIO: This had just -- I had just made additional copies and supplied a copy for the Administrative Judge.

MS. BROWN: It's not in the record.

MR. OCASIO: One for the Agency, and one for the Court --

ADMINISTRATIVE JUDGE ELLISON: This is what you gave us earlier today.

MR. OCASIO: Yes, sir.

ADMINISTRATIVE JUDGE ELLISON: Okay.

MR. OCASIO: Okay.

ADMINISTRATIVE JUDGE ELLISON: That's what I need, so okay. All right.

MR. OCASIO: So, at this particular point the -- what I'm asking the Board to take judicial recognition of is the

question that Ventura County District Attorney asked of the Attorney General which goes as follows.

ADMINISTRATIVE JUDGE ELLISON: Okay. I don't want to discuss that now. My point is you gave it to me, I just identified it.

MR. OCASIO: I gave it to you. That's fine.

ADMINISTRATIVE JUDGE ELLISON: Fine, the point is --

MR. OCASIO: It's in the record.

ADMINISTRATIVE JUDGE ELLISON: The point is -- I'll be glad to take it into the record. The point is -- I'll be glad to read it, but whether or not you are correct that there was a citizen's arrest actually done or that it was improper, if in fact it was improper, or if it should have been converted into a City Police Department arrest, et cetera, et cetera, all of which is pretty irrelevant to the facts of the case. I mean it may be relevant to something else, and it may be relevant to your District Court case, but it's not relevant to the Board proceeding, but I'll be glad to take this in. Okay. Any other questions?

MR. OCASIO: No, I have no other questions.

ADMINISTRATIVE JUDGE ELLISON: Okay. Ms. Brown, anything else?

MS. BROWN: Obviously -- very quickly -- obviously the Agency objects to that exhibit being put in the record in terms of relevance. And also from what I can tell there's several

Opinions in there, some of which are not what he was speaking of earlier, so I'm not terribly certain what probative value they have to add to this matter.

MR. OCASIO: If on redirect, their probative value to this matter is very very simple. If it --

ADMINISTRATIVE JUDGE ELLISON: I just want to know what the other thing is. I can see this --

MR. OCASIO: The Law Review articles --

ADMINISTRATIVE JUDGE ELLISON: -- this first case.

MR. OCASIO: -- Your Honor, basically speak to the holding from the Attorney General that once a placing is placed under citizen's arrest no California police officer may refuse custody.

MS. BROWN: Your Honor, I'm not certain what a prepaid whole life insurance policy has anything to do with this particular case.

ADMINISTRATIVE JUDGE ELLISON: Okay. Nor does this seem to be a Law Review article so --

MR. OCASIO: The AG Opinion, Your Honor, the bottom line winds up being --

ADMINISTRATIVE JUDGE ELLISON: Okay. We're just trying to figure out what this next thing is. I can see there's Opinion number 9801, et cetera, et cetera, and then there's something else after that.

MR. OCASIO: Well, the -- the entire Law Review

article, Your Honor, was copied. Opinion 1003 was copied in inadvertently. I basically ran it through the sorter and just stapled it, so I might have inadvertently included exhibits from another Attorney General Opinion.

ADMINISTRATIVE JUDGE ELLISON: Okay. That's all we needed. All right.

MR. OCASIO: The -- the bottom line winds up being one of the character of this contact. They don't remember anything.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, this is not the time for closing arguments. I'm just asking you what this is.

MR. OCASIO: I'm not closing the arguments, Your Honor.

MS. BROWN: So, therefore --

MR. OCASIO: I'm speaking to the relevancy of the Attorney General Opinion.

ADMINISTRATIVE JUDGE ELLISON: Okay. I'm going to call this Appellant's Hearing Exhibit No. 1.

(Appellant's Hearing Exhibit No. 1 marked for identification and received into evidence.)

MS. BROWN: And again the Agency objects on the basis of relevance.

ADMINISTRATIVE JUDGE ELLISON: All right.

MR. OCASIO: Well, that's fine.

ADMINISTRATIVE JUDGE ELLISON: Okay. All right. Any other questions?

MR. OCASIO: No, I'm done with the witness.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, now we'll let Ms. Brown answer my question.

REDIRECT EXAMINATION

BY MS. BROWN:

Q. In terms of the Police Department, whenever you got to the scene, Officer Farley, you were both there, correct?

A. Correct.

Q. So, whose call was it to decide to let the gentlemen go or to arrest them?

A. Officer Farley's.

MS. BROWN: Okay. Thank you.

ADMINISTRATIVE JUDGE ELLISON: Okay. All right. Thanks very much.

THE WITNESS: Thank you.

UNIDENTIFIED MALE: Thank you for your courtesies today, Judge.

ADMINISTRATIVE JUDGE ELLISON: What's that?

UNIDENTIFIED MALE: For your courtesies today.

ADMINISTRATIVE JUDGE ELLISON: Okay. You're welcome.

(Witness excused.)

(Off the record.)

ADMINISTRATIVE JUDGE ELLISON: Okay. Before we go to our next witness Mr. Ocasio is making a point. He asked about Mr. Gaston, who as we know is an approved witness called by the Appellant, for whom a subpoena was given. I don't know the details of how or when it was served. Assuming Mr. Gaston doesn't show up, I informed Mr. Ocasio, of course, there is a provision and procedures through which by which he can petition for enforcement of the subpoena. Do you want to comment on that?

MR. OCASIO: Well, Your Honor, I'm advancing a vigorous objection and a inherent --

ADMINISTRATIVE JUDGE ELLISON: I'm sorry. Objection to what?

MR. OCASIO: I'm -- I'm griping, Your Honor. And my gripe is that all the way up to this particular point I have been forced to defend this matter as a strongarm tactic here at the hearing. I have been denied every single document requested. The Board's --

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, let's take this piece by piece here because --

MR. OCASIO: Okay.

ADMINISTRATIVE JUDGE ELLISON: -- I mean you --

MR. OCASIO: Dealing specifically --

ADMINISTRATIVE JUDGE ELLISON: If you --

MR. OCASIO: -- with Captain Gaston.

ADMINISTRATIVE JUDGE ELLISON: Okay.

MR. OCASIO: The relevancy and the materiality of his testimony was outlined before.

COURT REPORTER: Wait a minute. (Pause) All right, go ahead.

MR. OCASIO: Thank you, ma'am.

ADMINISTRATIVE JUDGE ELLISON: Okay. And that's why he was approved, so we're past that point now.

MR. OCASIO: Well, no. It's -- we're not past that point because I barely got Gaston as a witness after vigorous objection in an hour and 45 minute prehearing conference. You didn't approve him for me in the beginning. It was actually a fight. Captain Gaston's status with the Navy and the reason for his termination, all these other factors which impacted the Agency's decision to take its adverse employment action against this Appellant, were raised in all of the Pleadings. The only objection I got from the Agency was that it was burdensome, irrelevant, and they couldn't figure out why we were asking what we were asking for.

ADMINISTRATIVE JUDGE ELLISON: Okay. I'm sorry to interrupt, but once again we are past that point. I approved him so what do you want?

MR. OCASIO: We are past that point.

ADMINISTRATIVE JUDGE ELLISON: Now we're talking about the fact that he apparently is not going to show up and what

we're going to do about that.

MR. OCASIO: There's not -- I mean it's -- all I can do is notice my -- my disgruntledness into the record and reference that at some particular point and I'm basically finished.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, that's --

MR. OCASIO: You guys have tied my hands.

ADMINISTRATIVE JUDGE ELLISON: That is in fact, of course, not all you can do. You can petition for enforcement of the subpoena. We can go through the process. That's fine.

MR. OCASIO: That's fine.

ADMINISTRATIVE JUDGE ELLISON: Frankly, I've never had to do this before, and did a little research into it, and there are steps to take. And you -- the first thing you will have to do, if Mr. Gaston doesn't show up which apparently is the case, is decide. And since you were the one who requested the subpoena, it's ultimately up to you to decide whether or not you want to pursue that -- that avenue of trying to enforce the subpoena by deciding for yourself how important you think his testimony is. I obviously approved him, so clearly you made a sufficient showing of his relevance to have him approved as a witness. Now at this point, obviously, it's a burden, but that's why there are these provisions to -- to allow you to try to enforce the subpoena if you want to and you can certainly do that. And we can talk about that --

MR. OCASIO: Since we're on --

ADMINISTRATIVE JUDGE ELLISON: -- at any time and --

MR. OCASIO: Since we're on the record then and on the subject, I do not believe Captain Gaston will be making a appearance regardless of what subpoena or order is made. Then I would request then that the Court revisit its position on EFA West Security Director because then he becomes the second integral part of the Agency's actions.

ADMINISTRATIVE JUDGE ELLISON: Okay. I may very well do that. We'll finish up with who we have and then we'll --

MR. OCASIO: That's fine.

ADMINISTRATIVE JUDGE ELLISON: -- we'll see.

MR. OCASIO: Then I would, you know, just let the record stand the time. We can go get some lunch and, hopefully --

ADMINISTRATIVE JUDGE ELLISON: All right. So, you're going to -- needless -- I'm sorry. Needless to say you're going to defer your decision as to whether or not you want to pursue the enforcement of the subpoena for Mr. Gaston.

MR. OCASIO: Well, Your Honor --

ADMINISTRATIVE JUDGE ELLISON: I mean you don't have to make it right now.

MR. OCASIO: No, I mean it's -- unless I can sail through an <u>ex parte</u> order for you to sign and me to bring to the Presiding Judge for her to have Marshals go out and find

him and bring him here, it's going to be highly doubtful. Unless I go through that particular motion at this particular time, then Captain Gaston will not come here unless we drag him over here and that's --

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, frankly, I'm not -- since I've never had to do this before I'm not sure exactly what all the steps are, but obviously there is some way to enforce these --

MR. OCASIO: If I request an order --

ADMINISTRATIVE JUDGE ELLISON: -- subpoenas through District Court.

MR. OCASIO: -- from the Board and prepare the moving papers, I can bring it up to the Duty Judge for a signature and have Marshals go get him and bring him here and that's --

ADMINISTRATIVE JUDGE ELLISON: Well, perhaps that's the way it goes.

MR. OCASIO: I can prepare -- I can prepare --

ADMINISTRATIVE JUDGE ELLISON: If that's it, that's fine.

MR. OCASIO: -- a motion, if we take a half hour break or during lunch I can draft out the ex parte and bring it up to the Duty Judge.

ADMINISTRATIVE JUDGE ELLISON: Well, no, he's not going to be here today, so we're not going to do that --

MR. OCASIO: I understand, but if we --

ADMINISTRATIVE JUDGE ELLISON: -- during lunch or before we finish, obviously.

MR. OCASIO: -- if we enforce that order and have the Marshals go and get him, then we can make sure that he appears for testimony tomorrow. And since it would be a civil contempt, as it were --

(Tape changed at this time.)

MR. OCASIO: Your Honor, my experience in District Court proceedings dealing with this very same subject has many times been met with an order signed by the Duty Judge and Marshals to get the attorney or the witness and drag them into chambers. I would, of course, not want to have to resort to that type of a drastic measure, however, Captain Gaston sits : the middle of this almost as much as Mr. Lewis and Mr. Carranza, and if he's not going to appear even though he was noticed of it, the United States Attorney was properly served, then the only way we're going to get Mr. Gaston here is to send some friends to pick him up and make sure he comes here. And because it's a contempt matter at this particular point, I can prepare the order for signature and bring it to the Duty Judge and have the Marshals go and get him. And since it's a enforcement remedy at this particular point for me to avail myself of, I will be more than happy to prepare the order and walk it into the Duty Judge 'cause I believe Captain Gaston should appear. And his relevancy to the proceeding is

contained in all of the exhibits and we basically need him. And if I have to go through the motion to do an enforcement action to make sure he comes, then I'd like to make sure he is brought.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, apparently there is a requirement for -- from you, as the party who requested the subpoena, for a document certifying that the subpoena was served.

MR. OCASIO: Yes, Your Honor.

ADMINISTRATIVE JUDGE ELLISON: And apparently we need that and then the Board, in accordance with 5 U.S.C. 1204C, may then ask the appropriate District Court to enforce the subpoena.

MR. OCASIO: Yes, sir. We have a copy of the subpoena, Your Honor, when it was served on the Assistant United States Attorney.

ADMINISTRATIVE JUDGE ELLISON: Okay. Now, it was served on the United States Attorney?

MR. OCASIO: Yes, sir.

ADMINISTRATIVE JUDGE ELLISON: And not on Mr. Gaston?

MR. OCASIO: It was not served on Gaston. It was served on his attorney of record 'cause Captain Gaston has secreted himself into hiding.

ADMINISTRATIVE JUDGE ELLISON: So, wait a minute. The U.S. Attorney --

MR. OCASIO: The U.S. Attorney was --

ADMINISTRATIVE JUDGE ELLISON: -- is his attorney of record?

MR. OCASIO: -- was -- yes, sir. The U.S. Attorney filed a certification that the Lugo v. Gaston District Court case was an act that was performed within the character, nature, and scope of his employment as a federal employee.

ADMINISTRATIVE JUDGE ELLISON: So, the U.S. Attorney has got authority to accept service and process --

MR. OCASIO: His attorney --

ADMINISTRATIVE JUDGE ELLISON: -- on Mr. Gaston?

MR. OCASIO: It's his attorney of record, sir.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, I'm not all sure about that, but I can't say yea or nay. It doesn't sound likely, but --

MR. OCASIO: Well, sir, tomorrow we'll have to have a half hour recess because at 9:00 in the morning Mr. Lugo is appearing in front of Judge Chesney (phonetic) under the United States Motion for Substitution and Motion to Dismiss. Captain Gaston, Buchanan, all the Naval personnel sued in the Lugo v. Gaston matter. The issue requesting the Board to remand the Lugo v. Gaston case to the jurisdiction of the Board --

ADMINISTRATIVE JUDGE ELLISON: Which, of course, as we discussed, we have no authority to do.

MR. OCASIO: Actually, yes, you do. The District

Court was requested *ex parte* to remand the matter from the District Court to the Board because we crossed both of the motions and clearly both jurisdictions were very well aware of the Board appeal. They're going to dismiss that case anyway. As the U.S. Attorney is the attorney of record for Captain Gaston in the District Court case, it would stand to reason that their ability to serve subpoena or Board order for Captain Gaston would also flow.

ADMINISTRATIVE JUDGE ELLISON: Well, I mean, you know, as I say it doesn't sound right. I'm not saying it's wrong. I don't know. I would certainly need to see some sort of authority to that effect, because obviously the first step in a petition for enforcement of a subpoena is a statement, as I have said, indicating what the service of process was, upon whom it was served, et cetera, et cetera. Obviously, we need to clarify whether or not there was proper service before we can attempt to enforce it. But, you know, I think it's pretty clear it's not going to be one way or the other. It's probably not going to be resolved by tomorrow, since I would have to get that statement from you and I would have to determine whether or not, based on that statement, there was proper service, et cetera, et cetera. So, I don't see even in the most optimistic view that it's going to result in his appearance tomorrow, but certainly this is something that is available to you to pursue. If you want to pursue it, we'll pursue it and that's fine

'cause that's why -- that's why the provision is there.

Okay. Why don't we break for lunch. Let's go off the record, please. I have --

(Lunch break at this time.)

ADMINISTRATIVE JUDGE ELLISON: Good afternoon.

THE WITNESS: Hi.

ADMINISTRATIVE JUDGE ELLISON: Do you have any objection to taking an oath regarding your testimony?

THE WITNESS: No.

ADMINISTRATIVE JUDGE ELLISON: Would you raise your right hand, please.

Whereupon,

CHARLES S. SMITH,

having been first duly sworn, was examined and testified as follows:

ADMINISTRATIVE JUDGE ELLISON: Thank you. Could you state and spell your full name for the record, please.

THE WITNESS: Charles Scott Smith, C-H-A-R-L-E-S, S-C-O-T-T, S-M-I-T-H.

ADMINISTRATIVE JUDGE ELLISON: Okay. Thank you. Ms. Brown?

MS. BROWN: Hi, Commander Smith.

DIRECT EXAMINATION

BY MS. BROWN:

Q. Could you give us your title, please?

# EVANGELISTA LUGO

V

# DEPARTMENT OF THE NAVY

MERIT SYSTEMS PROTECTION BOARD
SAN FRANCISCO REGIONAL OFFICE
CASE SF-0752-00-0499-I-1

# EXHIBIT

# 6

TESTIMONY OF CHARLES S. SMITH
PAGES 182 THROUGH 247

'cause that's why -- that's why the provision is there.

Okay. Why don't we break for lunch. Let's go off the record, please. I have --

(Lunch break at this time.)

ADMINISTRATIVE JUDGE ELLISON: Good afternoon.

THE WITNESS: Hi.

ADMINISTRATIVE JUDGE ELLISON: Do you have any objection to taking an oath regarding your testimony?

THE WITNESS: No.

ADMINISTRATIVE JUDGE ELLISON: Would you raise your right hand, please.

Whereupon,

CHARLES S. SMITH,

having been first duly sworn, was examined and testified as follows:

ADMINISTRATIVE JUDGE ELLISON: Thank you. Could you state and spell your full name for the record, please.

THE WITNESS: Charles Scott Smith, C-H-A-R-L-E-S, S-C-O-T-T, S-M-I-T-H.

ADMINISTRATIVE JUDGE ELLISON: Okay. Thank you. Ms. Brown?

MS. BROWN: Hi, Commander Smith.

DIRECT EXAMINATION

BY MS. BROWN:

Q. Could you give us your title, please?

A. Currently I'm Regional Operations Officer, but that just changed in September.
Q. And for where you're the Regional Operations Officer?
A. Engineering Field Activity West.
Q. Is that a Navy facility?
A. That's a Navy facility as part of Naval Facilities Engineering Command.
Q. Okay. And what is your rank?
A. Commander.
Q. Okay. How long have you been in the Navy?
A. Nineteen years.
Q. Oh, close to 20. How long have you been at EFA West?
A. Coming up on three years, almost three years.
Q. Okay. And as you know, we are here about Mr. Lugo's removal from federal service with the Department of the Navy. And what was your role in that matter?
A. At the time I was the Director of the Base Conversion Office and in that role I was the deciding official --
Q. Okay.
A. -- in the removal.
Q. It is the Exhibit 4-B, bravo, is a Decision, Officer Removal. I'm going to hand that to you. If you'll take a brief look at it. Are you familiar with that?
A. Yes.
Q. Is that your signature on the second page?

A. Yes, it is.
Q. So, that was your decision on Mr. Lugo's case?
A. Yes.
Q. Okay. So, basically what we're doing today is talking about events that lead up to that letter, and basically how you made that decision, and your decision itself. Do -- what is your relationship with Mr. Lugo?
A. I was the Director of the Base Conversion Office so all issues and events on any of the closed bases in the Bay Area would fall under my purview.
Q. Okay. Whenever -- there was a proposal on this which was issued, according to Agency 4-C, on April the 20th. That proposal offered Mr. Lugo a chance to present an oral or written reply to you. Did he take advantage of that?
A. No, I never received anything.
Q. Did you get any oral reply at all?
A. No.
Q. And no written reply?
A. No.
Q. Okay. So, if he didn't have an oral or written reply, what did you rely on to give you facts that you could make your decision on in this instance?
A. There was a package that I had that I reviewed and looked at.
Q. Okay. Would that be -- I just want to show you the

Q. Okay. Now, you talked to these people. Were they in-depth conversations about the situation?

A. Yes, I mean at different times.

Q. Okay. Having talked to these people, did talking to any one of them change your mind about the decision that you were going to make?

A. No.

Q. Okay. You said you reviewed this package, which is Agency Exhibit 4-E. How long did you review it?

A. Probably total a couple hours.

Q. Okay. Did you read it once?

A. Several.

Q. How -- how many times?

A. Several times.

Q. Okay. You said you read it -- you reviewed for a couple of hours. Then how long did it take you to actually make your decision on removal?

A. That was over a couple days.

Q. Okay. Had you ever removed anyone before?

A. No, I have not.

Q. Was it an easy decision to make?

A. No, it was not.

Q. Why is that?

A. I knew it was a decision that was going to affect somebody's life, their livelihood, their career, their

reputation, all those type of reasons. It's a -- it was a serious decision in my mind.

Q. Okay. Are you familiar with the Douglas factors?

A. Yes, I am.

Q. Okay. I'm going to --

MS. BROWN: I just have a list here of the Douglas factors, Your Honor, just going to hand it to him.

ADMINISTRATIVE JUDGE ELLISON: Okay.

BY MS. BROWN:

Q. And as you know, I just want you to tell me. Let's go through the Douglas factors and kind of give me an idea what your thought process was in terms of how you made this decision. So, what I'd like to know first is, looking at the Douglas factors could you tell me -- don't give me by number, but tell me what were the most important factors to you in terms of making this decision about Mr. Lugo's removal?

A. Okay. The first one was very important to me.

Q. And what is that?

A. That's the nature and seriousness of the offense, but it goes on. Relation of the employee's duties, position, responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated. That one and the second one, the employee's job level and type of employment, including supervisory, contacts with the public or prominence of the

identification, no. Just the event, itself, I thought was enough.

Q. Okay. To your knowledge was Mr. Lugo permitted to carry a concealed weapon off duty?

A. No.

Q. Okay. Were you present when the events at the Flamingo Nightclub occurred?

A. No, I was not.

Q. Okay. If you had considered anything else, would you have put it in the letter, the decision letter?

A. Yes, I would have.

Q. In your mind how serious was what Mr. Lugo did, the alleged conduct?

A. I consider it very serious because of a lot of the things I've talked about. With the responsibility, the authority that goes with a police officer, and the dealings with the public, I found it very serious.

Q. Do you think a long suspension would have been a significant deterrent in this particular case?

A. Not in this case, no.

Q. Did you consider doing anything less than removal?

A. Considered it, but I didn't find that that would be appropriate.

Q. Do you have anything against Mr. Lugo just as a person, personally?

A. No.
Q. Okay. Whenever you made your decision you said you had this packet in front of you, the 4-E exhibit, did you have a copy of the Police Report?
A. No, I didn't.
Q. Have you ever seen the Police Report?
A. I saw it. I didn't read it or anything. I saw -- I saw a copy of it, but I didn't look at it.
Q. And when was that?
A. Yesterday.
Q. There's another question I have. In terms of if I'm an employee of Hunters Point and I need to call back to have someone perhaps verify my employment, is there a number people can call 24 hours a day?
A. Yes.
Q. And who would that be?
A. It would be the on-duty police. Actually at this point in time there were three police officers on duty at any time, but there was always a Captain of the Watch or a senior police officer. But there was a number that -- there is a number you can call.
Q. Okay. Did the officers know? Were they given that number?
A. I don't specifically know. I can't imagine they didn't have it. It was a number -- I mean I know it, I would

assume they know it.

Q. Okay. Given everything, if you'd look back at your decision, would you make the same decision today if you were faced with the same set of facts in front of you?

A. Yes, I would.

Q. Are you comfortable with your decision?

A. Yes, I am.

MS. BROWN: We'll pass the witness.

ADMINISTRATIVE JUDGE ELLISON: Okay. Mr. Ocasio?

CROSS-EXAMINATION

BY MR. OCASIO:

Q. Your regular Naval personnel, sir?

A. Yes.

Q. Are you familiar with the Uniform Code of Military Justice, sir?

A. Yes.

Q. You said in your decision to remove the Appellant you relied upon the package that was -- that the Agency just referenced being the Gaston letter and the enclosures.

A. Right.

Q. Is that correct?

A. That's correct.

Q. Okay. How did you consider this off-duty misconduct complaint, sir? Your opinion of the complaint that was brought to the Agency, did you consider that a civil matter or did you

consider that a criminal matter, sir?

A. What complaint that was --

Q. This thing here that led to the officer's removal. Did you consider that a civil matter or a criminal matter, sir?

ADMINISTRATIVE JUDGE ELLISON: Okay. We should clarify. You made reference to the package, you said the Gaston letter --

MR. OCASIO: The -- the --

ADMINISTRATIVE JUDGE ELLISON: -- and the enclosures.

MR. OCASIO: Agency 4-E and the allegations made by the Agency's witnesses --

ADMINISTRATIVE JUDGE ELLISON: Right.

MR. OCASIO: -- and his careful consideration of them.

ADMINISTRATIVE JUDGE ELLISON: Right. Okay. That's from Mr. Lewis, correct?

MR. OCASIO: Excuse me, sir? Exhibit 4-E, he just testified --

ADMINISTRATIVE JUDGE ELLISON: Right.

MR. OCASIO: -- that he went through this package at length.

ADMINISTRATIVE JUDGE ELLISON: Right, I'm just saying. This is not a big thing, I'm just saying that you said the Gaston letter and the enclosures.

MR. OCASIO: Well --

ADMINISTRATIVE JUDGE ELLISON: I'm assuming, and you

referred to this, and you are now referring to this which is -- which is a letter.

MR. OCASIO: The enclosures being 4-D, which was --

ADMINISTRATIVE JUDGE ELLISON: Which is a letter.

MR. OCASIO: -- the Gaston notice to the Agency.

BY MR. OCASIO:

Q. And is it your representation, sir, that these --

ADMINISTRATIVE JUDGE ELLISON: Okay. Perhaps I --

Q. -- enclosures here -- I'm sorry.

ADMINISTRATIVE JUDGE ELLISON: If you're finished, I would like to finish, too. I'm just saying you're referring to 4-E, which is a letter from Mr. Lewis to the ExO.

MR. OCASIO: Yes.

ADMINISTRATIVE JUDGE ELLISON: And the Commander has testified that's the package he considered.

MR. OCASIO: Yes, sir.

ADMINISTRATIVE JUDGE ELLISON: And you said 4-B.

MR. OCASIO: That's what I'm -- yeah.

ADMINISTRATIVE JUDGE ELLISON: But you said -- you said that he considered the Gaston letter and the enclosures. I'm just trying to clarify if you meant --

MR. OCASIO: Enclosures.

ADMINISTRATIVE JUDGE ELLISON: -- 4-E.

MR. OCASIO: 4-E, all of the exhibits.

ADMINISTRATIVE JUDGE ELLISON: Which is the Lewis

letter and enclosures.

MR. OCASIO: Yes.

ADMINISTRATIVE JUDGE ELLISON: Okay. Not the Gaston letter and enclosures.

MR. OCASIO: Okay.

ADMINISTRATIVE JUDGE ELLISON: Is that correct?

MR. OCASIO: Well, the Gaston letter, sir, is enclosed in the enclosures in 4-E. It's Exhibit No. 4, sir.

ADMINISTRATIVE JUDGE ELLISON: Okay.

MR. OCASIO: 4 and 5. Okay.

ADMINISTRATIVE JUDGE ELLISON: Let's see here.

MR. OCASIO: It's --

ADMINISTRATIVE JUDGE ELLISON: It's -- No. 4 is from Mr. Carranza and 5 is from --

MR. OCASIO: It's No. 5 --

ADMINISTRATIVE JUDGE ELLISON: Five is from --

MR. OCASIO: -- according to this sequence I have here. It's the memo to Michael Lewis, pages 1, 2, the Summary of Enclosures.

ADMINISTRATIVE JUDGE ELLISON: Okay. You're going to have to tell me where this is. Because if you're looking at this thing that --

MR. OCASIO: I have Agency's 4-E, Your Honor.

ADMINISTRATIVE JUDGE ELLISON: Right, right.

MR. OCASIO: Okay. The first page of Agency's 4-E is

a Michael Lewis letter, 1 and 2. There is a Summary of Enclosures which is two pages. And the very next document would be the Gaston E-mail, two pages. Then the voluntary statements in the --

ADMINISTRATIVE JUDGE ELLISON: Okay.

MR. OCASIO: -- sequence that the Agency had provided, sir. I wanted to make sure I didn't take it out of sequence.

ADMINISTRATIVE JUDGE ELLISON: Okay. All right.

MR. OCASIO: So, when I reference Exhibit 4-E I mean the whole packet.

ADMINISTRATIVE JUDGE ELLISON: Right. Okay.

BY MR. OCASIO:

Q. Okay. Is it your representation, sir, that Exhibit 4-E and all the attachments here constitute the investigation of the misconduct complaint?

A. Yes.

Q. Okay. And that you reviewed it and you spoke to Gough, Mr. Lewis, Roger Green.

A. Yes.

Q. Did you speak to Mr. Green at length, sir? Or did you have -- let me rephrase that question. How in depth was your conversation with the Base Chief General Counsel, sir?

A. Probably fairly in-depth.

Q. Your recollection of the Base General Counsel's understanding of this misconduct complaint, sir, what was it?

MS. BROWN: Attorney/client privilege. Objection.

MR. OCASIO: Excuse me. If you're going to raise an attorney/client privilege, Mr. Green was specifically requested to be deposed and to appear as a witness. The Judge did not even rule on the motion with a flat denial. Mr. Lewis' communication to authorities in San Mateo County, as well as communications of what he had directed his investigator to do, are at the heart of this debacle.

ADMINISTRATIVE JUDGE ELLISON: Okay. We're not talking about Mr. Lewis right now. Are you talking about Mr. Green?

MR. OCASIO: We're talking about Base General Counsel. So, whatever he instructed his Agency investigator to do.

ADMINISTRATIVE JUDGE ELLISON: I'm sorry. He who? The General Counsel?

MR. OCASIO: Yes, Mr. Green. Someone called Mr. Green. Before we even get there I want to find out more or less did you at least have an in-depth conversation with the Base General Counsel?

ADMINISTRATIVE JUDGE ELLISON: He said he did.

MS. BROWN: He's already testified to that.

MR. OCASIO: He did, fine.

BY MR. OCASIO:

Q. Your recollection, excluding whatever assertion of work product or an absolute communication privilege that you

had with the Base General Counsel within the character, nature, and scope of your official functions. The short version, his take of this misconduct complaint?

MS. BROWN: Objection again. Attorney/client privilege.

MR. OCASIO: Will you --

ADMINISTRATIVE JUDGE ELLISON: Okay.

MR. OCASIO: Would you identify what attorney/client privilege you speak of, ma'am? And with specific particularity what areas are you asserting are privileged?

ADMINISTRATIVE JUDGE ELLISON: Okay.

MS. BROWN: Go ahead, Judge?

ADMINISTRATIVE JUDGE ELLISON: Go ahead.

MR. OCASIO: What?

ADMINISTRATIVE JUDGE ELLISON: I mean I'm not sure that that applies with a -- in this kind of a case with a General Counsel of an Agency as opposed to a representative of an individual. So --

MS. BROWN: My understanding would be that those discussions though would have taken place in that he wanted to make sure that Commander Smith would make the appropriate decision and that would be based on like the Navy's legal interest. And other than that, why would the Navy have a legal counsel except to have an attorney/client relationship? Because he at that point is operating as a representative of

the Navy, the Agency, and therefore, he as the Agency is getting information from his attorney. If that's the case, then we shouldn't even have General Counsels because we couldn't consult with them without fear of having something like this brought before everyone.

ADMINISTRATIVE JUDGE ELLISON: Okay.

MR. OCASIO: Your Honor, I would voice a very vigorous objection that the Agency's argument is very circular. We have not asked for anything that is not privileged. It is the conduct of the Agency taken in total that resulted in this removal. It's a very clear, simple question. Does not call for any national secret. Does not call for anything that would even be remotely covered under a privilege argument. And the question basically is, just like with all of the other witnesses who have appeared before the Board, if there was a conversation regarding the alleged off-duty misconduct complaint, is that something which is properly brought before the Board for the Board to assess? If the Agency properly, or for some other ulterior motive, sailed through an adverse personnel action, it goes to the nexus and the rebuttable presumption of the Agency's best interest to remove a individual. You've testified, sir, that upon careful consideration of all of the exhibits and attachments and the Agency's enclosure, it was your judgment call that the offense was so egregious it warranted a removal. So, if you had a

conversation which goes to the heart of that decision, this would be the only place to raise it.

ADMINISTRATIVE JUDGE ELLISON: Okay. I'm a little confused. What was the purpose for your conversation with the General Counsel?

THE WITNESS: Actually, purpose of that was more to find out the range of penalties that were -- were authorized, how we would take certain steps if we decided to do certain things, what the consequence of that may be. It was legal advice along that -- those lines.

MR. OCASIO: That's a fair question.

ADMINISTRATIVE JUDGE ELLISON: Okay.

BY MR. OCASIO:

Q. So, in asking what the maximum reasonable penalty would be from the Agency for getting beat up at a bar, which we have yet to have a fact-finding was job related or reflected poorly on the Agency, sir --

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, I mean aside from --

MR. OCASIO: That's the decision that the Board is going to make.

ADMINISTRATIVE JUDGE ELLISON: -- assuming facts not in evidence, I didn't even understand if that was a clause or a question or what.

MR. OCASIO: Well, it's -- if I'm allowed to preface

my question and ask it, I believe it might circumvent a standing objection from the Agency rep.

BY MR. OCASIO:

Q. Your conversation in the nature of legal advice from Base General Counsel specifically, sir, on how to handle the investigation of this complaint, sir, what was it?

A. I didn't have the conversation. I don't recall a conversation with Roger Green about the investigation, itself, and how it was conducted.

ADMINISTRATIVE JUDGE ELLISON: I mean --

MR. OCASIO: Did you have a --

ADMINISTRATIVE JUDGE ELLISON: I'm sorry. Your conversation with him, I assume, was after you received this package; is that correct?

THE WITNESS: Yes.

BY MR. OCASIO:

Q. Up until that -- up until that point you had no conversation with anyone in the Agency on how to proceed with this particular matter?

A. I had conversations with people. I'm not sure Roger Green was involved at me -- with me until I got the package and started looking at options and what was, you know, what would be available alternatives.

Q. Very fair. Would any of those conversations, sir, involve Mr. Lewis?

A. I had conversations with Mr. Lewis. I'm not sure he was ever involved in a conversation with Roger Green and I at the same time.
Q. No, but that at least you spoke to him.
A. Oh, I spoke to Mr. Lewis, yes.
Q. And did you speak to Mr. Lewis at length concerning the particulars of this specific appeal, sir?
ADMINISTRATIVE JUDGE ELLISON: I'm sorry. About the appeal or about --
MR. OCASIO: This removal action. I mean it's --
ADMINISTRATIVE JUDGE ELLISON: Okay. Well, I mean an appeal --
MR. OCASIO: No, I'm -- I --
ADMINISTRATIVE JUDGE ELLISON: -- comes after the removal action, obviously, so --
MR. OCASIO: I understand.
ADMINISTRATIVE JUDGE ELLISON: Okay. So --
MR. OCASIO: Let me rephrase the question.
BY MR. OCASIO:
Q. Did you have a conversation with Mr. Lewis regarding this incident, sir?
A. Oh, yes, I've said that.
Q. Okay. Was it a lengthy conversation, sir?
A. I don't think the conversation or conversations with Mr. Lewis were ever lengthy on this. I mean it was almost in

passing or when he happened to be in my office about something else.

Q. Okay. So, in passing, sir, what exactly was your conversation with Mr. Lewis?

A. Probably discussing what had happened, past performance, those type of issues.

Q. Anything specifically come to mind regarding your conversations with Mr. Lewis about this specific incident, sir?

ADMINISTRATIVE JUDGE ELLISON: Well, that's what he's --

MS. BROWN: I think he just answered that question.

ADMINISTRATIVE JUDGE ELLISON: That's what he's answering.

MR. OCASIO: No, I -- I --

THE WITNESS: No, because --

MS. BROWN: Just --

ADMINISTRATIVE JUDGE ELLISON: Okay.

BY MR. OCASIO:

Q. To your personal knowledge, sir, was Mr. Lewis present during -- during this investigation, for lack of a better word? 'Cause I'm not quite sure what to -- how to reference Agency's Exhibit E.

A. What do you mean, present during the investigation?

Q. Was Mr. Lewis present at the Flamingos Nightclub when the Agency investigator, Captain Gaston, was gathering these

witness statements, sir?

A. Was he there while the investigation was ongoing?

Q. Yes, sir.

A. I don't think so.

Q. One question I have, sir, about the investigation in total, sir. Why was this matter not referred to the Criminal Investigation Division, sir?

A. I don't know.

Q. Why would -- oh, do you know why Captain Gaston was selected to conduct this investigation, sir?

A. No, other than he was the Chief of Police at the time.

Q. Captain Gaston was the Chief of Police? I'm sorry.

A. I believe he was, yeah.

Q. Captain Gaston, as the Chief of Police, sir, does he have the authority to issue concealed weapon permits?

A. I'm not sure. I don't believe so because I don't think our officers are -- I know our officers are not authorized to wear or have concealed weapons off duty.

Q. Okay. Well, that's a -- that's a very interesting point there, sir. Exactly what Naval directive says that a DOD police officer cannot carry a concealed firearm, sir?

A. I don't know that it is a Naval directive.

Q. Okay. Well, then let me ask you this question, sir. The ability for a federal officer to carry a firearm, sir, is that conferred by federal statute?

A. The authority to may, but our Command specifically does not authorize it. In fact restricts it.

Q. Does the fact that your Command may or may not authorize a particular officer to carry a concealed firearm, sir, invalidate the federal statute that allows federal officers to carry weapons, sir?

A. I think --

MS. BROWN: Objection. I think that this would be certainly something he wouldn't have personal knowledge of in terms of --

ADMINISTRATIVE JUDGE ELLISON: Well, I mean he's given --

MR. OCASIO: The objection --

ADMINISTRATIVE JUDGE ELLISON: He's given his opinion, his belief as to whether or not it's --

MR. OCASIO: I am -- well.

ADMINISTRATIVE JUDGE ELLISON: -- it's --

MR. OCASIO: It is his objective and subjective opinion that we are examining, Your Honor, where --

ADMINISTRATIVE JUDGE ELLISON: Okay. But once again --

MR. OCASIO: -- he believes, he says he does. They've painted this situation with a very fine brush, that it is a misconduct situation, that he knows they're not authorized to carry firearms, and so on and so forth. Even though the

admonishment has been made all day, we have basically sat here and allowed the -- the obviation of the appeal by opposing counsel advising the Agency representative present during a Board hearing, and all this other stuff. If it is your subjective opinion we are looking at, sir, that in your opinion this was a egregious situation, then your opinion and your understanding of the foregoing federal statutes is at issue.

ADMINISTRATIVE JUDGE ELLISON: Well, I mean, you know, I've allowed you to ask this question 'cause I always want to try to make sure it's going towards something relevant and material, but -- and, you know, I'll even say that Commander -- I'm sorry -- Commander Smith may be wrong about that. I'm not saying he is or isn't. I don't know. But I am saying that that's not going to be -- you're not going to see that in an initial decision one way or another because he was not charged with unauthorized carrying of a weapon off duty. So, it's not a charge, as I've said I know many times, and it's not something that's going to appear in the initial decision.

MR. OCASIO: I -- I -- I understand that.

ADMINISTRATIVE JUDGE ELLISON: So, you know, I mean really whether -- whether his opinion is, what it's based on, whether it's correct or incorrect, for purposes of this appeal it is not relevant.

MR. OCASIO: With all due respect and without incurring the ire of the Board, I'm referencing that because

regardless of whatever the Administrative decision is going to be, I fear that the objections and the information sought to be entered into the record at some point. I'm appealing this period and it doesn't make a difference --

ADMINISTRATIVE JUDGE ELLISON: Even if you win?

MR. OCASIO: -- how the decision goes. I -- I am standing at this particular point, if the Appellant isn't restored to the job, it's going to get appealed anyway. So, it doesn't make a difference to me how we arrive at that point. My problem is that we are dealing with the objective and subjective nature of the deciding official. If this was a matter that the Agency has painted very subtly as it's more a criminal offense than anything else to misuse your credential and badge and get into a bar fight and all this other stuff. I'm being limited to the argument that the weapon issue was not part and parcel of his decision to remove the Appellant and that is the farthest thing from the truth. Regardless of how it is we want to paint this particular situation, it's his subjective decision-making ability that I want to explore. So, I will direct my questions very short and concise and try and make a point.

BY MR. OCASIO:

Q. The Commander said that you -- your decision that it was abusive behavior on his part to get into a bar fight was part of your decision to support the removal; is that correct?

A. Not in those exact words.
Q. Well, I mean I'm --
A. But his conduct was -- yes.
Q. Wanted to paraphrase, sir. Okay. So that if there was someone who was accused of this type of a situation, it would be something that you would look upon very poorly. Is that my understanding of your testimony?
A. Yes.
Q. Okay. The Agency's -- the Appellant's exhibit attached with the Notice of Appeal contains at Exhibit 6-3, my original package -- you have a copy of my original package here -- a cover sheet of a Report of Investigation from the United States Department of Justice, sir.
ADMINISTRATIVE JUDGE ELLISON: Okay. Hold on a second. This is the original appeal?
MR. OCASIO: The original appeal, Your Honor, Exhibit 6-2. (Pause)
ADMINISTRATIVE JUDGE ELLISON: Okay. Tell me what it is 'cause I don't see a 6-2.
MR. OCASIO: It's -- it's --
ADMINISTRATIVE JUDGE ELLISON: I see -- I see a 6-4.
MR. OCASIO: -- page one of six. If I may approach the Administrative Judge, it's this exhibit, sir. If I may.
ADMINISTRATIVE JUDGE ELLISON: Okay.
MR. OCASIO: The original appeal notice, sir. I'm

sorry. It would be Exhibit 6-5. The number apparently scuffed itself off when I was making the copy.

ADMINISTRATIVE JUDGE ELLISON: Okay. So, this is --

MS. BROWN: I'm there.

ADMINISTRATIVE JUDGE ELLISON: Okay.

MR. OCASIO: If I may show a copy of this to the Agency's witness, sir?

ADMINISTRATIVE JUDGE ELLISON: Sure.

MR. OCASIO: Sir, would you take a look at that synopsis or the Report of Investigation, sir. I'd like to preface this by basically it is unrelated to the instant matter on appeal. It is merely being introduced as a reasonable comparative of an alleged off-duty misconduct complaint.

MS. BROWN: Objection. I don't see what this has to do with the actual decision of the Commander on behalf of the Navy.

MR. OCASIO: The objection -- I'm sorry.

MS. BROWN: It's a different agency.

ADMINISTRATIVE JUDGE ELLISON: This is -- what is this? This is a report of an investigation by the INS; is that correct?

MR. OCASIO: By the Department of Justice, sir, and we are illustrating a point that if it is the Commander's opinion that the offense that was alleged against this Appellant warranted a removal, his opinion of how he would handle a

similar-type matter is relevant to his decision to remove this Appellant.

ADMINISTRATIVE JUDGE ELLISON: Well, other cases are not relevant. The only thing --

MR. OCASIO: The notable difference --

ADMINISTRATIVE JUDGE ELLISON: -- remotely or arguably relevant would be a disparate treatment allegation in which you would have to show that somebody very similarly situated to the Appellant did something similar and received significantly different discipline. That's not --

MR. OCASIO: Which would fall in line with the exhibit and the arguments advanced.

ADMINISTRATIVE JUDGE ELLISON: Well, this exhibit is not from the Navy, then it's not similarly situated and it's not -- it's not sufficient to comprise a valid comparator.

MR. OCASIO: Well, Your Honor, it is the Agency's --

ADMINISTRATIVE JUDGE ELLISON: I mean this is -- I'm sorry. This is from INS. Is that not right?

MR. OCASIO: Yes, sir.

ADMINISTRATIVE JUDGE ELLISON: Okay. And the -- here, let me check the caption. Department of Navy is who we got to today, right?

MR. OCASIO: Yes, sir.

ADMINISTRATIVE JUDGE ELLISON: Okay.

MR. OCASIO: So, it's --

ADMINISTRATIVE JUDGE ELLISON: So, what -- what Department of Justice, INS, does is -- to someone else is not relevant to the proceeding.

MR. OCASIO: I -- I understand, Your Honor, but it was offered more or less to demonstrate how a actual allegation of misconduct or impersonation of a federal officer is to be investigated. In this specific matter --

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, I mean two things. First of all, we don't have impersonation of a federal officer. Second of all --

MR. OCASIO: It's a bar fight.

ADMINISTRATIVE JUDGE ELLISON: -- an agency can do -- six agencies can do investigations six different ways --

MR. OCASIO: I understand, Your Honor.

ADMINISTRATIVE JUDGE ELLISON: -- if they want to.

MR. OCASIO: However, it is more or less an issue of how they handled this particular situation. It's his testimony he'd never removed anybody before. He considered very careful factors and so on and so forth. This particular situation here falls in line with what he was instructed to do and what he considered, and that's where I'm trying to get to.

ADMINISTRATIVE JUDGE ELLISON: Well, he's testified at some length about what he considered.

MR. OCASIO: He hasn't testified at length, sir. He's made very amorphous descriptions that he consulted, the Agency

objected on a privilege argument, we don't know who he consulted, we don't know what he was instructed, we don't know what he considered. And --

ADMINISTRATIVE JUDGE ELLISON: Well, we know --

MR. OCASIO: -- the timing of his decision --

ADMINISTRATIVE JUDGE ELLISON: We know what he considered to the extent he told us. We know who he consulted to the extent he told us.

MR. OCASIO: So --

COURT REPORTER: One moment please.

MR. OCASIO: Yes, ma'am.

ADMINISTRATIVE JUDGE ELLISON: Okay.

(Tape change at this time.)

MR. OCASIO: Thank you, ma'am.

ADMINISTRATIVE JUDGE ELLISON: So, if you have any other questions about what his consideration was, who he consulted, et cetera, that's fine. Looking at what INS did in a different case, a different agency, to a different person, is not going to help.

MR. OCASIO: Unfortunately, Your Honor, the investigative protocol for a misconduct complaint of this type can only be investigated by the Office of the Inspector General. I mean any federal agent, any federal person that has a badge that has a situation like this is investigated by the OIG. So, it is a --

ADMINISTRATIVE JUDGE ELLISON: Well, I'm sure --

MR. OCASIO: -- uniform standard throughout --

ADMINISTRATIVE JUDGE ELLISON: I'm sure they can be, but --

MR. OCASIO: My experience in this matter, so it's my own subjective experiences, the Office of the Inspector General investigates these types of complaints. So --

ADMINISTRATIVE JUDGE ELLISON: Okay. Are you alleging then that the investigation and, therefore, the action in this case is reversible because it was not investigated by the OIG?

MR. OCASIO: No, it is my -- it is my argument that the action should be reversed because the investigation was not only woefully inadequate, but there was a nexus of prior protected activity which formed the basis for the Agency -- our contention is -- the Agency's action to remove him.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, that's fine. You can ask questions about that. Those are affirmative defenses.

MR. OCASIO: Well, then that's -- that's exactly where I want to bring this issue.

ADMINISTRATIVE JUDGE ELLISON: But -- certainly ask questions about that as an affirmative defense, it has been raised, but this -- this INS investigation of somebody else in a different agency is just not relevant.

MR. OCASIO: Unfortunately, it is the investigation of

the investigating officer and it is very relevant because the investigating officer, having survived a OIG misconduct complaint such as the one that has been leveled against this Appellant, went through the entire process. Investigated by real federal officers, witness statements, sworn statements, interviews, so on and so forth, were all documented and executed under penalty of perjury, and a finding was made to not prosecute. It was thoroughly and adequately investigated. What we have here is a E-mail and eight pieces of paper. We don't have any interview of the investigating officer of Mr. Lugo. Even though Captain Gaston identifies witnesses by name, he knows personally their statements aren't there. The Agency attached the copy of the District Court complaint, which was faxed from the attorneys who appeared here to Navy General Counsel. Between the time this was faxed the Gaston investigation was handled and a huddle or a meeting of minds was made. Then the Redwood City Police Report gets prepared retrodated to the date of the incident. So, there are too many coincidences here that seem to indicate that a few people got together, discussed how they were going to proceed with this matter, and then the proposed removal was made.

ADMINISTRATIVE JUDGE ELLISON: Okay. So, do you want to pursue any allegation of reprisal for prior protected activity?

MR. OCASIO: In the EEO investigation report letter I

specifically referenced to the investigator I requested informal and formal counseling from Michele Johnson at the time Officer Lugo was terminated. It's referenced in the EEOC Report of Investigation. It somehow didn't make it in. And because of the anomalies with documentation sent to San Bruno and other factors, I could only mention them, attach the exhibits, we get into the record.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, as I said, as we discussed during the prehearing conference, I specifically asked you if you had affirmative defenses and you said you did, and we acknowledged that you had an allegation of reprisal for prior protected activity, and I tried to discern what that particular activity was, and that's -- that's fine. Those are valid points. But if you want to ask the deciding official something about them --

MR. OCASIO: I -- I will.

ADMINISTRATIVE JUDGE ELLISON: -- now is the time to do it.

MR. OCASIO: Well, I intend to, sir.

BY MR. OCASIO:

Q. Okay. Exactly what did you believe, sir, was the abusive conduct that warranted Mr. Lugo's removal?

A. It is the descriptions of the events that were in those witness statements. It was using his badge to get into the place, refusing to be searched because of his badge. It

was using his position and his badge to try and get out of trouble once he was in trouble. It was the abusive language he was using, the abusive --

Q. I would like to question you on that, sir.

MS. BROWN: Can we let him finish?

MR. OCASIO: Please. I apologize. Sorry, Your Honor. Please, I didn't mean to interrupt you, sir.

THE WITNESS: Well, and a lot of the other things that I had talked about before. That the physical abuse of people or aggression towards people there.

BY MR. OCASIO:

Q. What physical or aggression, sir?

A. Well, I mean it's been a while since I've read those statements, but standing up and grabbing somebody's arm, trying to throw them to the ground, verbally arguing with them, using foul language and then claiming to be a DOD Hunters Point police officer. I mean all those things --

Q. I see.

A. -- were in the witness statements.

Q. Okay. Why was it that you afforded all of this weight and credibility to the statements, sir?

A. Well, because there were various statements, not just one. There was a number of them and because I thought the conduct was inappropriate and it was serious.

Q. Independent from these statements, sir, what -- what

else did you base your decision on?

MS. BROWN: He's already answered that question.

ADMINISTRATIVE JUDGE ELLISON: Independent of the evidence?

MR. OCASIO: Yes.

THE WITNESS: I don't think there was anything independent of the evidence.

BY MR. OCASIO:

Q. Let me understand this correctly. This was a judgment call you made after you read through all the statements.

A. Yes.

Q. Is that correct?

A. Yes.

Q. How did you know he didn't pay his way into the club, sir?

A. It was written there in a statement.

Q. That's one. How do you know he didn't enter into the club through the rear of the club, sir?

A. That's -- wouldn't be what the statements say.

Q. Why weren't his witnesses interviewed by Captain Gaston, sir?

MS. BROWN: Objection. Lack of personal knowledge.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, I mean first of all --

MR. OCASIO: To your --

ADMINISTRATIVE JUDGE ELLISON: -- potentially there is a lack of knowledge.

MR. OCASIO: She's right.

ADMINISTRATIVE JUDGE ELLISON: I don't know. We'll have to ask --

MR. OCASIO: To your personal knowledge.

ADMINISTRATIVE JUDGE ELLISON: -- the Commander but --

BY MR. OCASIO:

Q. Did you -- did you not find it odd that there were additional witness statements which were not contained in this enclosure, sir?

A. I would not have known if they weren't included.

Q. Well -- I'm sorry. If the Gaston E-mail says he was i the company of a lady not his wife, Maria Elena, who's an owner of a nightclub where Mr. Lugo allegedly works as a guard, and we looked at Agency 4-E, the list of the statements, and we don't see a statement in there from Maria Elena, is that something that did not catch your attention, sir?

A. No.

Q. It didn't catch your attention. When he says that he was with other people who were at the table, sir, which is what the statement says, and there's no statement or no mention in the enclosure of the other people who were at the table there, sir, is that something that didn't catch your attention either?

A. Not in that investigation. I would have expected to

see those in some kind of response. If they were pertinent, I would have expected to see them, but I was never presented with that.

Q. The sole removal action is these documents that are here.

A. That package that I reviewed.

Q. Okay, sir. Part of the package after the Linda Carranza exhibit was the civil rights complaint, sir, that had been filed. Were you aware of that?

A. I saw that.

Q. Did you read through the civil rights complaint, sir?

A. I -- yes.

Q. What was your -- your understanding of the civil rights complaint that had been filed, sir?

A. I didn't find -- I personally didn't find much merit to it. I didn't -- I found it a little hard to follow at times, confusing, but I didn't -- I don't remember it changing my opinion. I mean it didn't change my opinion, but I don't remember it having a huge impact.

Q. So, what was it about the complaint, sir, that was unavailing to you?

A. I don't -- there's very little, if anything, in that I could actually remember now. I mean that's been months since I looked at that.

MR. OCASIO: If I may, Your Honor, I'd like to give my

copy of the Agency's exhibit for the Commander to review, with the Agency's permission. It's coming from Exhibit 4-E. May I approach the Agency's witness?

ADMINISTRATIVE JUDGE ELLISON: Well, I mean you could show it to him, but we're not going to go through and determine the validity or the sufficiency of it. You did ask him if he reviewed it and he's aware of it, and he said he did and he was aware of it, and gave you his opinion as he recalls it now of what impact, if any, it had on his decision. So --

MR. OCASIO: Well, what I'd like to do is refresh that memory of his because it seems to be more vague and amorphous as my questions begin to center around why it was he thought the District Court Complaint had no merit. But he's giving all this weight and value to unsworn, unsubstantiated statements. The District Court Complaint that was filed before the statements were obtained for some reason or another had no weight with him. So, I'd like him to take a very short amount of time, review the Complaint, and tell me what was it about this that was -- that had no substance for you. And I think it's relevant to all of the issues raised by the Appellant and the Agency's removal.

ADMINISTRATIVE JUDGE ELLISON: Okay. Did the Appellant bring this up to the Commander before he made his decision and then point that out or discuss it with him or --

MR. OCASIO: Well, sir, according to the --

ADMINISTRATIVE JUDGE ELLISON: -- ask him to take other statements from other people?

MR. OCASIO: Well, sir, according to the Agency's exhibits, the fax was sent from the law firm representing Redwood City to the Hunters Point Command.

ADMINISTRATIVE JUDGE ELLISON: Yeah, but in answer to my question, did the Appellant present that to him or ask him to interview other people that were not interviewed in the investigation?

MR. OCASIO: Well, we never had a chance to review the investigation. What we got was a Notice of Proposed Removal based on these attachments and there wasn't an opportunity to turn around and be able to controvert this. They sent us a package. I was sent a letter by Roger Green saying these are the exhibits, our investigations, we're removing him. There was no --

ADMINISTRATIVE JUDGE ELLISON: We are proposing to remove him, yes.

MR. OCASIO: This is true. There was no insert in, were there other witnesses who were not interviewed or whatever?

ADMINISTRATIVE JUDGE ELLISON: Well, I would think that that would be incumbent upon the Appellant and/or his representative at some point to say, "Listen, you didn't talk to Ms. X or Mr. Y."

MR. OCASIO: Well, had --

ADMINISTRATIVE JUDGE ELLISON: "Why don't you -- why didn't you do that? Why don't you do that?"

MR. OCASIO: Well, had that opportunity presented itself, it would have been done, but --

ADMINISTRATIVE JUDGE ELLISON: Did the Appellant not get an opportunity to make a response, a reply, either oral or in writing to the proposed action?

MR. OCASIO: We didn't get an opportunity to respond or submit anything. Even though --

ADMINISTRATIVE JUDGE ELLISON: Did the Appellant and/or you -- I think if you were representing him at the time, I don't even know if you were -- receive the proposal to remove?

MR. OCASIO: I received the proposed removal. After the proposed removal became a removal, the <u>Lugo v. Gaston</u> District Court Complaint was filed forthwith and because it was an issue arising out of a employment action.

ADMINISTRATIVE JUDGE ELLISON: Okay. But in answer to my question, did --

MR. OCASIO: I let them know I was getting exhibits in. Once their proposed removal became a removal, the Agency had already made up its mind, so any addition --

ADMINISTRATIVE JUDGE ELLISON: You mean after the decision letter was issued?

MR. OCASIO: After the decision we didn't see --

ADMINISTRATIVE JUDGE ELLISON: Well, of course, after the decision letter is issued then it's kind of too late to make an oral or written reply, the opportunity for which has passed at that point.

MR. OCASIO: Well, it's -- what the bottom line is with the ability to respond. Your Honor, once the City of Redwood City got together with Base General Counsel, this entire fiasco was orchestrated. The statements in the record, the Police Report, everything was retrodated after the attorneys for Redwood City consulted Base General Counsel. Not at any point up until that contact did any documentation ever get to the Appellant. Wasn't interviewed, nobody took a statement, didn't do anything. They were looking to basically sandbag him off of his job.

ADMINISTRATIVE JUDGE ELLISON: Okay. But so you don't know or you're not telling me why he didn't make a response to the proposal notice?

MR. OCASIO: We weren't provided the opportunity to make a response. We were told you could, but that's not what happened.

ADMINISTRATIVE JUDGE ELLISON: Okay. All right. Now, do you want to ask the Commander anything about the effect that this -- his awareness of this complaint may have had on this?

MR. OCASIO: Yes, I would, but I would like him to

take a very short moment and just review the basics of it 'cause I don't want to go into the detail of the District Court Complaint other than it was filed and it's his opinion that it had no merit towards him. And I'm trying to get to why it was he gave all this weight and sufficiency to these unsworn affidavits. And I think that's very relevant to his decision to remove this Appellant.

ADMINISTRATIVE JUDGE ELLISON: Okay. Let him take a look at it.

MS. BROWN: Can I see that?

ADMINISTRATIVE JUDGE ELLISON: This is what exhibit? Is this Exhibit 10, enclosure 10 --

MR. OCASIO: Yes.

ADMINISTRATIVE JUDGE ELLISON: -- from 4-E?

MR. OCASIO: From 4-E.

THE WITNESS: (Pause ) Okay. I mean I didn't read it again, but I skimmed it.

BY MR. OCASIO:

Q. What was it about your skim just now, sir, you found unmeritorious in your decision to consider these mitigating factors in your proposed removal, sir?

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, that's a compound question. Do you --

MR. OCASIO: Okay. So, I'll ask a very -- I'll keep it simple. I'm sorry.

BY MR. OCASIO:

Q. You skimmed the District Court Complaint. Yes?

A. Just now.

Q. Okay. Was there one specific thing that -- that comes to your mind about skimming this federal civil rights lawsuit, sir, that you found unmeritorious?

A. I found that the description of events in that was drastically different than the other numerous witness statements that I had read.

Q. One more on that subject, sir. These voluntary statements, sir, are these standard Naval forms?

A. I couldn't tell you that. I don't know.

Q. Is it -- did it catch your attention, sir, that these statements were all not executed under penalty of perjury, sir?

A. No.

Q. It didn't catch your eye that the admonition that a false statement to a federal official, et cetera and so forth, wasn't contained anywhere on these documents, sir?

A. No.

Q. So, what was about these enclosures and these statements, sir, that in your mind gave greater weight to these than the District Court lawsuit that had been filed, sir?

A. There were a number of them that differed significantly from the -- the other writeup I just skimmed again. And just in skimming it the descriptions of being beat

over the head typically there would be more of a -- I knew that when the police arrived everybody went home. Typically if there is assault, an actual physical I mean beating like that, there's not just everybody goes home. So, it just didn't seem in my mind to add up.

Q. What didn't add up, sir?

A. The events depicted in what I just skimmed and the other witness statements from various people and the outcome of the night when everybody went home.

Q. So, you made a judgment call, sir, that he was lying. Yes?

MS. BROWN: Objection. I think that's --

MR. OCASIO: It's -- it's --

THE WITNESS: To tell you the truth I don't even know if he had seen that. I don't know I mean.

MR. OCASIO: Let me rephrase that question.

BY MR. OCASIO:

Q. You made a judgment call as to credibility; is that correct?

A. I gave more weight to the various witness statements.

Q. So, if we could transfer or translate that into Ebonics, sir, you thought he lied. Would that be an accurate representation of the weight you're giving one set of statements as opposed to another?

MS. BROWN: Objection. I think he's misquoting.

ADMINISTRATIVE JUDGE ELLISON: Well, first of all the complaint is not a statement by the Appellant, although it's obviously based on his -- his belief or assertion. But I don't know how many different ways you want to hear it. He read several statements saying one thing and one complaint saying something materially different, and he chose to give --

MR. OCASIO: Yeah, so I'm -- I'm --

ADMINISTRATIVE JUDGE ELLISON: -- more weight to the --

MR. OCASIO: I'm trying to understand.

ADMINISTRATIVE JUDGE ELLISON: -- the number and consistency of the other statements. I don't -- you know, it's pretty clear.

BY MR. OCASIO:

Q. To your personal knowledge, sir, who wrote these statements?

A. I don't know.

Q. Okay. Other than the statements and the E-mail, there was no other information considered by the -- oh, excuse me -- considered by you in your decision to remove him; is that correct?

A. Yes.

Q. The basis -- or let's just cut to the chase and just get right down to the thing we're all trying to find out here. If it was one thing that you could put your finger on, sir,

that supported your decision to remove this gentleman from his job, what was it?

A. I felt like I had an obligation to make sure that somebody that was serving in a position as a police officer carrying a weapon under a DOD badge in my Command should hold themselves to a certain standard. That's -- that was I felt an obligation that this should not -- this is not somebody that I should let carry a badge and a weapon.

Q. That's fair. Let me ask you this. EFA West Security Director Lewis, is he a sworn police officer, sir?

A. I don't know I mean what a sworn police officer is.

Q. Is he a federal police officer like he used to be?

A. He is a GS -- I don't know that. I mean he is our Chief of -- he is our security officer.

Q. I understand.

A. He is authorized to make arrests, to carry a weapon, all that. I don't know how he is categorized or anything.

Q. What specific authorization does Mr. Lugo have to effect arrests and carry a weapon, sir?

A. I have actually seen his badge. I don't know to tell you the truth.

Q. Well, let me ask you this. What does his badge say?

A. I don't know. I mean I've seen his badge and his ID, but I couldn't tell you what it said.

Q. Well, what does the ID card say?

A. I couldn't tell you. I don't know.
Q. I'm sorry. You can't tell me what his ID card says?
A. I don't know what it says. I mean I've never read his ID card. Other than seeing it, I mean I've never looked at it closely.
Q. Well, Base General Counsel produced the identification card that the Appellant was issued. And you've not seen Mr. Lewis' ID card. I want to make sure I heard that correctly.
A. No, I have just totally out of different circumstance I've seen his badge and his ID card, but it was like here it is or I saw it, but I have never taken it from him and --
Q. No, no, no.
A. -- looked at it and read it.
Q. I'm not asking that. Let me ask you a question about Mr. Lewis' badge. Okay. Is it an oval kind of badge? Is it a star?
A. It's not a star, but I couldn't tell you whether it was oval or shield shaped or --
Q. Well, oval, you know, it's kind of like an egg, you know, like a --
MS. BROWN: It's asked and answered.
THE WITNESS: I don't know.
MR. OCASIO: You don't know.
THE WITNESS: I don't remember.
MR. OCASIO: Yeah, okay, you don't remember.

BY MR. OCASIO:

Q. Getting back to Mr. Lewis, what authority does he have to carry a federal firearm?

MS. BROWN: Objection. I'm not sure what that is particularly relevant to the instant case of the removal of Mr. Lugo --

MR. OCASIO: The -- well, what the relevancy is --

MS. BROWN: -- for his conduct at the bar.

MR. OCASIO: What the relevancy is is very simple. He's testifying that apparently his -- his moral sensibility and his indignancy and outrange over the abuse of the position and his authority and these types of things so moved you that it warranted a removal action.

BY MR. OCASIO:

Q. That that type of conduct should not be tolerated from somebody under your command. Am I stating it correctly?

ADMINISTRATIVE JUDGE ELLISON: Comma, now we'll get to the punch.

MR. OCASIO: Okay. Now we get to the crux of it.

BY MR. OCASIO:

Q. So, if a officer in your Command is abusing his official position or authority or something of that sort, that would be something that would be looked upon -- that was something that would warrant your attention.

A. Absolutely.

Q. So, if my question now winds up being does your Security Director have authority to carry a firearm, sir, and you are painfully aware of Mr. Lugo's ability or inability to carry a federal firearm that led to his removal, is something that demands a question. So, if Mr. Lewis is carrying a firearm illegally, or does not have the authority to carry a firearm by virtue of his position, would that be something that would warrant a removal by you?

A. If he was doing something wrong --

Q. Yes, that's what I'm asking.

ADMINISTRATIVE JUDGE ELLISON: If he was doing something wrong, then I assume the Agency will look into it, but --

MR. OCASIO: Well, I mean it's -- it's --

ADMINISTRATIVE JUDGE ELLISON: -- A, Mr. Lewis is not on trial here. B, there's no evidence that he was doing anything wrong.

MR. OCASIO: The evidence winds up being --

ADMINISTRATIVE JUDGE ELLISON: And C, why do we care?

MR. OCASIO: Well --

ADMINISTRATIVE JUDGE ELLISON: The point is he didn't say that Mr. -- the Commander here didn't say that Mr. Lugo could not carry a weapon. He said he couldn't carry a weapon off duty.

MR. OCASIO: I understand. So --

ADMINISTRATIVE JUDGE ELLISON: And even if that -- whether that is right or wrong, it's not a charge in the case and it's not something that appears in the decision letter, and he has not testified it was something that he considered in his -- in decision to uphold the removal. So --

MR. OCASIO: The -- the problem here is very simple. What we have here is a -- we have a selective application of what it is that the Agency is contending. On the first hand we're hearing this very righteous conversation that officers in my command should be held to a certain standard. If they are abusing their position, it would be something that I would look upon not too kindly. That if I read a investigation report or allegation or complaint that somebody has abused their position, I won't be too happy and, if it's meritorious, I'm going to fire him. Well, if it's good for the goose, it's good for the gander. So, if they're only applying this standard to the Appellant, then the Agency now has to articulate some nondiscriminatory reason why they applied that standard only to him.

ADMINISTRATIVE JUDGE ELLISON: Okay. For the second or perhaps third time and last time, in order to show a valid comparison for disparate treatment allegation purposes, you would have to show that another police officer did the things that -- the kind of things that Mr. Lugo is accused of doing and in the same chain of command under similar circumstances

and received lessor or different or no penalties or consequences. Certainly that doesn't apply to Mr. Lewis. I haven't heard any evidence that he, A, was even a police officer to begin with, but even if he is, that he misused his badge, that he got into a confrontation in a public place off duty, or any of the other things that Mr. Lugo is accused of doing.

MR. OCASIO: Well, if we concent --

ADMINISTRATIVE JUDGE ELLISON: So, that's where the comparison, if in fact that's why you're bring it up, Mr. Lewis --

MR. OCASIO: Your Honor --

ADMINISTRATIVE JUDGE ELLISON: -- breaks down.

MR. OCASIO: If I cannot create a similarly situated peer, then what we have is an insular minority, which is Mr. Lugo. If we have a similar-type situation, which is Captain Gaston, and everyone's looking the other way trying to ignore the relevancy of that exhibit, that's fine. If the issue winds up being here now, if Mr. Lewis who our inquiry is, is he a police officer authorized to carry a firearm. If he isn't, then what we have here is a situation where we have a standard that's not being applied or, in Mr. Lugo's specific case, is being selectively applied, not even as a --

ADMINISTRATIVE JUDGE ELLISON: Not in the context of this appeal since there is no charge.

MR. OCASIO: Well, the context of this appeal winds up being the severity and the rebuttable presumption of nexus, that it advanced the Agency's position to fire him. If he's abusing his position or his badge, then fire him. Very simple. But if Mr. --

ADMINISTRATIVE JUDGE ELLISON: That's why we're here. That's what they did.

MR. OCASIO: I understand. However, if -- if the question winds up being his perception of how he's handling this matter or the complaints that were brought before him, then the issue winds up being first of all can Lewis carry a firearm? It's a very simple question.

ADMINISTRATIVE JUDGE ELLISON: And a very irrelevant question.

MR. OCASIO: Well, it -- it's not irrelevant if we have the removal and the criminal indictment tied into the same type removal action. That it's Mr. Lewis' testimony he couldn't carry a gun period that led to him getting indicted.

ADMINISTRATIVE JUDGE ELLISON: Okay. I don't know anything about the indictment.

MR. OCASIO: Well, I --

ADMINISTRATIVE JUDGE ELLISON: I'm not going to worry anything about the indictment.

MR. OCASIO: Well, it's -- the issue winds up being here that we're remembering only what we want to remember and

that's fine. They're very specific questions. I can't get to who he consulted about the removal because they're going to argue it's privileged.

ADMINISTRATIVE JUDGE ELLISON: Did I uphold that?

MR. OCASIO: It's not --

ADMINISTRATIVE JUDGE ELLISON: No. Did you ask questions about it?

MR. OCASIO: Well, it's -- it's --

ADMINISTRATIVE JUDGE ELLISON: Yes. Did he answer them? Yes.

BY MR. OCASIO:

Q. Okay. Very specific. Is there any officer in your Command, sir, that you are aware of who is carrying a concealed weapon, sir, off duty? They --

MS. BROWN: Objection again to relevance.

ADMINISTRATIVE JUDGE ELLISON: A police officer besides Mr. Lugo carry a weapon off duty? Is that the question?

MR. OCASIO: Yeah.

ADMINISTRATIVE JUDGE ELLISON: Okay. Can you answer?

THE WITNESS: None of our officers that were at Hunters Point to my knowledge were authorized to carry concealed weapons off duty.

MR. OCASIO: Okay.

ADMINISTRATIVE JUDGE ELLISON: But the question was

are you aware of any who did?

THE WITNESS: No, I'm not.

BY MR. OCASIO:

Q. Are any of the DOD officers in San Bruno authorized to carry a concealed weapon, sir?

A. The police officers?

Q. Yes, sir.

ADMINISTRATIVE JUDGE ELLISON: Off duty?

MR. OCASIO: Off duty.

THE WITNESS: Not that I know of, no.

BY MR. OCASIO:

Q. Okay. So, when we have the -- the exhibit provided by the Agency on the Police Report where Mr. Lewis says he's only one of three people who's authorized to carry concealed, sir, who might the other two people be?

A. I wouldn't know.

Q. Okay. Well, is it fair to say at this particular stage that you were going to remove him anyway? Would we be able to --

ADMINISTRATIVE JUDGE ELLISON: Anyway, what does that mean?

Q. -- boil all of this down to say that he was going to get fired regardless?

ADMINISTRATIVE JUDGE ELLISON: Regardless of what? Regardless of the evidence?

MR. OCASIO: Regardless of any exhibit or attachment entered into the record.

THE WITNESS: I would say --

ADMINISTRATIVE JUDGE ELLISON: So, okay. I'm sorry. I'm very unclear of the question. Regardless of what? If --

MR. OCASIO: Regardless of --

ADMINISTRATIVE JUDGE ELLISON: If there had been a proposal to remove with no supporting documentation?

MR. OCASIO: Yes, sir.

ADMINISTRATIVE JUDGE ELLISON: Is that the question?

MR. OCASIO: Um-hmn.

ADMINISTRATIVE JUDGE ELLISON: Would -- would the Commander have removed him if there was no supporting documentation to the charges?

MR. OCASIO: Yes.

THE WITNESS: No.

MR. OCASIO: You would not. Okay.

ADMINISTRATIVE JUDGE ELLISON: I think we were probably pretty sure of that.

MR. OCASIO: I'm -- see, I'm at a loss here to try and figure out what exactly you were considering in the removal.

ADMINISTRATIVE JUDGE ELLISON: Well, we've heard it several times from him.

MR. OCASIO: No, what we've heard is very vague, amorphous, wishy-washy kind of statements that he remembers,

but he doesn't remember. We get into the issues of the Security Director and a real basic question is can he carry a gun, and I can't even get an answer on that.

ADMINISTRATIVE JUDGE ELLISON: Well, you did get the answer, despite --

MR. OCASIO: He said he didn't know.

ADMINISTRATIVE JUDGE ELLISON: -- despite the fact that it's irrelevant.

MR. OCASIO: Well, he said --

ADMINISTRATIVE JUDGE ELLISON: I mean if you had another Judge from my office this would have ended 20 minutes ago because he wouldn't even allowed you to ask that question. Me, being one of the more liberal judges, has allowed you to ask a lot of questions in the understanding and assumption that it's going to be leading to relevant questions and relevant lines of inquiry.

MR. OCASIO: The relevant line of inquiry here is very very simple. My hands are tied.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, obviously that's not a line of inquiry.

MR. OCASIO: And that's -- that's -- that's where it is. We basically don't have, other than the eight statements, any evidence that is severe enough to warrant a removal.

ADMINISTRATIVE JUDGE ELLISON: Well, that's your opinion and you can certainly make that argument in a closing

brief --

MR. OCASIO: That's fine.

ADMINISTRATIVE JUDGE ELLISON: -- if you want to.

MR. OCASIO: I mean it's -- okay. Is there --

ADMINISTRATIVE JUDGE ELLISON: But do you have any other questions for the deciding official?

BY MR. OCASIO:

Q. Did you speak to Captain Gaston about these enclosures, sir?

A. No.

Q. You didn't speak to the Agency investigator about his report?

A. No.

Q. Why not?

A. I didn't have any questions. I didn't feel the need to.

Q. You didn't feel the need to question him about his investigation?

A. No.

Q. It was okay with you.

A. Again --

Q. Okay. There were no other mitigating factors you considered other than the bar incident, sir, to warrant his removal?

A. Mitigating, I guess --

Q. Well, I mean it's -- there was civilian complaints and other things that have been filed against Officer Lugo. Did any of those factor into your equation of making the decision to remove him?

ADMINISTRATIVE JUDGE ELLISON: I'm sorry, what civil, I mean what complaints?

MR. OCASIO: Agency's Exhibit 4-I, after the response of Lugo to his disciplinary complaint. At Exhibits 3-1 all the way to the end exhibits 10-16 are grievance letters and citizen complaints and other such documents which were included in the Agency file. Notice of Proposed Suspension, so on and so forth. Okay. At Exhibit 4 in that very same attachment was the letter from Lugo to HRO asking them to send copies of the investigation and so on and so forth. So, it's not like he hasn't been asking for the Agency to produce its documentation.

ADMINISTRATIVE JUDGE ELLISON: Okay. This -- okay. So, there is apparently a letter of reprimand here?

MR. OCASIO: Yes, sir.

ADMINISTRATIVE JUDGE ELLISON: Previous letter of reprimand. Now, first of all before we talk about that, that's -- those are not referenced, I don't believe, are they, in the proposal or the decision letter or the proposal letter?

MS. BROWN: No.

ADMINISTRATIVE JUDGE ELLISON: I mean there are no prior disciplinary actions referenced in the proposal letter;

is that correct?

MS. BROWN: That's correct.

ADMINISTRATIVE JUDGE ELLISON: Okay. And I don't believe I've heard from the Commander live here today that he considered any prior disciplinary actions in assessing the penalty, unless I'm mistaken. Somebody tell me I'm mistaken.

MS. BROWN: That's correct. It's not mentioned in the final letter of decision either.

ADMINISTRATIVE JUDGE ELLISON: And it's not mentioned in the final?

MS. BROWN: That's correct.

ADMINISTRATIVE JUDGE ELLISON: Okay. All right. So, the question then is what?

BY MR. OCASIO:

Q. What was it about all these exhibits, sir, that convinced you that Lugo had done everything he was accused of doing, sir?

ADMINISTRATIVE JUDGE ELLISON: You're talking about the statements in 4-E?

MR. OCASIO: Yeah, I am.

BY MR. OCASIO:

Q. I'm trying to ascertain here why'd you remove him?

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, he's --

THE WITNESS: I don't know how many ways I can say it.

ADMINISTRATIVE JUDGE ELLISON: I mean he is -- yeah, I

mean he's --

BY MR. OCASIO:

Q. No, I mean it -- it -- I understand the statements that you've made. I'm not asking you to recite whatever testimony we've heard. Whatever you've been instructed to do, fine. Just in your own words.

ADMINISTRATIVE JUDGE ELLISON: Okay.

Q. What was it that he did that was so bad that warranted you firing him?

ADMINISTRATIVE JUDGE ELLISON: Okay. Mr. Ocasio, first of all asked and answered.

MR. OCASIO: Okay. That's fine.

ADMINISTRATIVE JUDGE ELLISON: Extensively.

MR. OCASIO: It's -- it's -- it's I --

ADMINISTRATIVE JUDGE ELLISON: Second of all -- second of all on the record now for the first time, having done it once off the record, I would ask you not to make sarcastic statements like that. It's very kind of demeaning to the process and not necessary. It doesn't help anybody, including --

MR. OCASIO: Yes, Your Honor.

ADMINISTRATIVE JUDGE ELLISON: -- your client.

MR. OCASIO: I -- I --

ADMINISTRATIVE JUDGE ELLISON: So, it's just it's not a fruitful use of time. Do you have any other relevant

questions --

MR. OCASIO: I don't have --

ADMINISTRATIVE JUDGE ELLISON: -- of the Commander?

MR. OCASIO: -- any other relevant questions. I am -- I'm --

ADMINISTRATIVE JUDGE ELLISON: Yes.

MR. OCASIO: I'm done. You know, it's okay.

ADMINISTRATIVE JUDGE ELLISON: Okay. Ms. Brown, anything else?

MS. BROWN: Brief redirect.

ADMINISTRATIVE JUDGE ELLISON: Okay.

REDIRECT EXAMINATION

BY MS. BROWN:

Q. Okay. At the time you made your decision were you aware of any EEO activity by Mr. Lugo?

A. No, I wasn't.

ADMINISTRATIVE JUDGE ELLISON: I'm sorry, aware of the what activity?

MS. BROWN: Of any EEO activity by Mr. Lugo. I apologize. Did I get an answer?

THE WITNESS: No.

MS. BROWN: Okay.

THE WITNESS: I was not.

BY MS. BROWN:

Q. Did you have any reason whenever you were given the

packet that's in 4-E to doubt the validity of the investigatory packet?

A. No, I didn't.

Q. And finally, if Mr. Lugo had come to you with either an oral or a written reply, as referenced as a possibility in the Notice of Proposed Removal, say he wanted to talk about the validity of the investigation or give you different witness statements, would you have considered those?

A. Absolutely.

MS. BROWN: Thank you.

MR. OCASIO: I have a redirect on that one, Your Honor, one thing.

ADMINISTRATIVE JUDGE ELLISON: I'm sorry. Were you finished?

MS. BROWN: Yes, I was finished.

ADMINISTRATIVE JUDGE ELLISON: It sounded like you were, but --

MS. BROWN: Thank you.

ADMINISTRATIVE JUDGE ELLISON: Okay.

RECROSS EXAMINATION

BY MR. OCASIO:

Q. Were you aware of Mr. Lugo's OWCP complaint? His OWCP claim, sir?

A. I don't think so. I don't even know -- I don't know what that is, no.

Q. Office of Workman's Compensation claim, sir.
A. Oh, no, I wasn't.
Q. October '99.
A. No.
Q. You were not aware that Lugo had injured his back on the job?
A. No, I'm -- no.
Q. Oh, you didn't know.
A. I just heard that.
MS. BROWN: Asked and answered.
Q. Okay. Well, would it -- would it seem strange to you that somebody who has a controverted claim for a back injury would be able to lurch out of a chair?
ADMINISTRATIVE JUDGE ELLISON: Well, if he's not aware of it, he couldn't very well have considered it at the time.
MR. OCASIO: So then the -- so it winds up being a rather simple question. That Captain Gaston was very well aware of the OWCP claim because he controverted it. HRO was aware of the OWCP claim because they made him rewrite the CA-1 three separate times. Department of Labor denied the claim on the back injury. So, I am amazed that the Commander knows everything about this case and the statements and everything except the OWCP claim.
ADMINISTRATIVE JUDGE ELLISON: Well, first of all he said he wasn't aware of it and --

MR. OCASIO: I -- I understand.

ADMINISTRATIVE JUDGE ELLISON: -- and perhaps he could have been aware of it if somebody had told him about it, such as the Appellant or yourself, if in fact you thought that was relevant.

MR. OCASIO: I -- you know, it's -- it's -- there not much I'm going to be able to do at this particular point, except to say that everybody else in San Bruno was aware of the claim being controverted. I find it very suspect, sir, that you say you had no knowledge of the claim being controverted. I'm -- there's nothing else. There's no other question I have for him.

ADMINISTRATIVE JUDGE ELLISON: Okay. All right. Thank you very much. I appreciate it.

MS. BROWN: Thanks, Commander, we appreciate it. Thank you very much.

ADMINISTRATIVE JUDGE ELLISON: Go off the record, please.

(Witness excused.)

(Tape changed at this time.)

ADMINISTRATIVE JUDGE ELLISON: On the record actually.

THE WITNESS: Good afternoon.

ADMINISTRATIVE JUDGE ELLISON: Do you have any -- any objection to taking an oath regarding your testimony?

THE WITNESS: No.

# EVANGELISTA LUGO

V

# DEPARTMENT OF THE NAVY

MERIT SYSTEMS PROTECTION BOARD
SAN FRANCISCO REGIONAL OFFICE
CASE SF-0752-00-0499-I-1

# EXHIBIT

# 7

TESTIMONY OF MARIA ELENA GRIJALVA
PAGES 248 THROUGH 270

ADMINISTRATIVE JUDGE ELLISON: Could you raise your right hand, please.

Whereupon,

MARIA ELENA GRIJALVA,

having been first duly sworn, was examined and testified as follows:

ADMINISTRATIVE JUDGE ELLISON: Thank you. Could you state and spell your name for the record, please.

THE WITNESS: Maria Elena Grijalva.

ADMINISTRATIVE JUDGE ELLISON: Okay. Could you spell it for us, please.

THE WITNESS: M-A-R-I-A, E-L-E-N-A, last name is G-R-I-J-A-L-V-A.

ADMINISTRATIVE JUDGE ELLISON: Okay. Thank you. Mr. Ocasio?

DIRECT EXAMINATION

BY MR. OCASIO:

Q. Would you state for the Board, please, what you do for a living?

A. I have my own business. I have a restaurant and a nightclub.

Q. Could you tell us in your own words what -- what happened March 14th when -- well, first of all, let me back up one moment. Would you tell us what happened on the 14th of March when you went to the Flamingos Nightclub, ma'am? What

time did you arrive at the club?
A. I don't recall exactly, you know, the time. Approximately around 10:00, 10:30, 11:00.
Q. Did you come into the club through the front or through the back?
A. Through the back.
Q. Through the rear of the club?
A. Yes.
Q. Were you escorted into the business, ma'am?
A. Pardon me?
Q. When you went to the back did they escort you to a table?
A. Yes, they did. One of the owners.
Q. Who escorted you to the table, ma'am?
A. Rudy Carranza.
Q. Rudy. Okay. What were you guys drinking that evening? Do you remember? Strike that. Let me --
A. Well, we have --
Q. -- ask the question. Were you ordering drinks or did you order a bottle?
A. We never order bottles.
Q. Never ordered a bottle.
A. We order beer, Corona, and Maritelli (phonetic) Cognac.
Q. Okay. How many times do you remember Lugo left the

club to go out and smoke a cigarette?

MS. BROWN: Have we shown that she was with Mr. Lugo, yet?

ADMINISTRATIVE JUDGE ELLISON: Well, no. It's my question I mean.

BY MR. OCASIO:

Q. Well -- well, first of all were you sitting at the table with Mr. Lugo?

A. Yes, I was sitting with Mr. Lugo, my girlfriend Aria, and myself.

Q. So, you three sat at your own table for the bulk of the evening?

A. Yes.

Q. Okay. During the course of the evening did Lugo ever exit the club to go and smoke a cigarette?

A. Yes.

Q. Did he go out the back?

A. Yes.

Q. And they let him back in?

A. Yes.

Q. Through the rear?

A. A few times.

Q. Couple, three times maybe?

A. Two, two or three.

Q. Two or three times. Okay. So that we can frame for

the Board your relationship with all of the -- all of the witnesses here, where do you know Rudy Carranza from?

A. Mr. Carranza used to work for me as a Security.

Q. How long did Mr. Carranza work for you?

A. He worked for probably two years.

Q. Two years. How familiar are you with Linda Carranza?

A. We're friends.

Q. Let's go back to the evening of March 14th. Okay. We're getting close to closing time. Do you remember more or less how many people might have been left in the club about that time?

A. When they were closing?

Q. Yeah.

A. About 10.

Q. Ten people.

A. Maybe less. I don't recall exactly.

Q. Was that when you were invited over to the table with the Contreras brothers?

A. Yes, they offered me a drink and I walked to their table and we sat there for a few minutes.

Q. And then what happened?

A. And then we were talking and then Lugo, Mr. Lugo decide to have a cigarette, and one of the security guards told him that he could not smoke.

Q. Okay. Let me ask you something. How many drinks did

Mr. Lugo have that night?
A. He wasn't drinking much that night. He was -- probably two.
Q. How long were you guys at the club that you remember?
A. I will say about three, three hours, three and a half.
Q. About three and a half hours. So, is it your opinion that Lugo wasn't drunk?
A. I don't think so.
Q. So, what happened when Mr. Sham -- he reaches for a cigarette and then what happens?
A. Mr. Sham told him he could not smoke. And Mr. Lugo request to speak to the owner, and Mr. Sham said, no, you cannot.
Q. Do you remember how he asked him to speak to the owner?
A. Who?
Q. Was he yelling?
A. No.
Q. Was he being rude?
A. Not that I recall.
Q. Was he using foul language?
A. Not at all.
Q. Was he making any kind of threatening move or anything like that?
A. Nothing like that.

Q. Okay. So, what happened next?

A. And then the next thing I know is Mr. Sham is grabbing Mr. Lugo from the back, lift him up, throw him on the floor, and then I -- I started yelling, you know, like saying leave him alone, don't -- don't hurt him, and he didn't listen to me, the security guard. So, I ran to -- towards the bar and I spoke to Rudy Carranza, the owner, and I told Rudy, I said, "Rudy, they're beating up Lugo." And we went to the front, you know, where -- where Lugo was on the floor. Mr. Carranza was standing there doing nothing. He didn't say nothing or say anything like let him go or nothing. And then I ran again back to the bar and I spoke to Linda, Mr. Rudy Carranza's wife, and I asked Linda, I said, "Linda, they're beating up Lugo." And she said, "Well, there's nothing I can do." And then I said, "Well, aren't you the owner, can't you do anything? Can you just tell them, you know, to let him go, we'll leave." And she said, "No, I cannot do anything. I'm in charge of security guards." But I go, "But you're the owner, I'm sure the security guards will listen to you." And she said, "I'm sorry, but there's nothing I can do."

Q. So, what happened after -- I mean so -- so after you go speak to Rudy and you speak to Linda what happens next?

A. They called the police and then we went out. One of two police officers came in and they started searching him. I tried to talk to the police officer, I believe his name is

Farley. I don't recall exactly his name. And I tried to explain and he wouldn't let me explain anything. And when I tried to talk to him I remember he said, "If you don't move back, I'm going to arrest you." And I said, "But for what?" I'm trying to explain, you know, what happened. Said, "I don't need to talk to you."

Q. How did Lugo -- do you remember how he looked when the police arrived? Was he handcuffed?

A. He was handcuffed, yes. I mean his shirt was like on the side like he's been, you know, beat up. That's exactly what he did.

Q. So, after Farley shows up and he takes his identification from him --

A. He took his wallet and Mr. Lugo told him that his ID was inside his wallet, and he took an ID and he said, "Well, I cannot tell from original ID and a fake one."

Q. Did Lugo try to speak to him --

A. He tried to --

Q. -- in private?

A. -- talk to him, but he wouldn't talk to him. He will talk to the security guard, Mr. Sham, the one who hit Mr. Lugo. He didn't want to talk to none of us. He only talked to the security guard.

Q. So, when you were inside the club and Sham was putting handcuffs on Mr. Lugo did Sham ever tell him, "I'm placing you

under arrest?"
A. Say that --
Q. Did you ever hear Sham tell Lugo, "I'm placing you under arrest, citizen's arrest, or I'm arresting you?" Or did he say anything like that?
A. Nothing, nothing, he just grab him from the back. We were just talking. I was -- Lugo was sitting, like this is the table, he was sitting right here, I was sitting here, and my girlfriend here, and some other people here. And he just picked him up and throw him on the floor and start hitting him.
Q. After he handcuffed him did he continue to hit him?
A. Yes.
Q. Did he hit him a lot?
A. Yes.
Q. Did he hit him with a stick?
A. With a stick, yes.
Q. Do you remember if the stick was a small one?
A. No, it was --
Q. It was closed or was it open?
A. It was the one for use by police officers or, you know, security guards. And I started yelling, I said, "Let him go, please let him go, don't hurt him, you know, we'll leave right now, just let him go," and he wouldn't listen. I try to like to get in between, but, you know, he pushed me on the side and that's when I ran for Rudy because I thought -- you know, I

was afraid that if I get involved he would have hit me. He was out of control.

Q. So, after he handcuffed him he continued to beat him.

A. Even there were -- there was another security guard and he didn't get involved. He was just looking. And I remember he said, you know, "Just let him go," and he wouldn't listen. He said, you know, "This is -- this is on me," and I don't understand what he meant by that.

Q. So, he did use his night stick to beat him?

A. Yes.

Q. Is there anything else you remember about that night?

A. Well, I seen him there before and, you know, we never had any problems. We've been there before. And even that night, you know, when we first came in he said hello to us.

Q. How many times have you been to the Flamingos with Lugo?

A. Many times.

Q. More than two?

A. More than five.

Q. More than five times. When -- when you would go to the Flamingos with Lugo would you be coming in through the front or would you be coming in through the back?

A. Sometimes we come to the front, and if there's no space we go through the back. Mr. Carranza told me that it wasn't necessary for me to go to the front entrance, that I

could come to the back and park my car in the back 'cause sometimes there's no parking. As a courtesy, as friend, he let me, you know, in through the back.

Q. So, of those times that you were coming into the club with Mr. Lugo did they ever search him?

A. No.

Q. Is it your representation that everybody in there basically knew him? All the guards knew who he was?

A. All of them. I used to think they were friends, very good friends, 'cause I used to see Mr. Lugo and Mr. Carranza, you know, like hanging around a lot. When Mr. Carranza used to work in my nightclub they -- they used to say they were good friends.

Q. Some of the guards who worked for Rudy also work at your nightclub.

A. Yes.

Q. So, is it fair to say that everybody in that nightclub knew Angel personally?

A. Mr. Lugo, yes.

Q. And everybody in the nightclub basically knew he was a federal police officer.

A. Yes.

Q. Okay. In the five times that you went over to the club with Mr. Lugo were there ever any incidents he ever had with the people at the club? Did he ever like not pay the door

or anything that you can remember?

A. Well, the first few times we went we try to pay and they reimburse us for -- well, they've never charged me. He tried to pay and they said -- they give him back his money.

Q. Who will give him back his money

A. Linda.

Q. Is it your testimony that Linda also knows Angel very well?

A. Oh, she does. She used to come at the bar and when we were talking, you know, Lugo and I, she used to come and talk, you know, together as friends.

Q. Were there ever any instances where Rudy would come over to your club and get drunk?

A. What do you mean drunk?

Q. Well, it's -- he had a incident in '95 that it was a attempted suicide.

MS. BROWN: Objection. Relevance to the instant removal.

MR. OCASIO: Well, it's -- the relevance winds up being probative, Your Honor. There was a relationship shared with all of these people that surpasses a plain working relationship. All these people know each other personally. They have at one time or another been very very close friends. I'm trying to establish for the Board how well all of these people know each other 'cause we have testimony from Mrs.

Carranza that the Appellant --

ADMINISTRATIVE JUDGE ELLISON: Okay. That's all right. I understand. Go ahead.

MR. OCASIO: Yeah, so I mean it's --

BY MR. OCASIO:

Q. You know him real well basically?

A. I'm sorry?

Q. Rudy.

A. Of course I know him.

Q. He used to run your Security.

A. Yes, he used to come, too, on Thursdays and have a few drinks. Well, actually get drunk. A few times Mr. Lugo had to, you know, drive him to his house because he couldn't drive.

Q. Okay. Did you fire Rudy from running your Security operations?

A. Well --

MS. BROWN: Objection. Relevance. I don't understand where we're going with this.

ADMINISTRATIVE JUDGE ELLISON: Well, I mean --

MS. BROWN: Perhaps I'm missing something but --

ADMINISTRATIVE JUDGE ELLISON: -- we have a statement here from Mr. Carranza, so I guess it goes to his --

MR. OCASIO: Yeah.

ADMINISTRATIVE JUDGE ELLISON: -- credibility in some way.

MR. OCASIO: Well, it -- it --

ADMINISTRATIVE JUDGE ELLISON: Go ahead.

BY MR. OCASIO:

Q. Did he use to run your Security?

A. Yes.

Q. Okay. And at some point he stopped running your Security.

A. The reason was because I request for him to give me proof of insurance for the security guards. And I asked him if he didn't bring me any proof of that insurance, he could no longer work for me. Some proof that he had a license to work as a security guard and an insurance for the employees that he had.

Q. Okay. Would you say that that might have caused some -- some hard feelings with -- with Rudy and Linda Carranza --

A. With me?

Q. -- against you?

A. With me?

Q. Um-hmn.

A. I don't think so.

Q. Would there be any reason why Rudy would have any, I guess, hard feelings towards Angel?

A. No, I was shocked that night when that, you know, when that happens. I was shocked because when I -- I went to get Linda she refused to go, and then I asked Rudy and he stand

there and he didn't do nothing, and to me they were very good friends. And I say friends as I say it again, I mean Mr. Lugo drove Rudy a few times to his house because he was completely drunk and I didn't want to let him drive. I will take the keys away from him and -- and he will offer to drive him. And not only him, sometimes his security guard when he wasn't available. So, I mean to me that was -- I don't know what happened.

Q. All these months later after this incident did any of this stuff make sense to you? Can you -- I mean it's -- can you explain what happened?

A. No and I never -- I never talked to them or never said anything to them, but I noticed some changes from them. Because sometimes we used to exchange bands at nighttime, and since that incident happened I never got any phone call from her, nothing. She never called me back.

Q. So, your friendship has kind of soured out a little?

A. I don't know what to say because I been there after that incident and when I -- I was there they treat me nice.

Q. Okay. Well, let's -- let's get to Tuesday evening this week. Okay.

MS. BROWN: This week?

ADMINISTRATIVE JUDGE ELLISON: Tuesday evening of this week?

MR. OCASIO: This week.

there. And then I told you that's Mr. Carranza at the booth of the DJ and you walked towards the booth and I stayed behind. The next thing I notice is about three or four security guards, they walk towards you and I thought they were going to do something, and they were like moving their hands and I couldn't hear what they were saying.

Q. Was it your impression that they were trying to force me out of the club through the back door?

A. Yes.

MS. BROWN: Your Honor, I would just like to know the relevance of this testimony.

MR. OCASIO: Well, the relevance of this, Your Honor, is very simple. Linda Carranza sat there earlier today and testified that I -- and their attorney, that the subpoena was thrown on the floor, that Mr. Carranza was improperly served, that we were rude and abusive, and all this other direct testimony. Ms. Grijalva escorted me into the club because it was going to be the only way to effect a personal service of the subpoena, even though Mr. Carnagey was properly served. And witness fees could not be paid in light of Mr. Carranza's status as a deportable alien.

ADMINISTRATIVE JUDGE ELLISON: I understand this has to the service and process.

MR. OCASIO: Yeah, so --

MS. BROWN: I would like to say --

MR. OCASIO: -- the issue and the relevance winds up --

MS. BROWN: -- I think to a degree --

MR. OCASIO: -- being that while I'm at the club I am almost assaulted by the security person --

ADMINISTRATIVE JUDGE ELLISON: Well, no, that's not the relevance. The relevance is whether or not the service, the process was --

MR. OCASIO: Was fine.

ADMINISTRATIVE JUDGE ELLISON: -- sufficient.

MR. OCASIO: Yeah, so --

MS. BROWN: And as far as that goes, Your Honor, the only concern I have is that I think that was a misquote of Ms. Carranza's testimony in terms of the obnoxious part and all the other stuff. I don't believe that's what she said.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well --

MR. OCASIO: Well, we can --

ADMINISTRATIVE JUDGE ELLISON: We have that on the record.

MR. OCASIO: Yes, but I mean it was something to that effect.

ADMINISTRATIVE JUDGE ELLISON: Okay.

MR. OCASIO: That it was a less than pleasurable contact.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, you're not

on trial here either so --

MR. OCASIO: No, I understand, but to make sure that the Agency's objection is kind of put on the table.

BY MR. OCASIO:

Q. Were you present when the Redwood City Police Sergeant showed up to the club?

A. Yes.

Q. Okay. Basically for the record, it was the Redwood City Police Sergeant who commanded Mr. Carranza appear and receive the subpoena.

MS. BROWN: Could we do this without leading?

ADMINISTRATIVE JUDGE ELLISON: Okay. Yeah, wait a minute. You're not testifying, she is.

MR. OCASIO: No, I mean it's -- she had already exited the --

ADMINISTRATIVE JUDGE ELLISON: Well, you're testifying and the idea is to get a first-hand account from her.

MR. OCASIO: I apologize. Okay.

BY MR. OCASIO:

Q. Were you there when the Redwood City Police arrived?

A. Yes.

Q. Okay.

A. I was there when you called 911.

Q. Okay.

A. And after you called 911 I went out the club through

the front.

Q. Did you see the Police Sergeant enter into the club?

A. Yes.

Q. Okay.

A. He even said hello to me.

Q. After that was -- did you see me exit the club?

A. No.

Q. Okay. You had already left --

A. Left, yes.

Q. -- and you were waiting. End of that.

MR. OCASIO: Okay. Your Honor, I have no further questions. At this point I'll release the witness to the Agency for -- for direct.

ADMINISTRATIVE JUDGE ELLISON: Okay. Ms. Brown?

MS. BROWN: I just have two really quick question and this is just for me.

CROSS-EXAMINATION

BY MS. BROWN:

Q. What is your relationship with Mr. Lugo?

A. We're friends.

Q. How long have you known each other?

A. Many years. For, I would say, seven, eight years.

Q. Okay. And --

A. Same as Mr. Carranza.

Q. Okay. And what is your relationship with Mr. Ocasio?

With Mr. Ocasio?

A. Well, I met through him.

Q. You met Mr. Ocasio through Mr. Lugo?

A. Yes.

MS. BROWN: Okay. That's all I have.

ADMINISTRATIVE JUDGE ELLISON: Okay. Okay. Thank you very much.

THE WITNESS: Okay. You're welcome.

ADMINISTRATIVE JUDGE ELLISON: Oh, I'm sorry, I'm sorry. I do have another -- I do have a question.

You said you entered -- when you arrived there on the 14th you said you entered through the back --

THE WITNESS: Yes.

ADMINISTRATIVE JUDGE ELLISON: -- of the Flamingos Nightclub?

THE WITNESS: Yes.

ADMINISTRATIVE JUDGE ELLISON: Were you with Mr. Lugo at that time or did you meet him there?

THE WITNESS: No, no, I went with him and my girlfriend.

ADMINISTRATIVE JUDGE ELLISON: Okay. So, when --

MR. OCASIO: I was clearing my throat. I'm sorry.

ADMINISTRATIVE JUDGE ELLISON: Oh, sorry. When -- okay. So, when you entered did anyone ask Mr. Lugo for payment and/or identification? Or to --

THE WITNESS: They never did. As I said, you know, they were friend. I mean they were friends until this incident happened.

ADMINISTRATIVE JUDGE ELLISON: Okay. Who did you -- well, you said Mr. Carranza escorted you to a table --

THE WITNESS: Yes, he always --

ADMINISTRATIVE JUDGE ELLISON: -- when you arrived?

THE WITNESS: Yes, he always got a table for us. Even if there was no tables he will bring chairs or put an extra table on the side, you know, make room for us.

ADMINISTRATIVE JUDGE ELLISON: So, he did that for --

THE WITNESS: Always.

ADMINISTRATIVE JUDGE ELLISON: Mr. Carranza on this night, the 14th, did this for you and Mr. Lugo?

THE WITNESS: And my girlfriend.

ADMINISTRATIVE JUDGE ELLISON: The three of you.

THE WITNESS: Yes.

ADMINISTRATIVE JUDGE ELLISON: All three of you arrived together?

THE WITNESS: Yes, sir.

ADMINISTRATIVE JUDGE ELLISON: Okay. All right. Thank you.

THE WITNESS: Thank you.

ADMINISTRATIVE JUDGE ELLISON: Could we pause the record, please.

ADMINISTRATIVE JUDGE ELLISON: Okay.

(Whereupon, the hearing was adjourned at 4:00 p.m.)

---oOo---

## CERTIFICATE OF TRANSCRIPT

I, Louise Howes, as the Official Transcriber, hereby certify that the attached proceedings before Administrative Judge Anthony L. Ellison of the Merit Systems Protection Board,

| | | |
|---|---|---|
| In the Matter of: | ) | |
| EVANGELISTA LUGO, | ) | |
| Appellant, | ) | Case No. SF-0752-00-0499-I-1 |
| v. | ) | |
| DEPARTMENT OF THE NAVY, | ) | |
| Agency. | ) | |

were held as herein appears and that this is the original transcript thereof and that the statements that appear in this transcript were recorded on audio tape and transcribed by me to the best of my ability.

I further certify that this transcript is a true and accurate record of the proceeding.

Louise Howes (signature) 11/19/00

Louise Howes (Date)

# EVANGELISTA LUGO

V

# DEPARTMENT OF THE NAVY

MERIT SYSTEMS PROTECTION BOARD
SAN FRANCISCO REGIONAL OFFICE
CASE SF-0752-00-0499-I-1

# EXHIBIT

# 8

HEARING TRANSCRIPT VOLUME II
FRIDAY NOVEMBER 3, 2000
TESTIMONY INDEX

COPY

**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**
**SAN FRANCISCO REGIONAL OFFICE**

In Matter of:

EVANGELISTA LUGO, Appellant,

v.

DEPARTMENT OF THE NAVY, Agency.

Case No. SF-0752-00-0499-I-1

**VOLUME II**

ANTHONY L. ELLISON
Administrative Judge

FRIDAY, NOVEMBER 3, 2000
10:00 A.M.

Reported By: Mary Sproul
gh

**APPEARANCES:**

For the Appellant: Juan Carlos Ocasio
466 West 27th Street, Apt. 8C
New York, NY 10001

For the Agency: Darcy Baird Brown
Department of the Navy
Human Resources Central Office
Labor & Employee Relations
Code NOOCP32
937 North Harbor Drive
Building 1, 6th Floor
San Diego, CA 92132-0058

Also Present: John Di Filippo

Roger A. Carnagey, Esq.
Attorney at Law
One Kaiser Plaza, Suite 601
Oakland, CA 94612

# I N D E X


| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| For the Appellant: | | | | |
| Raymond M. Lewis | 5 | 35 | | |
| Evangelista Lugo | 70 | 84 | 91 | 98 |
| Examination by Judge | 94 | | | |

| EXHIBITS | IDENTIFIED | RECEIVED |
|---|---|---|

# EVANGELISTA LUGO

V

# DEPARTMENT OF THE NAVY

MERIT SYSTEMS PROTECTION BOARD
SAN FRANCISCO REGIONAL OFFICE
CASE SF-0752-00-0499-I-1

# EXHIBIT

# 9

TESTIMONY OF RAYMOND M. LEWIS
PAGES 5 THROUGH 69

FRIDAY, NOVEMBER 3, 2000 10:00 O'CLOCK A.M.

P R O C E E D I N G S

ADMINISTRATIVE JUDGE ELLISON: All right. We're back on the record about 10:00 a.m., November 2nd [sic], for the conclusion of the hearing in Mr. Lugo's appeal. We have Mr. Lewis --

THE WITNESS: Yes.

ADMINISTRATIVE JUDGE ELLISON: -- this morning. Do you have any objection to taking an oath regarding your testimony?

THE WITNESS: No, I do not.

ADMINISTRATIVE JUDGE ELLISON: Could you raise your right hand, please.

Whereupon,

RAYMOND M. LEWIS,

having been first duly sworn, was examined and testified as follows:

ADMINISTRATIVE JUDGE ELLISON: Thank you very much. Could you state and spell your name, please.

THE WITNESS: Name is Raymond Michael Lewis, R-A-Y-M-O-N-D, M-I-C-H-A-E-L, L-E-W-I-S.

ADMINISTRATIVE JUDGE ELLISON: Okay. All right. So, I guess Mr. Ocasio will go first.

MS. BROWN: Judge, before you start I just want to again put my objection on the record for Mr. Lewis' testimony.

I don't think he's relevant. I just want to get it on the record.

ADMINISTRATIVE JUDGE ELLISON: Okay. All right. Mr. Ocasio?

DIRECT EXAMINATION

BY MR. OCASIO:

Q. Mr. Lewis, would you state what your job title is, sir?

A. Security Officer, Director of Public Safety for all closed Naval Bases on the West Coast of -- the West Coast of the United States.

Q. Does that make you -- I mean are you a federal police officer, sir?

A. Due to the nature of my job, due to the fact I did the Phase I training, I am a federal police officer in the performance of my mission.

Q. Your Phase I training, would that be --

A. It would be the training that you have, and if you have it there it's in the 5530.14, which is now 5530.14 Charlie, which is the Navy Physical Security and Law Enforcement Manual.

Q. Did you graduate from a federal police training academy or federal law enforcement academy?

MS. BROWN: Objection. I'm not sure why this is relevant to --

MR. OCASIO: If we're going to start the day out with objections, you know why the question is very relevant.

ADMINISTRATIVE JUDGE ELLISON: Well, why don't you tell --

MR. OCASIO: It goes to qualifications of the witness. It goes to his ability to enter -- well, we're going to start this day out like this. The qualifications of the witness is very relevant to the instant appeal because Mr. Lewis' opinion in the performance of his duty, and so on and so forth, that gives him the expertise over the officers under his command.

ADMINISTRATIVE JUDGE ELLISON: Okay. Now, let me just kind of short-circuit this here. You know, the reason that I did approve Mr. Lewis is because apparently -- we don't know for sure yet -- I want to know what his role was in the investigation of this matter.

MR. OCASIO: That's fine, and --

ADMINISTRATIVE JUDGE ELLISON: Whether he directed it or what his role was. We don't know exactly.

MR. OCASIO: And I will limit it to that --

ADMINISTRATIVE JUDGE ELLISON: Whether or not he can carry a gun --

MR. OCASIO: -- particular line of questioning.

ADMINISTRATIVE JUDGE ELLISON: -- is irrelevant, so if you were thinking about that.

MR. OCASIO: So that I can have some clarity from the

Board, exactly why is that irrelevant? So that I can avoid all of these questions and circumvent what it is that we've been trying so hard to not allow me to do.

ADMINISTRATIVE JUDGE ELLISON: Well, there's no charge about having anything to do with a gun vis-a-vis Mr. Lugo. So --

MR. OCASIO: Unfortunately, the entire Administrative Hearing --

ADMINISTRATIVE JUDGE ELLISON: That's the main thing.

MR. OCASIO: -- has spent the time by the Agency rep peppering all of the witnesses, "Did you know Mr. Lugo could carry a weapon concealed?" She -- she spent the entire day working that into the record at the urgings of the attorneys for the City of Redwood City and Mr. Sham. I have never had a Board function where counsel of agency witnesses were able to coach the agency representative in how to sabotage a Board appeal.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, as you recall I did instruct -- I can't remember his name now, Harrington I believe it was.

MR. OCASIO: He was sitting right behind her passing her notes.

ADMINISTRATIVE JUDGE ELLISON: Well, when he did consult with her I advised him to step back and not --

MR. OCASIO: Well, I have, unfortunately --

ADMINISTRATIVE JUDGE ELLISON: -- participate.

MR. OCASIO: -- I have never experienced that in any Board function I've been involved in. It's never happened.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, you're not going to see anything in the initial decision about whether or not he can carry a gun. Doesn't mean you won't necessarily see the word, weapon, in the appropriate context of the narrative, but it's certainly not a charge regarding that and there won't be a finding regarding that.

MR. OCASIO: I understand that, but since we have just been granted leave to amend the Lugo v. Gaston case, the relevant portions of the transcript are going to be introduced into the new Amended Complaint and it has everything to do with the nexus of all three of the District Court lawsuits.

ADMINISTRATIVE JUDGE ELLISON: See, that's exactly what I'm trying to prevent because --

MR. OCASIO: Well --

ADMINISTRATIVE JUDGE ELLISON: -- this is not your opportunity to elicit any information that's relevant solely to another matter.

MR. OCASIO: Well, it -- if it dealt solely with the appeal, my ability has been successfully obstructed. I cannot cross and get to the issues I need to raise before the Board, regardless of whether your finding references it or not. My questions to Mr. Lewis would be directed to everything that the

Agency has contended. If I can't even get an answer from him if he's qualified as a police officer or if he is a federal police officer, then any issue as to the misuse of an identification, or the preparation of a government identification that has a state Penal Code prohibition on a federal identification, has everything in the world to do with his qualifications or lack thereof.

ADMINISTRATIVE JUDGE ELLISON: Okay.

MR. OCASIO: This identification card was created by somebody. I want to ask him who prepared it, who approved it, and if his identification resembles this very same one that was provided to San Mateo authorities, used to indict the Appellant. The misuse of this credential is the sole issue before the Board.

ADMINISTRATIVE JUDGE ELLISON: The misuse of the credential. There's no allegation that his credentials were fabricated or falsified --

MR. OCASIO: There are inferences in there --

ADMINISTRATIVE JUDGE ELLISON: -- or anything like that.

MR. OCASIO: -- that the -- that the identification was altered. The Gaston Declaration is very clear about that. It says in my opinion, sir, he must have altered it, et cetera, and so forth.

ADMINISTRATIVE JUDGE ELLISON: Well, that's fine, but

it's not in the charge and --

MR. OCASIO: Well, it's not in the charge --

ADMINISTRATIVE JUDGE ELLISON: -- so you're not going to say anything about that.

MR. OCASIO: -- but it's all over everybody's testimony. It has been all over her line of questioning --

ADMINISTRATIVE JUDGE ELLISON: There hasn't been --

MR. OCASIO: -- to all of the witnesses.

ADMINISTRATIVE JUDGE ELLISON: -- one statement about falsification of credentials from any witness yesterday.

MR. OCASIO: But it's in the Agency file. Mr. Smith, who couldn't remember anything about it, remembered he found it so egregious. The only thing out of all those statements that could have so offended his delicate Victorian sensibilities would have been the Declaration from Gaston or that Gaston E-mail, that the identification must have been altered. And somehow I was not allowed to -- to climb into his head to get him to remember what it was that offended him so, other than that. He disregard the District Court Complaint that had been filed first. I don't want to belabor the point that all of the action of the Agency was done after the District Court Complaint was filed. And since I have the U.S. Attorney and every other attorney worked into this matter sandbagging all of the questions, my hands are tied.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, you can --

MR. OCASIO: So, if I don't reference it into the transcript, whether I agree with whatever finding you make, if the ultimate question on review of any Appellate Court is going to be did I raise the objection at time of trial or hearing, and the answer is no. Whatever appeal I may raise, on whatever issues I may raise is moot.

ADMINISTRATIVE JUDGE ELLISON: Well, you're more than welcome to preserve any objections you want to preserve --

MR. OCASIO: And I am doing so.

ADMINISTRATIVE JUDGE ELLISON: -- and you've been doing it, and we've had it on the record.

MR. OCASIO: And I apologize if I am -- you know, it's -- I apologize for the vigorousness of this position. However, I believe, or it's my own subjective opinion, that I am fighting forces in addition to the merits of this particular appeal.

ADMINISTRATIVE JUDGE ELLISON: Well, you may be in the context of the District Court case, but this is not the forum for that court case.

MR. OCASIO: No, but it trickles all down here. And, unfortunately, my experience in this indication or in this instance has been it's a sandbag. And having been sandbagged before, I am merely -- first I'm apologizing to the Court if I appear to be obstinate, however, it's an intuitive situation. I will limit my questions to the issues you have approved this

witness for, I would respect a very small amount of latitude to question competence and ability of the Security Director, and deal with the issues solely of the misuse of the government credential. So, I will direct my questions in that area and I'll go from there.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, what we need to find out is what Mr. Lewis' role, if any, was in this matter, the investigation of this matter, the prosecution of this matter, the decision to take this action, et cetera, et cetera, et cetera.

MR. OCASIO: Fine, then I will concentrate my inquiry in that area and we'll go from there.

ADMINISTRATIVE JUDGE ELLISON: Okay.

BY MR. OCASIO:

Q. How many officers do you supervise, sir?

A. At this point?

Q. Yes, sir.

A. See, what am I down to? Myself, Lieutenant Fred Lewis, Lieutenant Joe Lemos, Lieutenant Michael Esh (phonetic), and recently hired Captain Eric Payne. We're now down to four.

Q. Do you supervise both Commands, sir, San Bruno and Hunters Point?

A. I'm not sure that you're correct in what you're saying, but I'll go ahead and I'll clarify for both of us.

Q. Yes, sir.

A. Okay. There's two separate ways that this is being ran. You have the Brach Office from Southwest Div and then you have the AOR Commander, area of responsibility Commander, which is Captain Buchanan. He is responsible for all areas within his AOR, which is the Bay Area, and that goes up as far as Ferndale and far south sometimes as Stockton. There's two separate areas that we're working at. I'm hired out of Southwest Div, which means as well as being the security officer for Southwest Div, my what you would call a position description was modified three years ago, before they made me the Security Director, to include that I would be responsible to the Area Commander in the Bay Area here. And, well, what it implies I've got three different Commands I work for.

Q. Yes, sir.

A. And the other one is at EFA Northwest, which takes me up to my other base which is Noatak, Alaska. So, I work from Noatak, Alaska, to San Diego. My primary focus is in the Bay Area.

Q. Okay. Dealing -- well, let's concentrate on Hunters Point.

A. Yes, sir.

Q. Because that's -- that's where we seem to be. How is the Hunters Point Command structured, sir?

A. As far as now or when?

Q. Well, at the time of the incident or at the time of

Lugo's hire, how was the department structured?

A. I'm trying to think about what it was like for Mr. Lugo when he was hired. I came into -- they relieved two Commanders, they put me in charge. Two Naval Commanders, put me in charge in -- I'm trying to believe it was July. Mr. Lugo, you know it. July '98, '97. Do you recall? You were there.

ADMINISTRATIVE JUDGE ELLISON: Just to the best of your --

THE WITNESS: I'm sorry.

ADMINISTRATIVE JUDGE ELLISON: -- recollection testify, please.

THE WITNESS: And what had happened was that when I came in Mr. Lugo was there. I had a Charles Davis Brown, he was then the Chief of Police. That was in, I think it was July of '97, '98. I had a Captain Robert Bagwell, he was at Oak Knoll. I then had a Captain Charles Gaston Santiago who was at Hunters Point. And I had various Sergeants such as Fred Lewis, who directly or indirectly Mr. Lugo worked for.

MR. OCASIO: Okay.

THE WITNESS: I was a third-line supervisor.

MR. OCASIO: The third-line supervisor.

BY MR. OCASIO:

Q. Okay. Mr. Brown was the Chief of the Department?

A. He was for a period of time. When I took over, and

then he was not on duty for a period of three to four months, and then he subsequently resigned.

Q. Okay. So, he -- he was the Chief.

A. He left, right.

Q. Okay.

A. And then there was no longer a Chief of Police, other than myself as the Security Director/Acting Chief of Police, as I had to be until I had an Acting Chief of Police, which was subsequently Chief Bagwell for a period of time, then I rotated it between him and Captain Gaston Santiago.

Q. So, let me see if I understand this correctly. Charlie Gaston was a Police Chief.

A. Well, he was an Acting Police Chief.

Q. I'm sorry.

A. Acting, he was not the Police Chief. As was Captain Bagwell, he was an Acting.

ADMINISTRATIVE JUDGE ELLISON: And when was Mr. Gaston Acting Police Chief?

THE WITNESS: Your Honor, I can't really say. I don't recall it, but we had different periods. I rotated it between the two men to give them the experience, but I'd have Bagwell on for a while and then I'd have Gaston, then Bagwell and Gaston, that type of thing.

ADMINISTRATIVE JUDGE ELLISON: Okay. And that would cover the entire year of 2000?

THE WITNESS: Negative. It would -- I lost Bagwell. I'm just -- I'm just trying to remember. I believe it was in September, July, September of 1999. And I went away from a Chief of Police at that point and just had two separate Captains rather than have -- just have one leapfrogging over the other all the time. So, I just had a Captain at Oak Knoll and I had a Captain at Hunters Point.

ADMINISTRATIVE JUDGE ELLISON: Okay. So, like in the May, April, June time frame of 2000 Gaston was the Captain at --

THE WITNESS: No, not 2000. That's this year. Gaston was a Captain of Police up until -- I'm having a hard time with the dates -- June, July of this year. We've had a lot of activity. And at which time his -- his appointment, he was then at a temporary appointment, but before the expiration of his temporary appointment he determined that he would resign and he resigned his position.

ADMINISTRATIVE JUDGE ELLISON: In July?

THE WITNESS: June, July. I can't give you a date. If I had the documents in front of me, I would give that to you.

ADMINISTRATIVE JUDGE ELLISON: All right.

BY MR. OCASIO:

Q. Okay. So, there's no Chief in the Department or just two Captains.

A. I had two Captains.

Q. There are two Captains.

A. After a period of time I made the determination it would be more appropriate. I had two separate facilities, two separate Captains.

Q. I understand. Dealing with the issue of this particular appeal, sir, after the Chief of Police leaves the department --

A. He resigned in December.

Q. After the Chief --

A. Right.

Q. Yeah, he -- he's out. Okay.

A. He's gone.

Q. He's gone. Were the identification cards of the officers changed?

A. I'm trying to recall during that period and I have to say that because I cannot give you firm --

Q. No, I --

A. -- facts and dates.

Q. As best you can remember.

A. But as the best I can recall I changed them to reflect at the bottom that no off-duty weapons authorized. In other words you cannot use this ID card to carry a weapon. If you wish to carry a weapon -- and I put this out, I've got it someplace and again I can't recall where it is -- I advised

people that I would write them a letter to the local sheriffs to advise them that if this person does this specific kind of work he can have a concealed weapon permit.

Q. Okay. This was the ID card more or less as you --

A. I can't see it from where you're at.

MR. OCASIO: May I hand this copy to the witness? I think it's the Agency -- one of the Agency exhibits.

MS. BROWN: You want to identify what number it is?

MR. OCASIO: Yes.

MS. BROWN: Why don't you do that?

MR. OCASIO: Okay. This appears to be a Department of Defense Police ID card that was faxed from EFA West Legal Office to the San Mateo District Attorney's Office.

THE WITNESS: May I see it?

MS. BROWN: What number is it again?

THE WITNESS: Oh, I'm sorry.

ADMINISTRATIVE JUDGE ELLISON: It's enclosure 13 to something or other.

MR. OCASIO: Yeah, it's in there somewhere. No idea.

MS. BROWN: Says Agency 13.

MR. OCASIO: Okay. Well, Agency's 13. If I may, I'd like to --

MS. BROWN: Probably part of the prehearing submissions, Judge.

ADMINISTRATIVE JUDGE ELLISON: Yeah, I think so.

MR. OCASIO: May I hand this copy to the witness, sir?
ADMINISTRATIVE JUDGE ELLISON: Sure.
BY MR. OCASIO:
Q. Would this be a document you remember?
A. I didn't write these words, Void, in there.
Q. No, no. That was a -- that was a copy sent from EFA West to show what the federal ID card, the DOD officers.
A. The only one that I recall giving out I typed across it the words, Void. I don't know where this one came from.
Q. That -- okay.
A. But the wording is correct where it says, "Off-Duty Weapon Not Authorized."
Q. Okay.
A. That's the wording that I put on it, but I didn't do this.
Q. No, no.
A. And I did give counsel copies of it, but the ones I gave counsel specifically said void across them. But I don't recall doing this or I don't recall Roger Green, the counsel that I gave it to, doing that.
Q. Okay.
A. But this is accurate, though, if you wish to know that.
Q. No, no. That's fine.
A. "Off-Duty Weapon --

Q. We're going to -- we're going to talk about that in one moment.

A. Sure.

Q. When you wrote or when -- well, actually who wrote "Off-Duty Weapons Not --"

A. I did.

Q. Okay.

A. I wanted to ensure -- if you wish this is -- okay, go ahead.

Q. No, please.

A. No, I'm listening to you is fine.

Q. Why did you write that admonition on the ID cards?

A. I wanted to ensure that people, when they were off duty, did not walk around with weapons that they were not authorized to carry and not use an ID card that had a federal police credential or identification on it. The thing about it is the only time that a man is authorized under normal normal course of duty to carry this weapon is when he is on station. The weapon is then after his tour of duty turned into the armory, checked back into its appropriate slot along with the ammunition.

Q. Okay. Your understanding that off-duty weapons is not authorized, sir, where did that come from?

A. It's out of the 5580.1. I gave those documents. The thing is is that you're not authorized to carry a weapon off

duty.

Q. I understand. What I'm trying to get to is the card, the issue.

A. Yes, sir.

Q. My question is, is a federal police officer authorized by federal law to carry a firearm?

A. While on duty.

Q. What authority do you know of that authorizes you to either put a prohibition like that or remove a prohibition like that from ID cards?

A. I put it on the ID card to ensure that both not only the officer is aware of it, but also local law enforcement officers would be aware of it as well.

Q. I understand. My -- my question, sir, is what statute, code, regulation --

A. There is no statute, no code.

Q. So, this was --

A. I am a security officer working and ensuring that my officers comply with not only federal, but with state law. My officers are not eligible to carry a weapon while off duty.

Q. This is why we went right to the issue, which became an objection right in the beginning, sir, of your qualification as a police officer or as somebody trained as a police officer to issue a document you have no legal authority to either grant or not grant. If -- I'm asking you what federal --

MS. BROWN: Judge, I'm really kind of confused here because I thought we were talking about the misuse of the ID and now it seems that we're talking -- we're making accusations against Mr. Lewis about how to put the ID together.

ADMINISTRATIVE JUDGE ELLISON: Right. Well, this is the amount of latitude that Mr. Ocasio asked for so --

MR. OCASIO: Okay. We -- here we go. Okay.

ADMINISTRATIVE JUDGE ELLISON: Can we -- I mean you asked the question. I let you ask the question. He answered the question. He answered what he did and what's the authority under which he thought he had the authority to do what he did regarding those words on the --

MR. OCASIO: If it -- well.

ADMINISTRATIVE JUDGE ELLISON: -- ID card. And I think probably now we should move on to the relevant issues of the case. And, you know, you asked for some latitude, I gave you some latitude. I let you ask and get answers to questions that are not material to this case, and now I think it's probably time to get to those material issues as I stated earlier; i.e., did Mr. Lewis have anything to do -- what was his role in the investigation and led up to this removal, these charges upon which Mr. Lugo was removed.

BY MR. OCASIO:

Q. How did you become aware, sir, of the incident at the Flamingo Nightclub?

A. I received a copy of a fax from then Captain Charles Gaston Santiago to the effect that Mr. Lugo had a lawsuit against the City of -- was it Redwood City, I'm sorry, suing them for -- and again I don't have the documents in front of me. As I recall for illegally restraining him, illegally keeping him from going about his business because he was a police officer. The only reason that I had knowledge that Mr. Lugo was involved in that event was because of the fact that a copy of it was faxed to him from some persons or persons in Redwood City. Otherwise, I would never have known that this incident had occurred.

Q. Let me understand this correctly, sir. No time prior to the filing of the District Court lawsuit was any civilian complaint filed to your knowledge?

A. No, sir, I was not aware of it. I usually take immediate action or I do take immediate action. It's a concern of not only myself in my capacity, but of the United States Navy. We want to make sure everybody's operating in an appropriate manner.

Q. Okay. So, after you received this -- this information from Captain Gaston what -- what'd you do?

A. I went to Redwood City to find out what was going on. It was determined -- and I'm, again, I'm recalling from records and documents I don't have in front of me. That I spoke to a Sergeant. I don't have his card, I've got -- I've got it

tacked to one of my files.

Q. It's in there some --

A. And I said, "What happened?" And he described an incident that occurred that involved Mr. Lugo and then he -- and he asked me, was he -- words to the effect, "Was he authorized to have the weapon?" I said no, he was not. He is not authorized to have an off-duty weapon and the use of this ID card. If he had a CCW, that's none of my business.

Q. He did have a CCW.

A. Then it was none of --

MS. BROWN: Objection. Assuming facts not in evidence and testifying.

ADMINISTRATIVE JUDGE ELLISON: Well, that's true. What is a CCW?

THE WITNESS: Carrying a concealed weapon.

MR. OCASIO: It's a concealed weapon permit, sir.

ADMINISTRATIVE JUDGE ELLISON: Okay. Okay. Go ahead.

BY MR. OCASIO:

Q. Exactly what did the Sergeant tell you the incident was?

A. That there was -- it was the later part -- latter part of the evening toward closure in the words that I can recall. And, again, it's I'm speaking for a man that I can't recall his name.

Q. That's fine.

A. I just -- I've got a vague recollection of the incident, so you'll have what I -- what I recall vaguely. That being that Mr. Lugo was said to have been intoxicated, was said to have been asked to leave the bar, refused. He was with other persons there, several females and possibly another male. That an incident arose, the bouncers were called, they subdued Mr. Lugo, Mr. Lugo was taken to the ground, a weapon was removed from him, he was handcuffed, he was taken outside. A police officer came upon the scene. Police officer asked him who he was, he brought forth a credential, showed it to the police officer, and with that credential the police officer released him rather than take him into custody for what would appear to be disorderly conduct.

Q. You recount that with awesome clarity, sir.

A. There's only seven or eight points there. That's all I put together.

Q. Well, I only want to deal --

A. It would probably take pages.

Q. No, I only want to deal with three of those.

A. Okay. Great, go ahead, please.

Q. You were informed Lugo was apparently drunk?

A. That's correct, apparently intoxicated. I had no way of knowing. I don't know if they took a breathelizer test or anything of him.

Q. So, after you meet with the Redwood City Police

Department and you find the facts or you -- which reminds me. When you met with the Redwood City Police Department, sir, do you have a recollection of when that might have been?

A. It was the March/April time frame.

Q. March/April time frame.

A. Again, I don't have my documents in front of me.

Q. We're asking just your best recollection, sir.

A. The best I can recall late March, early April possibly.

Q. Late March, early April.

A. That's my best recollection.

Q. When you met with a Police Sergeant did you have a chance at that time to review the Police Report?

A. I did not. I looked at a field interview card that had been done. There was no Police Report available for me and the field interview card was not that extensive.

Q. So, now what course of action did you take from there, sir?

A. I had what appeared to be at that time an incident in a local community with a federal police officer outside of his jurisdiction with what appeared to be, as I was told, a weapon on his person, using a federal ID card to extricate himself from a situation that he'd gotten himself in. That's what it appeared to be. At that point I then told Captain Gaston to conduct the investigation. I separated myself from it. He

conducted the investigation, brought the material to me, I then forwarded it to counsel. Counsel reviewed it, sent it back, we discussed the issues, and we reviewed those issues.

Q. Okay. Well, let's get over there to one moment. Why wasn't this referred to DOD Criminal Investigations, sir?

A. DCIS?

Q. Yeah.

A. There was no need to. It was inside, it was an internal. It was required by the security officer, in the manuals that I've quoted, that the security officer will do an investigation, it's a preliminary inquiry, refer it to -- to our superior officer. That's what I did. We determine if there's a problem and then we take action. What we had was administrative action because there was no felony crime committed, if in fact there was a crime committed.

Q. You are regular Navy, sir?

A. Regular? I'm sorry?

Q. Are you regular Navy?

A. I'm a civil servant, GM -- GS-13, Civil Service series 080, security officer.

Q. So, you are a civilian working for the Department of Defense.

A. That's correct.

Q. So, you would not be subject to Uniform Code of Military Justice regulations, correct?

A. No, sir. It depends on where I'm at. If I'm overseas, yes, I could be.

Q. But the Base Commander, the Buchanan guy, is he regular Navy?

A. No, he's not Buchanan guy. His name is Captain Greg --

Q. No, I'm sorry. Commander.

A. -- Buchanan. He's United States Navy regular.

Q. And I apologize for --

A. Yeah, he's my boss.

Q. -- not understanding the Command or --

A. He's a Captain.

Q. -- the Naval rank structure.

A. Yes, sir.

Q. Fine, I understand. Is the Captain regular Navy, sir?

A. Yes.

MS. BROWN: Objection. What is relevance here?

MR. OCASIO: If you let me finish asking the question, we'll get over to the point. The Security Director --

ADMINISTRATIVE JUDGE ELLISON: You did finish asking the question. And what is the relevance?

MR. OCASIO: The relevancy is that if the -- if this information is brought to Base Command, brings through the security officer up to the Commander of the Installation, off-duty misconduct complaint is alleged.

THE WITNESS: Yes, sir.

MR. OCASIO: Uniform Code of Military Justice regulations are automatic requiring the Base Commander to -- to have an inquiry investigation under -- under general articles from the UCMJ. The Base Commander would convene a immediate investigation.

ADMINISTRATIVE JUDGE ELLISON: Okay. Now, Mr. Lugo was not military at the time.

MR. OCASIO: Well --

ADMINISTRATIVE JUDGE ELLISON: He was a civilian employee of the Navy, as was --

MR. OCASIO: What we're getting --

ADMINISTRATIVE JUDGE ELLISON: -- Mr. Lewis.

MR. OCASIO: What I wanted to find out here was, you know, you're a civilian working for the Navy.

THE WITNESS: I am a security officer.

MR. OCASIO: You have several authority vested to you --

THE WITNESS: Okay. I'm sorry.

MR. OCASIO: -- to do your job.

ADMINISTRATIVE JUDGE ELLISON: As he explained.

MR. OCASIO: No. problem. I understand.

BY MR. OCASIO:

Q. So, my question then is when you bring it to Base Command, Captain Buchanan is -- is regular Navy.

A. Yes, he is.
Q. Okay.
A. I'm sorry.
ADMINISTRATIVE JUDGE ELLISON: Okay. All right, that's fine.
Q. Base General Counsel? No, it's --
ADMINISTRATIVE JUDGE ELLISON: Okay. So, he's regular Navy. So?
MR. OCASIO: It's -- let me strike that question and just go real basic here.
BY MR. OCASIO:
Q. You took it upon yourself to get this investigation handled. Yes?
A. No, sir, I don't. That's part of my direction by OP and I have instruction.
Q. Okay. So --
A. I am a Division Head.
Q. Yes, so who specifically instructed you regarding the handling of this incident, sir?
A. As a security officer I report any incident or alleged incident to my Executive Officer. At that time that was Commander Hubbard (phonetic). I advised him what was taking place. I advised him that we should and would be required to do an investigation into the matter. The reason being is that there was an allegation against one of my men that possibly he

was involved in criminal activity or was falsely accused of activity that he was not involved in, then I would be required to know that and report directly to him. When I put and had put together all the documents, I have to go through my counsel before I make direct -- direct statements regarding the facts that I have gathered to my Executive Officer and my Commanding Officer. I have a chain of command that I follow.

Q. Did you consult Mr. Green regarding any aspect of this investigation, sir?

A. Not until I concluded it. He was aware that I was initiating an investigation to determine if Mr. Lugo was or was not involved in this alleged activity.

Q. Now, you were interviewed by the Redwood City invest -- the Sergeant from Redwood City spoke to you or one of the Sergeants, one of the investigators?

A. I was never interviewed per se.

Q. There is a statement in the record you made to a Redwood City detective that stated that Mr. Lugo was not authorized to carry a fire --

A. Oh, yes, I did state that.

Q. Oh.

A. That's accurate.

Q. Fine.

A. He was not authorized an off-duty weapon.

Q. So, in your statement you also mention that you were

one of three people authorized to carry --

A. That's correct.

Q. -- an off duty. And who were the other two people authorized?

A. At that point it was Captain Bagwell. My -- correction, it was not Captain Bagwell, we were down to two people. It was myself and Captain Gaston, Charles Gaston Santiago. Reason being at this point is we were the only immediate response for persons on the stations.

Q. Okay. Who issued your concealed weapon permit, sir?

A. That comes from the Command. The Command knows it. I've got the ID card if you need that.

Q. I would very much like to take a look at your --

ADMINISTRATIVE JUDGE ELLISON: I am not going to spend time doing that. It's as irrelevant as it ever was.

MR. OCASIO: The bottom line here --

ADMINISTRATIVE JUDGE ELLISON: Let's move on.

MR. OCASIO: I just --

ADMINISTRATIVE JUDGE ELLISON: How many times can I tell you this is not relevant to this appeal. I can give you all the latitude I want to take in irrelevant information, and then finally at some point I have to say let's move on. You started, you were doing a good job. We got to what he did, he talked -- he told Mr. Gaston --

MR. OCASIO: You're tying --

ADMINISTRATIVE JUDGE ELLISON: -- to do an investigation.

MR. OCASIO: You're tying my hands.

ADMINISTRATIVE JUDGE ELLISON: I'm tying your hands from trying to get information that's pertinent to another matter.

MR. OCASIO: Again --

ADMINISTRATIVE JUDGE ELLISON: To that extent you're right.

MR. OCASIO: Again, you know, the -- I'll just go on the record and put it there, sir. I -- my personal subjective opinion is that you are inherently biased against my client.

ADMINISTRATIVE JUDGE ELLISON: I don't even know your client. I haven't heard a word --

MR. OCASIO: It doesn't make a difference. You are Agency Judge. We'll take for granted that the MSPB has a 98 percent kill rate for any Appellant coming before the Board. That's already a given statistic. I think I have a problem here that it doesn't make a difference how I proceed in this particular matter. You've made the decision to limit whatever it is I'm going to be able to talk about and that's how it goes.

ADMINISTRATIVE JUDGE ELLISON: That's part of my job.

MR. OCASIO: No, that's not part of your job.

ADMINISTRATIVE JUDGE ELLISON: Part of my job is to

limit what we do in these hearings to relevant information.

MR. OCASIO: Yeah.

ADMINISTRATIVE JUDGE ELLISON: Relevant and material to the --

MR. OCASIO: Well, that's -- that's all fine, well, and good, but --

ADMINISTRATIVE JUDGE ELLISON: -- to the case --

MR. OCASIO: -- we'll move on from there.

ADMINISTRATIVE JUDGE ELLISON: -- and the charges before us.

MR. OCASIO: Fine.

BY MR. OCASIO:

Q. Were you present with Captain Gaston at his investigation or did you accompany him? Or --

A. No, sir, I did not.

Q. You were not there. Were you satisfied the investigation Captain Gaston did was thorough, sir?

A. At the conclusion of the investigation, yes, I was.

Q. Did you find it odd, sir, that there were people he had mentioned in his E-mail by name he had not interviewed, sir?

A. I only recall that I reviewed the documents submitted to me, and based on those documents there appeared to be foundation for review by Command for their determination. That was the reason I forwarded that interview to Mr. Green.

Q. To counsel. So, what was your opinion, sir, about the --

A. My opinion, it wasn't really relevant. All I was there to do was grab facts, put them together, and then give it to counsel. Counsel reviews it. I can't do those things. That's not my charter. My charter is just to get the information, give it to counsel, and let them make determinations with Command.

Q. Why did Captain Gaston not interview Officer Lugo, sir?

A. I have no idea. He put -- I said I have no idea. If he did, I don't know that he did. He interviewed the folks, we put it together, and I presented it to counsel. Counsel reviewed the information before them and presented it to Command.

MR. OCASIO: I have no more questions for you.

ADMINISTRATIVE JUDGE ELLISON: Okay. Anything from the Agency?

MS. BROWN: A brief question.

CROSS-EXAMINATION

BY MS. BROWN:

Q. When Mr. Lugo was working for the Department of Defense what was his jurisdict -- what was his area of responsibility?

A. It was any Naval Base within the AOR of San Bruno and

Captain Buchanan. Any of our --

Q. So, the AOR is the area of responsibility?

A. Responsibility, that's correct. It could have been, I could have sent him to Oak Knoll, I could have sent him as far out as Skaggs Island, I could have sent him to Buchanan Field, Novato, Point Molate, those kind of places. If we had a need, the gentleman would have been asked to respond to those areas.

Q. Okay. Would Flamingos Nightclub be within his jurisdiction?

A. Obviously not.

MS. BROWN: Okay. That's all I have.

ADMINISTRATIVE JUDGE ELLISON: Okay. Anything else?

MR. OCASIO: Yeah, I want to know why I can't see his ID card.

ADMINISTRATIVE JUDGE ELLISON: 'Cause it's not relevant to the case.

MR. OCASIO: Then whatever.

ADMINISTRATIVE JUDGE ELLISON: Okay. Do you have any questions for Mr. Lewis?

MR. OCASIO: Yeah, I do.

ADMINISTRATIVE JUDGE ELLISON: Any relevant questions?

MR. OCASIO: Well, that in your subjective opinion wouldn't be relative, so I guess I'd have to wait for some other instance to do anything. I have no use for him.

ADMINISTRATIVE JUDGE ELLISON: Okay. All right.

That's fine. So, I just want to clarify. You did not accompany Captain -- excuse me, just a second.

THE WITNESS: No, sir, I did not.

ADMINISTRATIVE JUDGE ELLISON: I'm going to crack, too. You did not accompany Captain Gaston to the nightclub when he conducted his investigation, gathered these statements?

THE WITNESS: No, sir. That I have many other details that I'm -- other things that I'm involved with. I don't accompany somebody doing an investigation. I send them out then review their documents.

ADMINISTRATIVE JUDGE ELLISON: Okay. And you never saw any sort of security videotape --

THE WITNESS: No, sir, I did not.

ADMINISTRATIVE JUDGE ELLISON: -- from the nightclub? Okay. And you never interviewed or spoke to any of the percipient witnesses who were there at the nightclub that night yourself?

THE WITNESS: I'm recalling that that young officer, and I'm just -- this is a vague recollection again. When I spoke to the Sergeant they called that young officer in who was involved at that time, and he recounted those facts as -- or he recounted what I told you. That's what I was told.

ADMINISTRATIVE JUDGE ELLISON: Okay. Okay. Now, you didn't know anything about the incident before you learned about Mr. Lugo's lawsuit against Redwood City; is that correct?

THE WITNESS: I would never have had any knowledge that this incident had ever happened unless he had filed that lawsuit. I would have had no knowledge of his involvement.

ADMINISTRATIVE JUDGE ELLISON: Okay. Okay. All right, thanks very much.

THE WITNESS: Yes, sir.

(Witness excused.)

ADMINISTRATIVE JUDGE ELLISON: Okay. So, we have Mr. Lugo be our last witness.

MR. OCASIO: Do we have a ruling or a granting or a quashing of the subpoena on Carranza?

ADMINISTRATIVE JUDGE ELLISON: I -- well, I mean I would have to first of all get copies of this and let the Agency take a look at it so we can get some input. I don't know if they have any input or not, but I don't -- which I guess we could do.

MR. OCASIO: They have a copy. Seems everybody else has argued Mr. Carnagey's case. The Agency should take a shot.

MS. BROWN: Are we on the record or off?

MR. OCASIO: We're on the record.

ADMINISTRATIVE JUDGE ELLISON: Are we on?

MR. OCASIO: Let's stay on the record.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, does anybody know if we can get xerox copies somewhere around here?

MR. OCASIO: I'll make, as a matter of fact. If you

have a short recess, I'll make copies.

ADMINISTRATIVE JUDGE ELLISON: Do you know where to do that here?

MR. OCASIO: Yeah, I'm very familiar with the building. May I have that?

ADMINISTRATIVE JUDGE ELLISON: How about this here, if you would? Obviously, make one for yourself, too. Okay. Are we off the record?

(Off the record.)

ADMINISTRATIVE JUDGE ELLISON: Okay. We have to talk about this. I just got through speaking to my office about this, about various things to be able to do here. You know, I think in the first instance I'm going to have to allow Mr. Carnagey to respond to this, this idea that in fact there is this outstanding deportation order -- I mean it looks like there's -- certainly looks like there is -- to find out if that would be a good basis upon which to deny the motion to quash. But, you know, which, you know, assuming this is what it appears to be, it would be fine. But, of course, even with that, that what you have, as you have told me and have pretty much convinced me, that even if that happens Mr. Carranza is probably not going to show up, right? I mean that's your belief anyway.

MR. OCASIO: He's not here and --

ADMINISTRATIVE JUDGE ELLISON: Well, he's not here

based on this particular objection, which seems to be -- on the face of it to be sufficient. So, you have to like -- do you want me to try to work through you -- through this with you?

MR. OCASIO: No, I mean I'm -- I'm -- I was --

ADMINISTRATIVE JUDGE ELLISON: Okay. You seem distressed here. I'm indicating --

MR. OCASIO: No, sir. I -- I --

ADMINISTRATIVE JUDGE ELLISON: I'm indicating that it seems to me on the face that there's a good reason to deny the motion to quash is what I'm saying. But then you have to think about what's going to happen after that, which is that most likely Mr. Carranza is not going to show up. And then you have the opportunity, as we talked about yesterday, to make a motion to enforce the subpoena. Which, as I'm sure you know, maybe know better than I do, this could probably take a long time through a District Court.

MR. OCASIO: I understand and we can proceed to Mr. Lugo and finish this stuff so we can get out of here, but I -- I think I have been very adamant about my -- my frustration in dealing with this specific witness. In reading through his Declarations, it's Mr. Carnagey's assertion that Mr. Carranza doesn't have much to testify about. And I was not able to get to the heart of this matter. I'm not going to be able to get to the heart of this matter. It looks like as a direct result of the obstruction of this particular fiasco, 'cause I have no

idea how to label things, that I'm going to break my own personal record in the Ninth Circuit and, instead of being the only fraud examiner to have three current cases, I'll get to break it with four with Mr. Lugo.

ADMINISTRATIVE JUDGE ELLISON: Okay. Now could we talk about what we're -- the subpoena for Mr. Carranza.

MR. OCASIO: The -- the subpoena issue for Mr. Carranza at this point is moot because I raised this concern yesterday. The Administrative Judge allowed these people into the forum. You did this on purpose. You allowed it.

ADMINISTRATIVE JUDGE ELLISON: Wait, I have no idea what you're talking about. Allow what people into the forum?

MR. OCASIO: Mr. Carnagey and Mr. Harrington had absolutely no business present at these proceedings. You --

ADMINISTRATIVE JUDGE ELLISON: Well --

MR. OCASIO: You allowed them. Once you opened that door they had set this into place and here we are now talking about an issue I raised yesterday. He wasn't going to show. Now I'm getting this drivel that I can run out to somebody with a motion to enforce a subpoena, which isn't going to help the hearing. We won't have the benefit of these people showing up. We won't have the benefit of their testimony. Oh, my god, it's not the first time I've complained about this. So, it really doesn't make a difference. What am I going to do? I'm going to cry about spilled milk. He's not here. Mr. Carnagey

obviously perjured himself. Knew he was lying, did it anyway, and was able to accomplish his sole objective, to make sure that this -- I can't even find the word to describe Carranza, so I'm not even going to try. He's at the heart of this. I don't care if I have to chase him to the very gates of hell, he will not escape me. So, you can -- let's move on to Mr. Lugo. You allowed this, you tied my hands, and talking about this after the fact now doesn't do me any good and I don't care.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, I approved the witness, I gave you a subpoena for the witness. There was a motion to quash.

MR. OCASIO: And the witness was properly -- the witness was properly served.

ADMINISTRATIVE JUDGE ELLISON: Then there's a motion to quash, which is part of the rules as you know, and I'm indicating that, based on what I see here, I would tend to deny the motion to quash which means there would still be a live, outstanding subpoena. Now, if that subpoena is to be ignored or not complied with by this particular witness, which appears to be the case, even if I were to quash this -- I mean deny the motion to quash, then you have avenues. Now, they're unusual avenues and they may not be as precipitous as you would like, but that's about all I can do is tell you that you can make a motion to enforce the petition through District Court, which I would be glad to do my part in in doing that, but, of course,

it's going to take time. I don't know. I've never had to do it before, quite frankly, so I don't know.

MR. OCASIO: Well, I mean it's -- I understand at the inception of this appeal that it has probably been a situation that the Agency rep has probably never encountered this one specific type fiasco because we have so many different intertwined things going on all at the same time. And I -- again, it's -- it's I've been sandbagged and I want the record to reflect that. Whatever remedies past this point, he's not here to testify, are graciously offered. They mean absolutely nothing. To allow me to enforce the subpoena without the benefit of the testimony to impact your decision dealing with this specific appeal again means nothing. It's like, gee, had you let me know, I would have helped. I asked for the help when I needed it by that analogy. The witness should have been compelled to appear. He sits at the center of this. We don't have Carranza, we don't have Gaston. It's not the first time I raised this concern.

ADMINISTRATIVE JUDGE ELLISON: Well, I understand that, Mr. Ocasio.

MR. OCASIO: And --

ADMINISTRATIVE JUDGE ELLISON: And that's why you got a subpoena and that's why I'm telling you that --

MR. OCASIO: Well, it may -- well, it --

ADMINISTRATIVE JUDGE ELLISON: -- if you want to try

to enforce it, that's fine. That's all I can do. I can't go over there and get him and bring him here myself. You know that.

MR. OCASIO: Well, you know, it -- had it been more expedient, as you had admonished Mr. Carnagey to appear and give oral argument for this motion. That had you ruled the motion to quash, his client would have testified, that would have meant something.

ADMINISTRATIVE JUDGE ELLISON: Do you think Mr. Carranza would have come here if I had --

MR. OCASIO: Had you --

ADMINISTRATIVE JUDGE ELLISON: -- denied the motion to quash --

MR. OCASIO: Had you admonished --

ADMINISTRATIVE JUDGE ELLISON: -- yesterday?

MR. OCASIO: Had you --

ADMINISTRATIVE JUDGE ELLISON: Which I -- which I didn't even have yet. Go ahead.

MR. OCASIO: Had you instructed Mr. Carnagey to appear and give oral argument for the motion, he would have had to appear with Carranza.

ADMINISTRATIVE JUDGE ELLISON: Well, that's not true. All right. That's obviously not true.

MR. OCASIO: Well, you know, it's -- it's a purely academic argument now. It has absolutely no meaning to my

ability to defend this appeal for this client, on the basis of this three time convicted individual who ordered him arrested. Mr. Sham couldn't remember, the cops couldn't remember, nobody knew what was going on, and the guy who taped it isn't here to speak about the recording systems in the club or anything else.

ADMINISTRATIVE JUDGE ELLISON: Okay. So --

MR. OCASIO: There's nothing I can do.

ADMINISTRATIVE JUDGE ELLISON: Well, there is something you can do, which is follow the provisions that you are as well aware of as I am. And if you want to do that, fine. If you don't want to do that for whatever reason, please put it on the record, as we are on the record --

MR. OCASIO: Well --

ADMINISTRATIVE JUDGE ELLISON: -- that you don't want to do that.

MR. OCASIO: We are on the record now. At this particular stage --

ADMINISTRATIVE JUDGE ELLISON: It's your choice at this point as to how you want to proceed with this.

MR. OCASIO: It's not my choice if you've intentionally sandbagged my ability to defend this appeal and then tell me I have remedies for enforcement of a subpoena that you not too subtly sat in the middle and allowed it to be orchestrated.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well --

MR. OCASIO: So, it's -- we need to --

ADMINISTRATIVE JUDGE ELLISON: I don't know, you know.

MR. OCASIO: -- move on to Mr. Lugo and let's get his questioning done so we can get out of here, and I got a 3:00 o'clock manicure appointment. I mean this is just --

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, I'm -- since we are on the record I don't have to reiterate anything that you have said.

MR. OCASIO: That's fine.

ADMINISTRATIVE JUDGE ELLISON: And I don't have to recharacterize it 'cause I think the characterization speaks for itself. Yes, Ms. Brown?

MR. OCASIO: That's very good.

MS. BROWN: In the interest of brevity I just wanted to say, in terms of the Agency's response to the -- the Appellant's motion to quash the subpoena, the only -- I have two concerns. Well, obviously the Agency didn't ask for this witness, so it's not something that I thought was relevant in the first place, and at the prehearing we had indicated that we didn't believe Mr. Carranza was relevant. First, in terms of his opposition to the motion to quash, it's unclear to me from the documents that were provided, some of which only have like the first page of the actual Pleading, if it is indeed Mr. Carranza. So, that would probably be something that would be helpful to know if that's actually the right person that has

that particular status. According to Mr. Ocasio he does, but I'm not certain from the documents in front of me that it is indeed the correct person. That would be helpful. And the second thing I believe I mentioned already, is that Mr. Ocasio has indicated that he was the one that served the subpoenas. And, again, 120183 of -- what is it -- Title 5? That's 1201 what? So, 5 C.F.R. 1201.83 indicates that a person who can serve the subpoena has to be someone who is not a party to the appeal. And then the general definitions, 1201.4, indicate under E that a party is a person participating in a Board proceeding, which obviously Mr. Ocasio is. So, to a degree, in terms of brevity, the Agency would submit that Mr. Ocasio didn't appropriately serve Mr. Carranza the subpoena. In terms of that, that may be a little bit more easy to deal with than all the other stuff about the INS and that kind of thing in terms of just basic procedural matters.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, that's -- that's --

MR. OCASIO: In response to that, Your Honor, that objection, if it were going to be raised, would have had to have been raised by Mr. Carranza and it wasn't. Again, here we are, I mean it's -- she made her point and let's be done with this.

ADMINISTRATIVE JUDGE ELLISON: Okay. So, I'll wait till you get back to the microphone. Okay. So, you know, if

MR. OCASIO: So, it's -- we need to --
ADMINISTRATIVE JUDGE ELLISON: I don't know, you know.
MR. OCASIO: -- move on to Mr. Lugo and let's get his questioning done so we can get out of here, and I got a 3:00 o'clock manicure appointment. I mean this is just --
ADMINISTRATIVE JUDGE ELLISON: Okay. Well, I'm -- since we are on the record I don't have to reiterate anything that you have said.
MR. OCASIO: That's fine.
ADMINISTRATIVE JUDGE ELLISON: And I don't have to recharacterize it 'cause I think the characterization speaks for itself. Yes, Ms. Brown?
MR. OCASIO: That's very good.
MS. BROWN: In the interest of brevity I just wanted to say, in terms of the Agency's response to the -- the Appellant's motion to quash the subpoena, the only -- I have two concerns. Well, obviously the Agency didn't ask for this witness, so it's not something that I thought was relevant in the first place, and at the prehearing we had indicated that we didn't believe Mr. Carranza was relevant. First, in terms of his opposition to the motion to quash, it's unclear to me from the documents that were provided, some of which only have like the first page of the actual Pleading, if it is indeed Mr. Carranza. So, that would probably be something that would be helpful to know if that's actually the right person that has

you can give me a brief statement as to how you want to proceed with this particular issue regarding Mr. Carranza for on the record --

MR. OCASIO: Okay.

ADMINISTRATIVE JUDGE ELLISON: -- so that we know what to do.

MR. OCASIO: Since we're on the record, my only inquiry to the Administrative Judge, a very simple question, is his motion to quash granted or denied?

ADMINISTRATIVE JUDGE ELLISON: Well, you have presented new information that we didn't have previously that, of course, I would have to give Mr. Carnagey an opportunity to respond to, and I'd be more than happy to do that. I mean no matter what we do, Mr. Carranza is not going to be here today. That's pretty clear. We haven't got time for that regardless of whether he's inclined to do so or not. But so I can do that, I can proceed in that way, in which case you may very well end up with a denial on the motion to quash. I certainly would have to look into what the Agency has raised and et cetera, et cetera. But let's just assume for the moment, let's just assume that the denial -- the motion to quash will be denied. Then at that point, for argument's sake, how would you want to proceed?

MR. OCASIO: Well, any available remedy at that particular point is -- is perfunctory at best. You can't

unring this bell, regardless of how you rule. So, it really doesn't --

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, I don't know what that means.

MR. OCASIO: You -- we're not going to have a third day of hearing. You're not going to call him back for him to testify.

ADMINISTRATIVE JUDGE ELLISON: If the motion to quash were denied, the subpoena were enforced, and however that works through the District Court it were to be enforced, we would reconvene to have Carranza to testify.

MR. OCASIO: The -- the problem with that, as you have so not too subtly mentioned, of course we don't want crossovers with the District Court action. You have gone out of your way to make sure that happened. Unfortunately, that's exactly what you did. So, if I have to seek enforcement remedies of the subpoena, we have a discovery crossover in the Lugo v. Sham matter that's already set for deposition. We have the motion to dismiss taken under submission by Judge Mokin (phonetic) November 13th in Lugo v. Howard. They're going to be allowed their treasure trove of discovery while I chase down some convicted three time knucklehead, who was properly served, and his attorney was able to throw a monkey wrench into the works. The only thing I require from this hearing is the transcript. Whatever decision you make past that point I could not possibly

concern myself with. Either he's going to be reinstated or he's not. All I needed in the transcript to demonstrate was that the Agency took it's actions after the District Court was -- after the District Court Complaint was filed.

ADMINISTRATIVE JUDGE ELLISON: Okay. That's a matter of record.

MR. OCASIO: That's all I needed. Whatever decision comes out of the Board, I don't care. So, let's proceed to Mr. Lugo and let's get his questioning done, and let's get out of here.

ADMINISTRATIVE JUDGE ELLISON: Okay. So, I have to ask you a question directly for the record so I know how to proceed with this. Assuming I were to deny the motion to quash, would you want to proceed to enforce the subpoena through the only available channels there are, which is through the District Court?

MR. OCASIO: If the Administrative Judge was so inclined to deny the motion to quash, I would make sure that the available remedy to me would be pursued so that Mr. -- so that Mr. Lugo's record would be complete. That the only remedies we have for this particular action is through the Board. If you were to deny the motion, I would seek the enforcement of the subpoena. I am pretty sure that -- that we'll have to kill a tree between Mr. Carnagey in arguing that point. And if the District Court found the argument availing,

I would inquire if the Administrative Judge would keep the record open until a determination on the motion to enforce the subpoena was granted. If Mr. Carranza was approved to come back and testify, then --

ADMINISTRATIVE JUDGE ELLISON: Of course.

MR. OCASIO: -- it's all I could do.

ADMINISTRATIVE JUDGE ELLISON: Of course I will, obvious.

MR. OCASIO: Then -- then, you know, it's -- again I apologize for -- for the frustration I'm exhibiting before the Board. It's been a very difficult matter so I'm apologizing if I've been difficult. But if you will consider that motion or grant or deny it, then we'll take the appropriate steps to make sure that Mr. Lugo's remedies are properly sought after. I mean it's if you deny the motion.

ADMINISTRATIVE JUDGE ELLISON: Okay. Let me ask you this, and that's fine. I got an answer. Do you have any alternatives that you can think of that you would suggest as a what, a sanction for lack of a better term here, assuming that Mr. Carranza is not going to be available? A reasonable --

MR. OCASIO: I would respectfully request and if the Board would quash or deny the motion to quash the subpoena, that if we could request the adverse inference as to the testimony that might have been elicited from Mr. Carranza as a sanction. You know, it's -- it's --

ADMINISTRATIVE JUDGE ELLISON: And, well --

MR. OCASIO: I like a dollar.

ADMINISTRATIVE JUDGE ELLISON: The adverse inference being what exactly?

MR. OCASIO: That -- I mean it's -- I'm not quite sure of what we would be able to do. My -- my concern at this particular juncture would have been to establish that Mr. Carranza ordered his guard to arrest Angel, and that's what started this fight. How do I put this? I have been at that club more times than I can tell, I'm real familiar with the location.

ADMINISTRATIVE JUDGE ELLISON: Okay. I'm just talking about the inference that you're talking about.

MR. OCASIO: No, I mean it's -- it's -- in looking at all this stuff that happened there and Rudy's position where he was standing there or should have been. I would have expected at a minimum of the adverse inference to reflect the fact that Mr. Carranza, personal friends with the Appellant, knew him very well, worked with him, worked with him in both establishments, and knew he was a cop. I would expect the adverse inference to -- to support a finding that -- that the phone call made to the Redwood City Police was done under highly questionable suspect conditions. He knew the Appellant wasn't drunk, he knew the Appellant had not tinned, showed his ID into the club that night because Mr. Carranza escorted them

to the table and let them in through the back. I would have expected the adverse inference to -- to demonstrate the fact that the Appellant had exited the building numerous times that evening to smoke outside the club. I would have expected the adverse inference to show a finding that not only at the nightclub in Oakland that Ms. Grijalva runs, but that at Mr. Carranza's establishment that after closing and the patrons are removed from the club that the people who remain there and staffers smoke inside the club. I would have expected the adverse inference to indicate that the witnesses I had sought, specifically Mr. Reed, to testify to the extensive history of alcoholism and domestic violence between the Carranzas would have made Linda Carranza's testimony highly questionable and suspect. It would have made Mr. Carranza's testimony -- 'cause he's not a two-time convicted felon, he's a three-time convicted felon, all three of the convictions are alcohol, weapon, and drugs related. I would have expected the adverse inference to clearly identify Mr. Carranza's position at the club because he was -- he was represented to be the owner, not a manager. You know, it's -- these were all these factual questions that would have led into a finding of credibility of whether or not Mr. Carranza, for reasons known only to him, might have had some type of personal issue or beef with somebody he's known for 10 years. That might have colored their assertions that Mr. Lugo misused his credential to get

into the club. The 1984 conviction, the arrest and conviction, Carranza was arrested by a drug task force agent and a detective from the East Palo Alto Police Department. I would have expected the adverse inference to clearly identify the fact that it was Special Agent Charles Gaston and Detective Robert Luca of the East Palo Alto Police Department that arrested him in 1984. Somehow that didn't make it into the record. I would have expected the 1995 incident where Carranza's working for Gaston as an armed security officer. The evidence that was submitted into the Superior Court file where Captain Gaston forged and falsified the INS Certificate of Appreciation, which was his, and grafted Mr. Carranza's name on it because Special Agent Ackerman retired from service in 1992. Ackerman was Charlie's Agent In Charge. Those adverse inferences would have at least cast some doubt that the pre-existing relationship between Gaston and Carranza, that they were not only friends, but work mates. Or I can't even begin to frame what their association is. I think it would have demonstrated a very poor lack of judgment to have an individual like Gaston handle a investigation for someone he is real close friends with, or whatever their relationship was. It used to be as boss, used to be his supervisor. There is intelligence information we can't reveal on Mr. Carranza because that would compromise our operatives in the federal agencies who work for us, but we believe that Carranza was a confidential informant

in the Northern District of California. Gaston's relationship to him while he was a Special Agent, he was his control officer.

MS. BROWN: I guess, Judge, the only question the Agency would have is why would we be sanctioned for his witness not showing up?

ADMINISTRATIVE JUDGE ELLISON: Well, I understand.

MS. BROWN: That would be my --

ADMINISTRATIVE JUDGE ELLISON: I'm not saying I'm accept --

MR. OCASIO: I mean it's --

ADMINISTRATIVE JUDGE ELLISON: I'm not saying I'm accepting any inference, but --

MS. BROWN: Right, I guess that would be my concern.

MR. OCASIO: The -- the --

ADMINISTRATIVE JUDGE ELLISON: Right, sure. Of course I understand.

MR. OCASIO: You know, it's --

ADMINISTRATIVE JUDGE ELLISON: Okay. So, you want --

MR. OCASIO: I mean adverse inference of finding --

ADMINISTRATIVE JUDGE ELLISON: Not surprisingly you would want --

MR. OCASIO: -- you know, it's --

ADMINISTRATIVE JUDGE ELLISON: Yeah, okay. I understand. I understand. Okay. I just wanted to see if you

could just throw that out as a possibility or some other form, but --

MR. OCASIO: Well, it's just that the -- the --

ADMINISTRATIVE JUDGE ELLISON: I mean clearly the -- obviously, the Agency would not -- would not certainly vehemently object to the extent of that sort of adverse inference for obvious reasons --

MR. OCASIO: Well, the only --

ADMINISTRATIVE JUDGE ELLISON: -- in light of the fact that they didn't call Mr. Carranza and it's not their fault that he's not showing up.

MR. OCASIO: Well, the only sanction I would request then, it's all things considered, that the Carranza statement, I mean perfunctory of course, but I would have requested as an adverse inference that no weight be given to the Gaston E-mail, which started this, and the Carranza statement that's still part and parcel.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, let me see you test that. I mean is that -- would that be, and it's a little different of course, but just to throw this out there as a possible resolution of --

MR. OCASIO: I mean it's --

ADMINISTRATIVE JUDGE ELLISON: -- to avoid this whole subpoena thing, throwing out what, the Gaston E-mail and Mr. Carranza's statement?

MR. OCASIO: And the Carranza statement. So, I mean and --

ADMINISTRATIVE JUDGE ELLISON: Okay. I mean that's separate and apart, of course, from any adverse inference that --

MR. OCASIO: Yeah, but I mean it's --

ADMINISTRATIVE JUDGE ELLISON: -- you've talked about here, obviously.

MR. OCASIO: -- it's some -- I mean it's -- it's something.

ADMINISTRATIVE JUDGE ELLISON: Yeah.

MR. OCASIO: I don't know what else --

ADMINISTRATIVE JUDGE ELLISON: Yeah, okay. Well, I understand. I understand.

MR. OCASIO: -- what else I could do.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, at this time I would suggest that we see who's coming in the door.

UNIDENTIFIED FEMALE: Roger Carnagey.

MR. OCASIO: Mr. Carnagey is here.

ADMINISTRATIVE JUDGE ELLISON: Okay. Hi, Mr. Carnagey, how you doing?

MR. CARNAGEY: I'm fine, Your Honor. Hi.

ADMINISTRATIVE JUDGE ELLISON: We're on the record by the way.

MS. BROWN: Do you want -- I guess do you want him

near a microphone maybe or something?

ADMINISTRATIVE JUDGE ELLISON: Yeah, please. Okay. Do you -- maybe I should go off the record to find out why --

(Off the record.)

COURT REPORTER: On the record.

ADMINISTRATIVE JUDGE ELLISON: Discuss this. Mr. Carnagey is here, Roger Carnagey, who is attorney for Mr. Carranza and he has submitted a supplemental motion to quash the subpoena for Mr. Carranza. What we were talking about before you got here was, of course, this and how we would proceed under various situations. I guess first of all I would ask you if you want to make any oral response now to the Appellant's reply to the motion to quash and the evidence that he submitted here?

MR. CARNAGEY: Yes, I would and thank you, Judge Elliott [sic] for the opportunity. As I understand the opposition to the motion, Mr. Lugo and his representative are asserting that Rudy D. Carranza is, in fact, a felon, ex-felon, and/or presently subject to deportation proceedings and, therefore, citing statutory grounds is somehow exempt from fees, payment of witness fees and mileage.

First of all, Your Honor, there is absolutely no foundation, there is no Declaration, there is no authenticated or certified copy of any document of which you might take judicial notice, that the Rudolfo Carranza mentioned in any of

the supporting documents submitted by Mr. Ocasio is in fact Rudolfo D. Carranza. That's the first point. Secondly, I would represent to the Board and to yourself, as the presiding official here, that this in fact the person referred to in the deportation documentation and the criminal charges and proceedings is in fact not my client. It is in fact someone else. And thirdly, if you -- if you would look at the exhibits in Mr. Ocasio's opposition, it's the last page, it's interesting to note that the subpoena in this action was issued to Rudolfo D. Carranza and the person referred to in the information, is the first page, is Rudy Mike Carranza.

ADMINISTRATIVE JUDGE ELLISON: I'm sorry. Where is this?

MR. CARNAGEY: That's the last page of the -- I'm sorry, it's the deportation proceeding documents. It's that stack of documents, not the opposition's, no. If you look at the last page there's a file endorsed copy of the first page of an information issued in -- do you have that document?

ADMINISTRATIVE JUDGE ELLISON: I think I have everything you have.

MR. CARNAGEY: It's attached to mine.

MR. OCASIO: It's the last page, Your Honor.

MS. BROWN: Do you have a date on that maybe?

MR. OCASIO: August 17th, 19 --

MR. CARNAGEY: August 17th, 1984.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, I guess I don't have it.

MR. CARNAGEY: Would you like to look at mine?

ADMINISTRATIVE JUDGE ELLISON: Sure, I don't know --

MR. OCASIO: Let me show you the --

ADMINISTRATIVE JUDGE ELLISON: Okay. Did you hand me this previously?

MR. CARNAGEY: It was -- Your Honor, it should have been the last page unless it was assembled out of sequence.

(Inaudible discussion between Mr. Carnagey and Judge Ellison.)

ADMINISTRATIVE JUDGE ELLISON: Okay. So, we're talking about the first page of information that Rudy Mike Carranza with Mike crossed out?

MR. OCASIO: Yes, sir.

MR. CARNAGEY: Yes, and then down in the body it does say Rudy Mike Carranza. We don't know who crossed that out. We have no idea. This not authenticated copy. It's not a certified copy of this document, but down in the body of the information at least it isn't crossed out and it says Rudy Mike Carranza.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, let me ask you this then. I don't know, I'm just working, you know, a wing and a prayer here. How about -- let me ask this as a question. If -- let's assume, for the sake of argument, that

you're correct and this is not your client.

MR. CARNAGEY: Yes.

ADMINISTRATIVE JUDGE ELLISON: And let's assume that for purposes of argument that Mr. Ocasio were to provide your client with witness fees and mileage for testifying, what would that do to us? How would that --

MR. CARNAGEY: He's not going to appear.

ADMINISTRATIVE JUDGE ELLISON: So, I assume -- okay. Based on what now? Assuming -- assuming that this is not -- does not apply, assuming this is not your client, and that therefore the denial of witness fees from Ocasio is incorrect, and he were to offer those fees to your client, that would nullify that particular argument obviously.

MR. CARNAGEY: Not really because we have an invalid subpoena right now as it stands. There's no way you can validate it unless he can go back and reserve my client and do it properly.

ADMINISTRATIVE JUDGE ELLISON: Okay. So --

MR. CARNAGEY: That's where we stand.

ADMINISTRATIVE JUDGE ELLISON: Okay. So that -- so if this basis for the motion to quash then is set aside then, then of course you -- you want to pursue the fact of the service itself; is that correct?

MR. CARNAGEY: That's correct. Well, I think the fees --

ADMINISTRATIVE JUDGE ELLISON: Based on this supplemental motion?

MR. CARNAGEY: That's -- the fee and mileage issue is part of the service issue, and then a collateral part of the service issue is whether or not Mr. Ocasio is a proper person to serve that subpoena, and that's what I've submitted in the way of a supplemental Points and Authorities today. I didn't submit any new Declarations or anything else. It's simply a citation of Board's regs. The other point that I wanted to raise is that Mr. Ocasio makes a point that somehow I was served on the part of Mr. Carranza. There's absolutely nothing in the regulations that allows that procedure, particularly where there was no evidence that I was authorized to accept service on Mr. Carranza. And in fact Mr. Ocasio, I would represent to you, that Mr. Ocasio called me about authority to receive service on the part of my client. When I attempted to return the phone call to the phone number that I had in my file on the MSPB documents that were sent to me and on the Notice of Designation of Representative form, it was disconnected. I later received a call from him in New York and I didn't get back to him because it was a Thursday, I believe, and he was leaving. He said he would be back in Oakland on Monday.

ADMINISTRATIVE JUDGE ELLISON: Okay. So, to make another large leap here, assuming that I were to deny the motion to quash based on whatever reason I were to find after

sufficient intake of information and research, where would that leave us? Let's assume you have a good and valid subpoena.

MR. CARNAGEY: Well, I dispute that.

ADMINISTRATIVE JUDGE ELLISON: Well, I know you do. Let's assume we have that subpoena.

MR. CARNAGEY: Then my client's going to be subject to a petition to enforce and we'll argue the points up there.

ADMINISTRATIVE JUDGE ELLISON: Okay. So, you would -- I mean he would not appear based on --

MR. CARNAGEY: Not voluntarily, no.

ADMINISTRATIVE JUDGE ELLISON: Well, I mean subject to a -- what I'm asking you to assume is a good and proper subpoena.

MR. CARNAGEY: I can't assume that, Your Honor.

ADMINISTRATIVE JUDGE ELLISON: Right, well --

MR. CARNAGEY: So, I'm not going to assume it. If it were good --

ADMINISTRATIVE JUDGE ELLISON: I'm just trying to see how we're going to proceed with this. So, in other words if Mr. Ocasio wants to pursue that matter, he's going to have to make a petition for enforcement of the subpoena.

MR. CARNAGEY: That's correct. I'll argue these points because I believe they're correct. I believe the service is bad.

ADMINISTRATIVE JUDGE ELLISON: Okay.

MR. OCASIO: Your Honor, do I have a -- do I have a shot here?

ADMINISTRATIVE JUDGE ELLISON: Sure.

MR. OCASIO: I would like the Board to take judicial recognition of the People of the State of California v. Michael Anthony Graffini, specifically the case says that a Declaration submitted with the intent that it be uttered or published as true constitutes the felony of perjury under PC 124. Mr. Carnagey makes three sworn statements in this Declaration. The first one he says that Mr. Carranza has never been convicted of a felony and he, in fact, sat there and testified Rudy Mike Carranza is not his client. The second page attached to that moving paper is the certification from the United States Attorney because this is the entire deportation file that was obtained pursuant to federal subpoena. Mr. Carnagey sat there and lied. The second issue he raises here, not only was he convicted once, but the INS deportation file in fact has the -- it has four pseudo names for Rodolfo, R-O-D-O-L-F-O, Carranza, Rudolfo with a R-U, Rudolfo D., Rudolfo Dagoberto (phonetic), and Rudolfo D. Carranza, all six of these individuals are the same person, Mr. Carranza. The Assignment of Rents which was used to post the immigration bond was signed by his mother, his client, the owner of the Flamingos Nightclub, so he sat there and lied again.

MR. CARNAGEY: Your Honor, I'm not going to sit here

and listen to this --

ADMINISTRATIVE JUDGE ELLISON: Okay. All right.

MR. OCASIO: The Assignment --

MR. CARNAGEY: -- and be accused of lying by Mr. Ocasio. I'm not going to sit here and do that.

MR. OCASIO: The INS --

MR. CARNAGEY: I have made my argument. If Mr. Ocasio can't be polite --

MR. OCASIO: Sir, I have --

ADMINISTRATIVE JUDGE ELLISON: All right.

MR. CARNAGEY: -- then I will leave.

MR. OCASIO: I have --

MR. CARNAGEY: I will leave.

ADMINISTRATIVE JUDGE ELLISON: Please.

MR. OCASIO: I have the floor, Mr. Carnagey.

ADMINISTRATIVE JUDGE ELLISON: Okay.

MR. CARNAGEY: I will leave. You know what you have is a lot of gall, Mr. Ocasio.

MR. OCASIO: Excuse me.

ADMINISTRATIVE JUDGE ELLISON: All right, Mr. Carnagey, please.

MR. CARNAGEY: You have a lot of gall.

ADMINISTRATIVE JUDGE ELLISON: Quiet everybody.

MR. OCASIO: Your Honor --

ADMINISTRATIVE JUDGE ELLISON: Quiet everybody.

MR. OCASIO: With all due respect to the Bench --

ADMINISTRATIVE JUDGE ELLISON: Quiet everybody.

MR. OCASIO: Okay.

ADMINISTRATIVE JUDGE ELLISON: Okay. I was asking you for a response to the specifics of the argument here. I was not asking for you to opine on Mr. Carnagey's credibility. I think at this point what we should do, since it's not going to be resolved today obviously anyway, as we discussed at some length previously, is to take the --

MR. OCASIO: I'll submit moving papers.

ADMINISTRATIVE JUDGE ELLISON: -- take a response from you, get a written record of what Mr. Carnagey has represented here from him about the identity of this person, and any input from you to see what their desirous of making into all these issues, and then I'll have to rule first of all on the motion to quash and then potentially we'll see where that takes us, as we discussed earlier, into the petition for enforcement of the subpoena if we get that far.

MR. OCASIO: Okay. That's --

ADMINISTRATIVE JUDGE ELLISON: Okay. I mean that's pretty much where we were before Mr. Carnagey arrived anyway. So --

MR. OCASIO: And it's not like I told the Board so, but it was -- that's fine.

ADMINISTRATIVE JUDGE ELLISON: Okay. All right. So,

we have in terms of what you've --

MR. CARNAGEY: Judge Ellison, would you like to know who the Rudolfo Carranza is that is referred to in the deportation proceedings?

ADMINISTRATIVE JUDGE ELLISON: Well, I'm sure you can put that in a -- and I would ask you to put it certainly in a written brief in response to the --

MR. CARNAGEY: I'll give you a further Declaration on it.

ADMINISTRATIVE JUDGE ELLISON: -- to the motion to oppose the motion.

MR. OCASIO: I would object, Your Honor.

ADMINISTRATIVE JUDGE ELLISON: I mean to the opposition of the motion to quash.

MR. OCASIO: I would object. If Mr. Carnagey is going to submit moving papers, have him do so and, you know, we don't actually need any further testimony from him. Submit his moving papers.

ADMINISTRATIVE JUDGE ELLISON: That's what I just said.

MR. OCASIO: I would respectfully request that the Board in its findings specifically take judicial notice of 18 U.S.C. 3, the Assimilated Crimes Act, so that if we have a finding on paper with the transcripts and the evidence of perjury, I want the Court to make its specific finding in

regards to the motion to enforce or deny the subpoena, and I will attend to whatever issue happens past that.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, similar to your request that Mr. Carnagey make his motion papers, I would make the same request of you.

MR. OCASIO: I will submit the moving papers.

ADMINISTRATIVE JUDGE ELLISON: So, I don't really want to talk about this any more at this point.

MR. OCASIO: We'll go from there.

ADMINISTRATIVE JUDGE ELLISON: Okay. So, we're going to move on then with the testimony of Mr. Lugo. Thank you very much.

MR. CARNAGEY: Thank you.

ADMINISTRATIVE JUDGE ELLISON: I appreciate it. And before you leave we should probably -- we're still on the record, correct?

MR. OCASIO: Yes.

ADMINISTRATIVE JUDGE ELLISON: Okay. We should probably set some sort of a time limitation here for doing this. Now, you want -- you have the opposition. I mean you have Mr. Ocasio's opposition to the motion to quash. We have gotten a verbal on the record response from you, which I would appreciate if you could put into a written statement so we have it in the record as well. Anything else that you want to say in opposition to the -- in further support of the motion to

quash and in opposition to the Appellant's opposition to the motion to quash. I would say --

MR. OCASIO: Seven, a week.

ADMINISTRATIVE JUDGE ELLISON: -- that we could do this -- what, I'm sorry?

MR. OCASIO: Would seven days be sufficient to submit moving papers?

ADMINISTRATIVE JUDGE ELLISON: I think that'd be fine with me. How does that sound to you?

MR. CARNAGEY: I'll fax that over to you well before seven days.

ADMINISTRATIVE JUDGE ELLISON: Okay. And then, Ms. Brown, any input that the Agency wishes to make in this would have a similar time limitation for that. Okay?

MR. CARNAGEY: All right. Thank you.

ADMINISTRATIVE JUDGE ELLISON: All right, so we'll agree on that. Okay. Thank you.

MS. BROWN: Okay.

ADMINISTRATIVE JUDGE ELLISON: Okay. So, now we will take Mr. Lugo.

MR. OCASIO: Can we have a short five-minute recess, sir?

ADMINISTRATIVE JUDGE ELLISON: Sure. Okay. Five minutes.

(Off the record.)

# EVANGELISTA LUGO

V

# DEPARTMENT OF THE NAVY

MERIT SYSTEMS PROTECTION BOARD
SAN FRANCISCO REGIONAL OFFICE
CASE SF-0752-00-0499-I-1

# EXHIBIT

# 10

TESTIMONY OF EVANGELISTA LUGO
PAGES 70 THROUGH 98

COURT REPORTER: On the record.

ADMINISTRATIVE JUDGE ELLISON: Okay. Mr. Lugo, you have any objection to taking an oath regarding your testimony?

THE APPELLANT: No, sir.

Whereupon,

EVANGELISTA LUGO,

having been first duly sworn, was examined and testified as follows:

ADMINISTRATIVE JUDGE ELLISON: Thank you. And we have your name. So, Mr. Ocasio.

MR. OCASIO: State your name for the record.

ADMINISTRATIVE JUDGE ELLISON: Well, as I say, we have his name, so that's fine, we have the spelling.

MR. OCASIO: Okay.

ADMINISTRATIVE JUDGE ELLISON: So, go ahead.

THE APPELLANT: On Tuesday, March 14th --

ADMINISTRATIVE JUDGE ELLISON: Oh, wait, hold on a second, please. I mean I assume you're going to be asking the questions.

MR. OCASIO: Oh, yeah. It -- it -- well, I'll just basically put it this way and let him say it in his own words.

DIRECT EXAMINATION

BY MR. OCASIO:

Q. Would you tell us what happened that day?

A. Okay. On 14 March 2000 at about 10:30 somewhere,

1530, I arrived at the Flamingo Nightclub in the company of Ms. Maria Elena Grijalva and Aria (phonetic) Ledesma. We parked at the rear of the Flamingo where we were met by a security guard, Audi Abone (phonetic), who escorted us to the back door, and met there by Mr. Rudy Carranza, who after greeted us and everything took us to a table.

Q. Where was the table situated in the club?

A. It was near the dance area at the -- one of the corner of the dance floor.

Q. Close to the dance floor?

A. Very close, yes.

Q. How far would you estimate was the table from the DJ booth where -- well, first of all, once you got seated where was Mr. Carranza?

A. After he seated us he -- he returned to the DJ booth.

Q. How far were you away from the DJ booth?

A. I said 15, 20 feet.

Q. So, for the bulk of the time that you were there you were basically sitting in front of him, weren't you?

A. Yes.

Q. The place starts to close. What happened?

A. As we were leaving we were asked to -- to accompany the Contreras brothers at their table and my guest, the people were with me, decided to stay so we sat down. At the table was some cigarettes and I was offered a cigarette. As I reached

for the cigarettes and had it in my hand and the lighter Security Guard Sham approached me and told me that I wasn't allowed to smoke cigarettes on the premises. And I told him that I wasn't going to light the cigarette, if he'd please contact Mr. Rudy Carranza, he had let us smoke in there after the people were gone from the establishment and if he say it was okay, fine. If not, I had no had no problem with putting the cigarette away.

Q. So, what happened next?

A. Mr. Sham indicated that Carranza really was busy and I asked him again, please call him or send somebody. There was some -- there was another female security officer with him at the time. Send somebody to get him for me, please, and no, no, I'm not going to light up a cigarette. His respond to me was that I wasn't going to tell him what to do, that he didn't care whether I knew Rudy, he knew who I was, and that he wasn't going to call him.

Q. Have you ever seen Sham before or have you ever met him before?

A. Yes, sir.

Q. Where did you meet Sham?

A. I first met him at 1301 Clay Street, Federal Building.

Q. Mr. Sham had prior knowledge that you were a federal police officer?

A. Yes, sir.

Q. Okay. Then what happened after he tells you, "You're not going to tell me how to do my job or what to do?"
A. I told Mr. Sham that it wasn't my intention to tell him how to do his job. I just would like for him to contact Mr. Carranza. He had a radio, he could call him. His remarks was, "Fuck this, I know what to do."
Q. What happened then?
A. He came around where I was sitting, he picked me up from the chair, and threw me on the floor.
Q. What happened after that?
A. I grab ahold of his leg and Mr. Sham -- I don't know what he hit me with, but I felt blows about my body. I was dragged across the floor, handcuffed.
Q. Did he continue to beat you after you were handcuffed?
A. I felt a lot of blows.
Q. Do you remember any yelling or screaming or was there anything else that you were --
A. I could -- I could hear a voice telling him, "Why are you hitting him? He hasn't done anything to you. Let him go."
Q. Up to that point how many alcoholic beverages had you had?
A. I had two.
Q. Over how long a period of time?
A. Oh, about 10:30 to about 11:00 -- 1:30 in the morning.
Q. Couple, three hours?

A. Yes, sir.

Q. So, now you're handcuffed, you're being beaten. What happened after that?

A. I recall security guard Abone, Audi Abone, he -- he told him, "Sham, I know this guy, you know him, too. Let me handle it." His response was, "This is on me." He picked me up from the floor. As he was taking me outside the club I was asking him why you doing this?

Q. What did he say?

A. He didn't say anything.

COURT REPORTER: One moment, please.

MR. OCASIO: Yes, ma'am.

(Tape changed at this time.)

BY MR. OCASIO:

Q. So, what happened after that?

A. I continued to ask him, "Why you doing this? You know who I am." Why -- why this. You know. And so the police was called and we got outside of the club and we're waiting for the police, he said to me, "I take this now." He reach over, took my gun, and as he was attempting to unload the weapon, moved the magazine a little bit, he racked the weapon. And I told him that --

Q. When you say rack, what do you mean?

A. He pulled the slide, and I told him that the weapon was not chambered, didn't have a round in the chamber. When he

did that he actually put a round in the chamber. He removed the magazine and I told him, "Check the weapon, there's a round in the chamber." He did, to his surprise there was a round in the chamber. Redwood City Police Department arrived. The first words out of Officer Farley to me were, "I believe anything this man have to say." I stated to Officer Farley, "Excuse me, Officer, what do you mean?" He stated, "He never lied to me in the past and he's not going to lie to me now." I requested Officer Farleys to step to the side so I could talk to him. He said, "You can talk to me right here and now. My hearing is perfect."

Q. How far away were you from Farley at that point?

A. I'd say about two feet the most.

Q. Two feet. What happened next?

A. Mr. Farley proceeded to tell me that I caused everything. I told Mr. Farley I -- how could I start anything when I have -- I showed him -- I still have the cigarette lighter in my hand. He said, "Well, you came into the place with a gun, in my Department if I do that -- and then you were drinking. I do that, you know, I'll be gone."

Q. Did Officer Farley tell you you were drunk?

A. No.

Q. Did Officer Farley conduct any type of field sobriety test?

A. No.

Q. Didn't make you walk a line?
A. No, sir.
Q. Touch your nose?
A. No.
Q. Count backwards?
A. No.
Q. Okay. What else happened?
A. The -- Officer Farley went to talk to -- excuse me -- Officer Sham to the sidewalk away from me and Officer Paraskevopoulos was next to me and he removed -- I believe Officer Farley, Officer Paraskevopoulos asked me if I had any more weapons and I told him I have a knife in my left boot, which my ID is in my back. They removed the ID, my wallet, and Officer Paraskevopoulos conducted a CLETS search 'cause he went into the vehicle and came back and told Officer Farley that I was confidential.
Q. Did you see Officer Paraskevopoulos go into the squad car?
A. Yes, sir.
Q. Was he on a radio, was he on the keyboard, was he on a monitor? What was he doing when he entered into the squad car?
A. I couldn't tell because the squad car came in part -- directly in front of me was Officer Farley's. Officer Paraskevopoulos' squad car was behind that on the street.
Q. Did you hear any radio transmissions that were made by

Officer Paraskevopoulos?
A. No, sir.
Q. No radio call, nothing?
A. No, sir.
Q. Okay. Would you explain to the Board, please, the nature of information that is available once you run a -- first of all, what is CLETS? Because we were unable to get a clear definition yesterday.
A. CLETS is a one-to-one on a subject or suspect or somebody you have in custody. Together with that is an NCIC, which is a national warrant -- national search. CLETS will reveal any warrants or warrants in the immediate area, in the state or the states.
Q. And the NCIC?
A. NCIC will do the same thing on the federal sector.
Q. What kind of information is contained in the NCIC system?
A. If the person has had any criminal history, that would reveal in that.
Q. How about --
A. Address, where's he been before.
Q. Would that information database also contain information on police officers?
A. Yes, sir.
Q. Okay. So, if I had no identification on me other than

a name and a date of birth, what kind of information would you be able to obtain if you were to call in or type in my name or ask somebody to --

MS. BROWN: Objection. You know, that's not the case here.

MR. OCASIO: Excuse me. It --

MS. BROWN: I mean he did have identification.

MR. OCASIO: We are --

MS. BROWN: So, it's just a poor comparison at best.

MR. OCASIO: The Agency's objection is -- is unfounded. The issue here is what the -- what did the officers know at the time they're running his investigation. The Agency has certainly tried to make a very very patently weak case that he --

ADMINISTRATIVE JUDGE ELLISON: Go ahead.

MR. OCASIO: -- misabused his credential. I'm just --

ADMINISTRATIVE JUDGE ELLISON: Go ahead.

MR. OCASIO: Yeah, fine.

BY MR. OCASIO:

Q. Would they have been able to find out if you were a police officer?

A. Yes, sir.

Q. Okay. So, after they run this CLETS, Officer Paraskevopoulos informed Officer Farley of what?

A. That I was confidential.

Q. And how many years of law enforcement experience do you have in total, sir?
A. Twenty-two plus.
Q. So, in your 22 plus years of law enforcement experience a address or name that comes back confidential would lead you to reasonably conclude what?
A. That the person involved is a police officer of some sort or has some kind of a -- it's a person who's connected with law enforcement.
Q. Okay. Now, Officer Farley finds out that you're thing comes back confidential, what else happened or what happened next?
A. Officer Farley tells Officer Paraskevopoulos, "I don't know, is that true or not? I don't -- never seen that badge before or that ID before."
Q. Did you request Officer Farley to make a Police Report at that moment?
A. Yes, sir.
Q. And what was Officer Farley's response to you?
A. He told me that he wasn't going to make a Police Report.
Q. Did you press the issue with him?
A. Yes, I did.
Q. What was his response when you pressed the issue?
A. He told me that if he makes a Police Report he was

going to arrest me.

Q. What happened after that?

A. I told Officer Farley that I was glad that I have civil rights.

Q. What happened next?

A. I elected to use a taxicab that had pulled to the area and when he released me, took the handcuffs off, I -- returned my weapon and gave the magazine to Maria Elena, I told Officer Farley that I was going to the Denny's close by, and if he had any questions or any concerns he could come, I'll be there.

Q. Was it your understanding that you were unable to -- to end this contact with the officer?

A. Oh, yes.

Q. Were you able to move about of your own free will?

A. No, I was handcuffed.

Q. Was it your understanding that you had been arrested?

A. Yes, sir.

Q. Were you advised of rights at any time during this encounter?

MS. BROWN: Objection. It seems like we're going right back into the other stuff that has nothing to do with the instant case --

MR. OCASIO: It has everything --

MS. BROWN: -- before the Board.

MR. OCASIO: -- to do with the line of questioning,

what he thought when he's handcuffed. We are working on the issue of he was detained. Nobody could define what was detained. All I'm ask --

ADMINISTRATIVE JUDGE ELLISON: Well, you can ask him if they gave him his rights, and which you have done.

MR. OCASIO: Yeah, I mean it's -- did you believe you were arrested?

THE APPELLANT: Yes.

ADMINISTRATIVE JUDGE ELLISON: He said yes.

MR. OCASIO: Fine, then we can move on from that point.

BY MR. OCASIO:

Q. Okay. So, you've now left the scene, you're at the Denny's.

A. Yes, sir.

Q. Why did you take a cab to go to the Denny's?

A. Because I felt by the statement that Officer Farley made that if I get behind a wheel, surprise, here we are, get pulled over, whatever.

Q. Now, if you are arrested and -- well, first of all if you are arrested by a police officer, what's going to happen to you if you've been arrested for drunk driving or whatever the offense is? How would they process you?

MS. BROWN: Objection. Relevance.

ADMINISTRATIVE JUDGE ELLISON: What I'm -- I'm sorry.

The question is what would happen to him if he were --

MR. OCASIO: Yeah.

ADMINISTRATIVE JUDGE ELLISON: -- arrested for drunk driving?

BY MR. OCASIO:

Q. If the officer arrested, you're now in handcuffs, and he's not going to release you, what would have happened to you that evening?

A. I would have been booked in the County Jail.

Q. Upon arrival at the County Jail how would they have processed you?

MS. BROWN: Again objection. Relevance.

MR. OCASIO: The relevancy --

ADMINISTRATIVE JUDGE ELLISON: Okay. I agree it's not -- doesn't seem to be relevant, but I'd prefer to just --

MR. OCASIO: Yeah, it's --

ADMINISTRATIVE JUDGE ELLISON: -- ask the question. So --

MR. OCASIO: Would they have processed --

ADMINISTRATIVE JUDGE ELLISON: -- the question is if, in fact, they had arrested him and taken him --

MR. OCASIO: To the County Jail.

ADMINISTRATIVE JUDGE ELLISON: -- to the station or to jail?

/////

BY MR. OCASIO:

Q. Would they -- how would they have processed you at the County Jail?

A. Well, depending on the county that you operate on, blood, urine specimens will be drawn.

Q. Okay. Why do you think Farley didn't arrest you?

A. 'Cause I wasn't drunk.

Q. What would have happened to this arrest for being drunk in public if they would have drawn samples and you did not have legal levels of being under the influence or whatever they alleged you were?

A. They would have dropped charges, let me go.

Q. Okay. So, what happens after that? Now, this incident is over, you're on your home. What happened on the job?

ADMINISTRATIVE JUDGE ELLISON: I'm sorry. On the job?

MR. OCASIO: On the job.

BY MR. OCASIO:

Q. How did the Agency find out about this incident and what happened from there?

A. I prepare a lawsuit against the establishment, the security guard, and the City of Redwood City. Those copies of the lawsuit were -- were faxed to my department.

Q. What happened after that?

A. I get called in by Mr. Mike Lewis, Captain Gaston, and

Lieutenant James, and where Mr. Lewis told me that there were some irregularities that have transpired and that he was checking into. He told me that he need to take my weapon, take my badge. And he says that I was to show that day to work in uniform, no weapon.

Q. What happened after that?

A. After that I was placed on administrative leave.

Q. After you were placed on administrative leave what happened?

A. I was terminated from employment.

MR. OCASIO: No further questions, Your Honor.

ADMINISTRATIVE JUDGE ELLISON: Okay. Ms. Brown?

CROSS-EXAMINATION

BY MS. BROWN:

Q. California law prohibits smoking in bars and restaurants, right?

A. That's correct.

Q. And you knew the club policy was no smoking, correct?

A. Correct.

Q. And you were a police officer at that point, correct?

A. Correct.

Q. But yet you were going to smoke anyway?

A. I didn't say I was going to smoke anyway.

Q. I believe that you testified that you wanted to check with Rudy and see if it was okay and then you would have gone

ahead and smoked had it been okay.

A. Because on previous occasions when I was at the bar Rudy okayed for us to smoke at the bar.

Q. Well, we've already established that it's against the law regardless of what Rudy says, correct?

A. That's correct.

Q. Okay. If you're a police officer and you're involved in an off-duty disturbance and you get handcuffed, regardless of your actions do you think that you should be released once they identify you as a cop?

A. If there was no merit to the call, yes.

Q. Were you in uniform the night that you were at the nightclub?

A. No, I was not.

Q. And the nightclub's not in your jurisdiction, right?

A. What do you mean by jurisdiction?

Q. The jurisdiction that you actually have when you're a DOD police officer.

A. I understand that my jurisdiction extends anywhere in the United States and its commonwealth or its territories.

Q. Your jurisdiction as a DOD police officer is the entire United States and the commonwealth and territories?

A. Yes, ma'am.

Q. And you said everybody at Flamingos knows you're a police officer?

A. Correct.
Q. And at some point isn't it true that your department had informed you that -- that you had been harassing and over-zealous to those you'd been dealing with?
A. There was complaints.
Q. Actually referring to performance evaluation, be at Agency Exhibit 4-P. I'll hand it to you. It's Agency 4-P. If you look on the first page, is that your signature next to your name?
A. 8/14?
Q. Yeah, it'll say --
A. It's my signature.
Q. -- maybe employee. That is your signature?
A. Yes, ma'am.
Q. Okay. And on that second page, let me find the line for you. Says, "That you have a problem at times with conforming and accepting the changes and policies of the department to the point of seeming harassing and over-zealous to those you have -- to those has dealing with." It's not well written, but is that correct? It's the second sentence. I believe it starts with, "But I'm not certain . . ." Is that correct?
A. It's in the statement.
MS. BROWN: If you'll give me just a few seconds here to get my Agency exhibit.

A. Yes, ma'am.

Q. You didn't pay a cover charge the night of the 14th when you went in, did you?

A. I didn't.

Q. And you didn't get searched that night?

A. No, I wasn't.

Q. So, again you didn't get searched 'cause you're a police officer?

A. No.

Q. The handgun that was taken from you at Flamingos, that was your personal weapon, right?

A. Yes, it was.

Q. Okay. And am I correct in making sure that you did show the Redwood City Police Officers your identification that night?

A. They removed my wallet from my person.

Q. And then you said you wanted to talk to Officer Farley in person as well?

A. Yes.

Q. And you tried to talk to him in private?

A. Yes.

Q. But he didn't want to.

A. Correct.

Q. Okay. And you're aware that as a DOD police officer you are not permitted to abuse your position, correct?

Q. You received the Notice of Proposed Removal on April the 20th, correct?
A. Can I see that?
Q. Sure, not a problem. It's Agency 4-C, Charlie.
A. This look familiar.
Q. In that proposed removal in Paragraph 3 it says that you have the right to reply to this proposed action orally, in writing, or both to Commander Scott Smith, and to submit affidavits or other evidence to support your reply. It also says that in Paragraph 4, the material on which this notice is based will be made available to you or your representative on your request.
MR. OCASIO: Objection.
Q. It's Paragraphs 3 and 4.
MR. OCASIO: Objection.
ADMINISTRATIVE JUDGE ELLISON: You're objecting to the proposal notice?
MR. OCASIO: I'm objecting to -- to the question. We specifically --
ADMINISTRATIVE JUDGE ELLISON: Well, wait a minute. First of all I don't think there is a question yet. She's read a paragraph from the --
MR. OCASIO: I understand.
ADMINISTRATIVE JUDGE ELLISON: -- proposal notice.
MR. OCASIO: And because I did not have a chance to

raise this issue with Commander Smith yesterday, although they informed the Appellant and myself that we had the right --

ADMINISTRATIVE JUDGE ELLISON: Yeah, well, you know, I mean --

MR. OCASIO: Sorry, but --

ADMINISTRATIVE JUDGE ELLISON: No, I mean, you know, whatever your point is I'm going to let you make it, but there's -- first of all there's no question yet, so I'm not sure -- I think we can probably predict what it's going to be, but let's --

MR. OCASIO: Yeah.

ADMINISTRATIVE JUDGE ELLISON: You'll have an opportunity to talk to Mr. Lugo again. Okay. Go ahead.

MS. BROWN: Give you a second to read that.

THE APPELLANT: The third you say?

MS. BROWN: It's Paragraph 3 and 4.

THE APPELLANT: Okay.

BY MS. BROWN:

Q. I just want to make sure you said that you received this. Did you ever take advantage of the opportunity to reply to this proposed action orally?

A. I believe I replied to that.

ADMINISTRATIVE JUDGE ELLISON: I'm sorry. So, you believe you what, you believe you replied to the Notice of Proposed Removal?

THE APPELLANT: I replied to it, yes, in -- in writing.

ADMINISTRATIVE JUDGE ELLISON: In writing?

THE APPELLANT: Yes, sir.

ADMINISTRATIVE JUDGE ELLISON: Okay.

BY MS. BROWN:

Q. You replied to this in writing to Commander Smith within the 10 days required?

A. Yes, I believe so.

Q. Could you identify for me in any of these materials where your written reply is?

A. No, I can't. And if I may, you know, we requested information from HRO, Michele Johnson. We -- I provided information to Commander Smith and I don't know if that information is there or not, but I believe I responded to that proposed termination.

Q. I understand that you believe that, but it would be helpful for me if you could point out somewhere in the materials that we have where that written reply would be, because we've had testimony that there wasn't one.

A. Well, I don't know what you have in your records.

MS. BROWN: I think that's all I have.

MR. OCASIO: I have --

ADMINISTRATIVE JUDGE ELLISON: Okay.

MR. OCASIO: -- a few redirects.

REDIRECT EXAMINATION

BY MR. OCASIO:

Q. Do you recall going to HRO in San Bruno and obtaining a copy or sticker that was on the computer at the police gate?

A. Yes, sir.

Q. Do you remember what that sticker said?

A. It was a Hot Flash sticker that indicates that I wasn't to be allowed at the Hunters Point or San Bruno locations.

ADMINISTRATIVE JUDGE ELLISON: Okay. I need to clarify what this means exactly. You went to --

MR. OCASIO: We went --

ADMINISTRATIVE JUDGE ELLISON: Okay. I just want to understand what he said. You went to San Bruno.

MR. OCASIO: We went -- I accompanied him to San Bruno to respond.

ADMINISTRATIVE JUDGE ELLISON: And got a sticker?

MR. OCASIO: There was a -- there was a small yellow post-it on the computer screen at the police gate.

ADMINISTRATIVE JUDGE ELLISON: The police gate? That's sort of -- that's kind of like a --

MR. OCASIO: When you go to San Bruno you have to go into the --

THE APPELLANT: Yes.

MR. OCASIO: Pass an ID to get a sticker to pass

through the gate to get on the Base. We were going to respond specifically to -- to this, requesting the documents of the investigation, the proposed removal --

ADMINISTRATIVE JUDGE ELLISON: Okay. I'm just --

MR. OCASIO: -- and the exhibits.

ADMINISTRATIVE JUDGE ELLISON: I'm sorry to interrupt, but I'm just trying to figure out. I just want to get the terminology right.

MR. OCASIO: Yeah.

ADMINISTRATIVE JUDGE ELLISON: And then Mr. Lugo can continue his explanation, his testimony.

MR. OCASIO: So --

ADMINISTRATIVE JUDGE ELLISON: Not yours.

MR. OCASIO: The post-it was the Hot --

ADMINISTRATIVE JUDGE ELLISON: So, he found there was -- okay. So, there was a post-it on the computer in like a guard shack or something like that.

MR. OCASIO: Yes.

ADMINISTRATIVE JUDGE ELLISON: Okay. And the -- and the post-it said what?

THE APPELLANT: That I wasn't to be allowed entry in through the San Bruno or Hunters Point shipyard.

ADMINISTRATIVE JUDGE ELLISON: Okay.

THE APPELLANT: I believe it was something else, sir, like -- I don't see it in front of me.

ADMINISTRATIVE JUDGE ELLISON: Okay.

BY MR. OCASIO:

Q. You requested the exhibits or the attachments or the -- the information that was supporting this document, the proposed removal?

A. I believe so, sir.

Q. Did you get any response to that request?

A. No, I didn't.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, to whom did he make the request and how? In writing, verbally?

BY MR. OCASIO:

Q. Okay. Did you request -- who did you make the request to?

A. HRO, Michele Johnson, and Commander Smith office.

Q. Okay.

ADMINISTRATIVE JUDGE ELLISON: In writing, verbally, how?

THE APPELLANT: Verbally, and believe I wrote something in paper, too.

MR. OCASIO: Okay.

ADMINISTRATIVE JUDGE ELLISON: Which you then -- I'm sorry.

MR. OCASIO: No, I'm just --

ADMINISTRATIVE JUDGE ELLISON: But this is information that I'm going to need, obviously.

# EVANGELISTA LUGO

V

# DEPARTMENT OF THE NAVY

MERIT SYSTEMS PROTECTION BOARD
SAN FRANCISCO REGIONAL OFFICE
CASE SF-0752-00-0499-I-1

# EXHIBIT

# 11

EXAMINATION BY JUDGE
PAGES 94 TO 98

EXAMINATION

BY ADMINISTRATIVE JUDGE ELLISON:

Q. So, you'd say both, you think verbally and writing? So, let's --

A. When we were denied entry at -- at the Base, yes, sir.

Q. Okay. Wait a minute. When did you make verbal request of either Ms. Johnson or somebody in Commander Smith's office for anything?

A. We went to San Bruno to get this information. We were denied. Actually me, I was denied entry according to the sticker that was at the gate.

Q. Was there somebody at the gate or was it just --

A. There was --

Q. -- a computer with a sticker?

A. There was a police officer at the gate, Police Sergeant, Sergeant Stickles I believe.

Q. Okay. And you saw this sticker? You saw this post-it?

A. I was standing right there and I saw it.

Q. Okay. And did you talk to the police officer on duty there?

A. Yes, I did, sir.

Q. Okay. And what did you tell him, what did he tell you?

A. I'm here to talk to somebody in HRO and he told me,

"You can't because there was a sticker that says you cannot enter any our facilities."

Q. Okay. So, then --

A. Meaning San Bruno and Hunters Point.

Q. Okay. So, then you left?

A. Yes, sir.

Q. Okay. And then so when did you make a verbal or oral request of anybody for anything?

A. I don't recall if it was the same day or shortly after that.

Q. So, what, you personally called this Ms. Johnson in HRO?

A. Yes, sir.

Q. And said what?

A. That I wanted to respond to the proposed removal and I need to speak to her, and never got a call back.

Q. Okay. You spoke to her per -- I mean --

A. No, sir.

Q. -- directly on the phone?

A. It's a answering machine.

Q. So, you left a message for --

A. Yes, sir.

Q. -- at HRO for this Ms. Johnson?

A. Michele Johnson.

Q. Okay. And you said you wanted to?

A. Address the proposed removal.
Q. Okay. Did you say --
(Off the record.)
COURT REPORTER: Go ahead.

BY ADMINISTRATIVE JUDGE ELLISON:

Q. Did you say you wanted to come in to talk to somebody? Or did you say you wanted them --
A. No, I didn't. My -- my message was to get hot -- information that's hot or get to respond to this proposed removal, and that I didn't get a call from her so I called Commander Lewis' office, and that was it.
Q. Commander Lewis or Commander Smith?
A. I'm sorry, Commander Smith.
Q. You called -- okay. So, you called Commander Smith's office?
A. Yes, sir.
Q. And who did you speak to there?
A. A recorder, sir.
Q. And you left a message saying what?
A. That I want to respond within the time prescribed to the proposed removal and I wanted to be contacted back.
Q. Okay. And then you said you thought you also did make such a request in writing; is that correct?
A. I believe so. I'm not sure.
Q. You're not sure. You don't -- do you remember sending

it to any particular office or address or person?

A. I believe it was Commander -- I mean, yeah, Commander Lewis -- Smith.

Q. Commander Smith.

A. It's kind of hard. Mr. Lewis was wearing Commanders, you know, ribbons so --

ADMINISTRATIVE JUDGE ELLISON: Okay. Go ahead.

BY MR. OCASIO:

Q. Did you request any of the exhibits or attachments or any investigation that -- that was done that supported this notice of this proposed removal?

A. Yes, sir. I requested reports, the notes, whatever they had available.

Q. Did they ever provide it?

A. No.

ADMINISTRATIVE JUDGE ELLISON: Okay. Now, once again, is this part of the content of the message that you left on these answering machines or is this is a different request for materials?

THE APPELLANT: No, this is in referring -- in reference to the proposed removal, Your Honor.

ADMINISTRATIVE JUDGE ELLISON: I know, but Mr. Ocasio's question was did you request documents, background documents, investigation, et cetera, et cetera? How did you make that request and to whom?

THE APPELLANT: I believe I made that by writing and it was to Commander Smith.

ADMINISTRATIVE JUDGE ELLISON: Okay. Did you keep a copy of that written request?

THE APPELLANT: I might have.

ADMINISTRATIVE JUDGE ELLISON: Okay. All right, Mr. Ocasio.

MR. OCASIO: Okay. That's it, Your Honor. I'm finished with my redirect.

ADMINISTRATIVE JUDGE ELLISON: That's it. Okay.

MR. OCASIO: Okay.

ADMINISTRATIVE JUDGE ELLISON: All right. Ms. Brown, anything?

RECROSS EXAMINATION

BY MS. BROWN:

Q. So, you don't have a copy of your written request that apparently you sent?

A. I'm not sure.

Q. Okay. I'm a little confused because yesterday when Commander Smith was here your representative, Mr. Ocasio, indicated that he didn't -- that you didn't have time to make a reply, that there just wasn't enough time. And yet today you're telling me that you and Mr. Ocasio went -- tried to make a reply, were not permitted to do so because you couldn't get on the Base. Which one is true?

A. Which one you want to be true?

THE APPELLANT: Your Honor, the deal here is that now I'm lying, making this up, but when we went to San Bruno we weren't allowed to talk to Commander Smith, to HRO, because we were denied access. I was --

BY MS. BROWN:

Q. So, does that mean --

A. I was --

Q. Does that mean it is the case that Mr. Ocasio is incorrect when he said yesterday that you didn't have time to make an oral or written reply?

A. I don't know. I'm not sure on this.

Q. I don't know --

A. He's --

Q. -- how this could be unsure. Is it the case that you did not have time to make an oral or written reply?

A. If Mr. Ocasio says so, he's my representative, I believe whatever he say is the correct answer to that.

Q. But yet you're also telling me that you went to the gate and tried to make an oral reply in a timely manner.

A. Yes.

MS. BROWN: Okay. That's all I have.

ADMINISTRATIVE JUDGE ELLISON: Anything else, Mr. Ocasio?

MR. OCASIO: No.

ADMINISTRATIVE JUDGE ELLISON: Okay. All right. When -- outside, after you went outside with the two police officers on the night in question there, did you tell Officer Farley or the other officer that you had been beaten up?

THE APPELLANT: Yes, sir.

ADMINISTRATIVE JUDGE ELLISON: Who did you tell, Farley or the other one?

THE APPELLANT: Officer Farley when I asked him about the report.

ADMINISTRATIVE JUDGE ELLISON: When you -- okay.

THE APPELLANT: When I asked him to make a Police Report, that's when I -- I was attacked, I'm a federal police officer.

ADMINISTRATIVE JUDGE ELLISON: All right. So, did you -- okay. You asked him to write up a report because you had been beaten up?

THE APPELLANT: Yes, sir.

ADMINISTRATIVE JUDGE ELLISON: And he said he was not going to write a report.

THE APPELLANT: That's correct.

ADMINISTRATIVE JUDGE ELLISON: Unless --

THE APPELLANT: If he writes a report, he was going to put me in jail.

ADMINISTRATIVE JUDGE ELLISON: He writes a report, he'll put you in jail. Okay. Okay. All right. One last

round anybody?

MR. OCASIO: No, we're -- we're --

MS. BROWN: Pass.

ADMINISTRATIVE JUDGE ELLISON: Okay. All right. Thank you.

THE APPELLANT: Okay.

(Appellant excused.)

ADMINISTRATIVE JUDGE ELLISON: Okay. So, while we're still on the record we're going to -- I think we have on the record already that in seven days we're going to get anything else, written argument, any other supporting documentation or anything, regarding this whole issue that we discussed at some length about the motion to quash the subpoena to Mr. Carranza. And then, Mr. Ocasio, you also said yesterday that you were not going to pursue the subpoena regarding Mr. Gaston; is that correct?

MR. OCASIO: Yes, sir.

ADMINISTRATIVE JUDGE ELLISON: Okay. All right. And then, well, I will leave -- certainly I will leave the record open unless -- I mean not unless -- until we find out what's going to happen regarding Mr. Carranza one way or the other.

MR. OCASIO: Yes, sir.

ADMINISTRATIVE JUDGE ELLISON: I may -- I may contact both of you a little later about this idea of some alternative resolution of the subpoena matter along the lines that we

talked about. I mean actually I haven't made any decisions in that regard --

MR. OCASIO: Yes, sir.

ADMINISTRATIVE JUDGE ELLISON: -- but something that, you know, I may ask for input on that. And then do you think -- are there -- I don't think -- I mean as I say I'll leave the record open for the possibility of testimony from Mr. Carranza, but separate and apart from that I don't think I have any need for closing written briefs in this case unless either of you believes there's a strong desire or need for that. Any input from anybody?

MR. OCASIO: I'd like to submit closing arguments by brief. That way, I mean it's -- if it's merely just to preserve the fact that I submitted closing arguments in a brief, and we'll just -- we'll go from there.

ADMINISTRATIVE JUDGE ELLISON: Well, I mean if you want to do it, you can do it, but that's why I'm asking for the input.

MR. OCASIO: I would --

ADMINISTRATIVE JUDGE ELLISON: Okay.

MR. OCASIO: I would like to submit closing arguments --

ADMINISTRATIVE JUDGE ELLISON: Okay.

MR. OCASIO: -- in a brief.

ADMINISTRATIVE JUDGE ELLISON: Okay. Well, let me --

well, why don't we say that we'll not set a time. And then, Ms. Brown, do you have any --

MS. BROWN: Obviously, I'd --

ADMINISTRATIVE JUDGE ELLISON: I mean obviously you have --

MS. BROWN: Obviously, I'd prefer not to.

ADMINISTRATIVE JUDGE ELLISON: Yeah, well, I mean --

MS. BROWN: But if he does, I'm required to so --

ADMINISTRATIVE JUDGE ELLISON: Well, not by me you're not required to I mean.

MS. BROWN: Right, there are -- there are other people.

ADMINISTRATIVE JUDGE ELLISON: You answer to higher authority.

MS. BROWN: That's correct.

ADMINISTRATIVE JUDGE ELLISON: Okay. All right. Well, let's not set a time deadline for that now. Let me -- I'd rather wait and first get the whatever we're going to get regarding this subpoena for Mr. Carranza. Resolve that first and then, if appropriate, I'll let you know a time, a reasonable time limit for --

MR. OCASIO: No problem.

ADMINISTRATIVE JUDGE ELLISON: -- for the submission of closing briefs. Okay.

MR. OCASIO: Thank you.

ADMINISTRATIVE JUDGE ELLISON: All right. So, we've got everything then, got all the written documents? I think we do. Okay. All right. With all those caveats and conditions the hearing is adjourned. Thank you very much.

MS. BROWN: Thanks.

MR. OCASIO: Thank you, Your Honor.

(Whereupon, the hearing was adjourned at 1:00 p.m.)

---oOo---

**CERTIFICATE OF TRANSCRIPT**

I, Louise Howes, as the Official Transcriber, hereby certify that the attached proceedings before Administrative Judge Anthony L. Ellison of the Merit Systems Protection Board,

| | |
|---|---|
| In the Matter of:<br>EVANGELISTA LUGO,<br>Appellant,<br>v.<br>DEPARTMENT OF THE NAVY,<br>Agency. | Case No. SF-0752-00-0499-I-1 |

were held as herein appears and that this is the original transcript thereof and that the statements that appear in this transcript were recorded on audio tape and transcribed by me to the best of my ability.

I further certify that this transcript is a true and accurate record of the proceeding.

Louise Howes 11/19/00

Louise Howes (Date)